UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DONNA MANCHESTER and <br> NOEMIA CAMARA, <br> Individually, and on behalf of all others <br> similarly situated, <br><br> Plaintiffs, <br><br> VS. <br><br> MAIN STREET TEXTILES, L.P., <br> JOAN FABRICS SERVICES, LLC and <br> JOAN FABRICS CORPORATION, <br><br> Defendants. | C.A. NO. 04-10439 RCL |

## MEMORANDUM IN SUPPORT OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The defendants, Main Street Textiles, L.P. ("Main Street" or the "Company"), Joan Fabrics Services, LLC and Joan Fabrics Corporation (collectively, the "Defendants") are entitled to summary judgment on all counts in this matter. The undisputed facts demonstrate that plaintiffs, Donna Manchester and Noemia Camara (collectively, the "Plaintiffs")[1], were laid off in September and October 2003, more than one month before the "mass layoff" that triggered Main Street's obligations under the Worker Adjustment and Retraining Notification Act ("WARN" or the "Act"); therefore, they are not entitled to any back pay under the Act, and the Defendants are entitled to summary judgment on the WARN Act claims as a matter of law.

Nor are the Plaintiffs entitled to "vacation pay," as demanded in the count styled as a "state law" claim.[2] The Defendants are entitled to summary judgment on the claims for vacation

---

[1] Although the Plaintiffs purport to bring this action as a class action, they have not moved to certify a class.

[2] This claim is presumably brought under the Massachusetts Wage Act, M.G.L. c. 149, § 148.

pay for two reasons. First, there is no evidence in the record that the Plaintiffs satisfied the statutory prerequisites established by M.G.L. c. 149, § 150 before pursuing their claim under the Wage Act. Second, even if they had complied with the statute, the Plaintiffs have no entitlement to "vacation pay," under the undisputed facts of this case because these payments were only made to those persons actually employed by Main Street during its week-long annual work stoppage between the Christmas and New Year's Holidays in December 2003, as set forth in the express terms of Main Street's vacation pay policy. Because the Plaintiffs were not then employed by Main Street, they were not entitled to be paid for that period when the plant closed. Based on the undisputed facts in the record, the Defendants are entitled to summary judgment on the Plaintiffs' claims for vacation pay as a matter of law as well.

## STATEMENT OF UNDISPUTED FACTS

Main Street was formed in 1996 as part of the Tyng Textiles Group, a subsidiary of Joan Fabrics Corporation. See Deposition of Penny Richards ("Richards Dep.") at 6:14-17, 8:8-9:12.[3] Until it closed in April, 2004, Main Street operated a weaving plant in Fall River, Massachusetts, that produced and supplied decorative fabrics for the home furnishing and contract industries.

### Main Street's Decline in Productivity

Main Street's Fall River facility experienced a decline in productivity after the events of September 11, 2001 as a result of a downturn in the United States economy generally, and in the home furnishings market in particular. See Defendant Main Street Textiles, L.P.'s Response to Plaintiffs' Interrogatories[4]; Deposition of Edward DiPetrillo ("DiPetrillo Dep.") at 33:19-34:15,

---

[3] The relevant excerpts of the Richards Dep. are attached to the Defendants' Local Rule 56.1 Statement as Ex. 1. All other Exhibits referred to in this Memorandum are likewise attached to the Defendants' Local Rule 56.1 Statement (the "Statement") and are referred to as "Ex. __".

[4] Defendant Main Street Textiles, L.P.'s Response to Plaintiffs' Interrogatories is attached to the Statement as Exhibit 2.

40:12-41:1[5]; Ex. 1 at 18:12-20.  These productivity problems became more acute in the Spring of 2003, and progressed through the Summer of 2003, forcing Main Street to reorganize its workforce and lay off employees.  See Ex. 2; Ex. 3 at 43:9-44:8; Ex. 1 at 18:18-20.  By September 7, 2003, Main Street had reduced its workforce to 348 full-time employees and one part-time employee.  See Affidavit of Lou-Ann Laporte ("Laporte Aff.") at ¶ 2, attached to the Statement as Ex. 4.

The Plaintiffs were included among the employees Main Street laid off in accordance with its seniority system of layoffs because of then existing market conditions.  See Layoff Policy, a copy of which is attached to the Statement as Ex. 5.  Specifically, Main Street laid off Ms. Camara on September 28, 2003 and Ms. Manchester on October 3, 2003.  See Ex. 2 at Ex. B.[6]

On or about October 10, 2003, Main Street determined that it would likely have to close the plant at some point.  See Ex. 3 at 55:16-23 (Company principals decided to close the plant "maybe a week before [the October 17, 2003 WARN Notice] at the most"); see also id. at 35:4-7, 35:17-24; Ex. 1 at 24:3-21; Cf. Deposition of Lou-Ann Laporte ("Laporte Dep.") at 13:5-13 (Main Street's Human Resources Manager testified that she was not informed of the proposed shut down until the October 17, 2003 WARN notice was actually posted).[7]  By letter dated October 17, 2003 (the "WARN Notice"), Main Street notified its active employees (and inadvertently some former employees who were recently laid off) that it intended to permanently

---

[5] The relevant excerpts from the DiPetrillo Dep. are attached to the Statement as Ex. 3.

[6] Defendant Main Street Textiles, L.P.'s Response to Plaintiffs' Interrogatories contains, as its Ex. B, a list of employees who were laid off prior to October 17, 2003.

[7] The relevant excerpts from the Laporte Dep. are attached to the Statement as Ex. 6.

close its Fall River plant by April 30, 2004. Specifically, the WARN Notice provided as follows:

> The Company regrets to inform you that Main Street Textiles has made the decision to permanently discontinue its manufacturing operations in Fall River. As a result, the Company expects the plant to close permanently by April 30, 2004. The first separations are expected to occur on or about October 17, 2003. Employees will be laid off at various times subject to the availability of work. Unfortunately, the Company does not know the exact dates that individual employees will be laid off and would like to delay lay offs as long as possible depending on the availability of work. If you are laid off prior to the expiration of the 60 day WARN Act notice period, the Company will continue your pay and benefits for the full 60 day notice period.

WARN Notice, a copy of which is attached to the Statement as Ex. 7.[8]

As contemplated by the WARN Notice, and prior to the plant closing on April 30, 2004, Main Street began permanently laying off groups of employees after the October 17, 2003 notice. See Ex. 2 at Ex. C.[9] On November 6, 2003, Main Street permanently laid off 36 employees. See id. The Company permanently laid off 67 additional employees on November 7, 2003. See id. It permanently laid off two more employees on November 14, 2003, one employee on November 21, 2003 and one more on November 28, 2003. See id. Finally, Main Street permanently laid off eight employees on December 2, 2003 and three employees on December 5, 2003. See id. Between November 6, 2003 and December 5, 2003, a total of 118 employees were laid off. See id. This was more than one-third of Main Street's workforce, thereby qualifying it as a "mass layoff" under the Act. See id. The mass layoff between

---

[8] On October 17, 2003, as required by the Act, Main Street also provided notice of its anticipated plant closing to the Mayor of Fall River, Edward M. Lambert, Jr., see letter to Mayor Lambert, a copy of which is attached to the Statement as Ex. 8, and to Jonathan Raymond of the Commonwealth Corporation, the entity designated by the Commonwealth of Massachusetts as the state dislocated worker unit. See Letter to Jonathan Raymond, a copy of which is attached to the Statement as Ex. 9.

[9] Defendant Main Street Textiles, L.P.'s Response to Plaintiffs' Interrogatories contains, as its Ex. C, a list of employees who were laid off between October 17, 2003 and April 30, 2004.

November and December 2003, triggered Main Street's obligations under the Act to those employees who were terminated as part of the mass layoff.

Additional layoffs followed those of November and December 2003.  <u>See id.</u>  Main Street permanently closed the Fall River plant on April 30, 2004.  <u>See id.</u>; Ex. 3 at 42:16-19.

### Main Street's "Vacation" Policy

Main Street historically shut down its manufacturing facility for one week in July and one week in December each year.  <u>See</u> Defendant Main Street Textiles, L.P.'s Supplemental Response to Plaintiffs' Interrogatories, a copy of which is attached to the Statement as Ex. 10. Production Hourly Associates were eligible for paid time off during those work stoppages, referred to as "vacation pay" under the Company's policy, so long as they were on the active payroll at the time of the stoppage, which was referred to as "vacation time".  <u>See</u> Production Hourly Vacation Pay Policy, a copy of which is attached to the Statement as Ex. 11 ("An Associate must be employed at vacation time or on an approved medical leave of absence to receive vacation pay, or unless they return prior to their next scheduled shift.");  Ex. 3 at 92:21-93:3, 96:7-10; Ex. 6 at 57:2-7, 59:5-13; Ex. 1 at 63:20-64:2.  Main Street's policy also states that "[n]ew associates must have worked prior to the last week in May to be eligible for vacation pay during the July 4th vacation and prior to the last week in November to be eligible for vacation pay during the Holiday vacation [*i.e.*, the last week of December between Christmas and New Year's]." Ex. 11; Ex. 3 at 93:4-12, 94:4-8.  Employees who were laid off prior to the work stoppages and not recalled by December 31 of the year of layoff were not eligible for vacation pay.  <u>See</u> Ex. 5.

Employees were not paid the same amount of vacation pay during the work stoppage. <u>See</u> Ex. 11.  Rather, Main Street computed the amount of any particular employee's vacation pay

based upon the employee's seniority and total earnings for the preceding six months.  See id. Pursuant to the express terms of the written policy, vacation time did not accrue.  See id.; see also Ex. 6 at 60:13-61:21; Ex. 1 at 61:4-14.

Although Plaintiffs assert a claim for vacation pay in this action, they do not allege in their Complaint, and they have produced no evidence to demonstrate, that they filed a complaint with the Attorney General's Office against Main Street based on their purported Wage Act claims, as the Massachusetts statutory framework requires.  Nor do they allege that they otherwise obtained permission from the Attorney General to pursue their claim for vacation pay in this action.

## ARGUMENT

To avoid summary judgment, the Plaintiffs must identify specific evidence in the record showing that there is a genuine dispute of a material fact that must be resolved at trial.  They may not simply rest on the allegations or denials in the pleadings.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).  A fact is material if it affects the outcome of the litigation under the governing law.  Anderson, 477 U. S. at 248.  A dispute is genuine if a fair-minded jury could return a verdict on the evidence presented.  Id. at 252;  see also Rogers v. Fair, 902 F.2d 140, 143 (1st Cir. 1990) (where evidence is merely colorable or is not significantly probative, summary judgment is warranted).  If the non-movant fails to meet its burden, summary judgment is appropriate.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The record in this case demonstrates that there is no genuine dispute of material fact in connection with the Plaintiffs' claimed WARN Act violations or their state law Wage Act claims for vacation pay, and the Defendants are entitled to summary judgment as a matter of law.

**A. The Plaintiffs' WARN Act Claims Fail as a Matter of Law.**

**1. The Plaintiffs' Employment was Terminated Prior to Main Street's "Mass Layoff"; Therefore, They Were Not Entitled to Notice (or the Equivalent Amount of Pay) Under the Act.**

The Plaintiffs were not entitled to any WARN notification (or the back pay and continuation of benefits that they now seek to have paid for a 60 day period) because they were laid off well in advance of the "mass layoff" that took place during the 30-day period from November 6, 2003 through December 5, 2003 and the "plant closing" that occurred on April 30, 2004. The Act provides benefits for those employees who suffer an employment loss as part of a mass layoff or plant closing, each of which is defined by the Act. Because the Plaintiffs' employment loss was not part of the mass layoff or actual plant closing, they simply are not entitled to any relief.

The WARN Act requires covered employers[10] to provide at least 60 days notice of a "plant closing" or "mass layoff" to employees affected by the plant closing or mass layoff.[11] See 29 U.S.C. § 2102; 20 CFR §§ 639.2, 639.6. The purpose of this provision is "to ensure that 'workers receive advance notice of plant closures and mass layoffs that affect their jobs.'" Kildea v. Electro – Wire Products, Inc., 144 F.3d 400, 405 (6th Cir. 1998) quoting Marques v. Telles Ranch, Inc., 131 F.3d 1331, 1333 (9th Cir. 1997). Covered employers who fail to provide the requisite notice may be liable to affected employees for back pay and benefits for each

---

[10] Main Street does not dispute that it is a "covered employer" under the Act because it employed at least 100 employees at or about the time that it was required to provide WARN notification to affected employees. See 29 U.S.C. § 2101.

[11] The Act also requires notice to the State or dislocated worker unit designated by the State to provide rapid response activities under 29 U.S.C. § 2864(a)(2)(A) and the chief elected official of the local government unit in which the closing or layoff is expected to occur. On October 17, 2003, in accordance with the Act, Main Street provided notice of its anticipated plant closing (scheduled for April 30, 2004) to the Mayor of Fall River, Edward M. Lampert, Jr., see Ex. 8, and to Jonathan Raymond of the Commonwealth Corporation, the entity designated by the Commonwealth as the state dislocated worker unit. See Ex. 9. The Plaintiffs do not appear to dispute that notice was given to Messrs. Lampert and Raymond in compliance with WARN.

calendar day that they fail to give such notice. <u>See</u> 29 U.S.C. § 2104(a)(1); <u>Siniscalchi v. Shop-Rite Supermarkets, Inc.</u>, 903 F. Supp. 182, 192 (D. Mass. 1995).

Under the Act, the term "plant closing" is defined as:

> the permanent or temporary shutdown of a single site of employment, or one or more facilities or operating units within a single site of employment, if the shutdown results in an employment loss at the single site of employment during any 30-day period for 50 or more employees excluding part-time employees.

29 U.S.C. § 2101(a)(2); <u>see also</u> 20 CFR § 639.3(b).

WARN defines a "mass layoff" as a reduction in force which:

(A) is not the result of a plant closing; and

(B) results in an employment loss at the single site of employment during any 30-day period for —

    i. at least 33 percent of the employees (excluding any part-time employees); and

    ii. at least 50 employees (excluding any part-time employees); or

    iii. at least 500 employees (excluding any part-time employees).

29 U.S.C. § 2101(a)(3); <u>see also</u> 20 CFR § 639.3(c). The term "employment loss" means:

(A) an employment termination, other than a discharge for cause, voluntary departure, or retirement,

(B) a layoff exceeding 6 months, or

(C) a reduction in hours of work of more than 50 percent during each month of any 6-month period.

29 U.S.C. § 2101(a)(6); <u>see also</u> 20 CFR § 639.3(f).

The undisputed facts demonstrate that the Main Street facility in Fall River experienced a decline in productivity after the events of September 11, 2001 as a result of a downturn in the United States economy generally, and in the home furnishings market in particular. <u>See</u> Ex. 2; Ex. 3 at 33:19-34:15, 40:12-41:1; Ex. 1 at 18:12-20. These productivity problems became more

acute in the Spring of 2003, and progressed through the Summer of 2003, forcing Main Street to reorganize its workforce and lay off employees. See Ex. 2; Ex. 3 at 43:9-44:8; Ex. 1 at 18:18-20. The Plaintiffs were included among the employees Main Street laid off in accordance with its seniority system of layoffs because of then existing market conditions. See Ex. 5. Specifically, Main Street laid off Ms. Camara on September 28, 2003 and Ms. Manchester on October 3, 2003. See Ex. 2 at Ex. B.[12]

Although none of the lay-offs initiated by Main Street through October 2003 were large enough to implicate WARN, it became apparent to management by the second week of October 2003 that Main Street's Fall River facility may ultimately have to close. See Ex. 2. Company principals first discussed closing the plant "maybe a week before [the October 17, 2003 WARN Notice] at the most." Ex. 3 at 55:16-23; see also id. at 35:4-7, 35:17-24; see Ex. 1 at 24:3-21.

As soon as the Company decided that it would in fact close the plant, Main Street notified its active employees that it intended to permanently close its Fall River plant by April 30, 2004. See Ex. 2 at Ex. E.[13] Specifically, the WARN Notice, dated October 17, 2003, provided as follows:

> The Company regrets to inform you that Main Street Textiles has made the decision to permanently discontinue its manufacturing operations in Fall River. As a result, the Company expects the plant to close permanently by April 30, 2004. The first separations are expected to occur on or about October 17, 2003. Employees will be laid off at various times subject to the availability of work. Unfortunately, the Company does not know the exact dates that individual employees will be laid off and would like to delay lay offs as long as possible depending on the availability of work. If

---

[12] The Plaintiffs do not allege that the layoffs resulted in the effective cessation of production at Main Street, or a plant closing, at that time.

[13] WARN Notices were also inadvertently sent to some of the employees who had already been laid off, including Ms. Manchester. See Ex. 2 at Ex. E. However, because Ms. Manchester was not laid off as part of the actual plant closing or mass layoff, Main Street had no legal obligation to provide her with any notice or the equivalent amount of pay under the Act.

> you are laid off prior to the expiration of the 60 day WARN Act
> notice period, the Company will continue your pay and benefits for
> the full 60 day notice period.

Ex. 7. The plant did in fact close permanently on April 30, 2004, which was the date of the "plant closing," as defined in Section 2101(a)(2) of the Act. See Ex. 3 at 42:16-19. Although Main Street issued the WARN Notice on October 17, 2003 (which provided ample notice of the April 30, 2004 plant closing), the actual layoffs that triggered the mass layoff notice requirements under the Act took place during the 30-day period between November 6, 2003 through December 5, 2003.

Main Street's layoffs within the 30-day period between November 6, 2003 and December 5, 2003 constituted a "mass layoff" under the Act because Main Street laid off in excess of 50 employees and more than one-third of its work force during that period. See 29 U.S.C. § 2101(a)(3); 20 CFR § 639.3(c). On November 6, 2003, Main Street permanently laid off 36 employees. See Ex. 2 at Ex. C. Main Street permanently laid off 67 additional employees on November 7, 2003. See id. Main Street permanently laid off two more employees on November 14, 2003 and one employee on each of November 21, 2003 and November 28, 2003. See id. Finally, Main Street permanently laid off eight employees on December 2, 2003 and three employees on December 5, 2003, for a total of 118 employees during the 30-day period between November 6, 2003 and December 5, 2003. See id. This figure was at least 33 percent of Main Street's workforce at the relevant time. See 29 U.S.C. § 2101(a)(3)(B); see also 20 CFR § 639.3(c). The Plaintiffs were **not** included among these layoffs; rather, they were laid off prior to the mass layoff and, indeed, prior to the issuance of the October 17, 2003 WARN Notice. See Ex. 2 at Ex. B, Ex. C. Each employee who was laid off as part of the mass layoff was paid for each day from the date of the layoff until 60 days from the date of the WARN Notice because

they were covered by the Act.  See Ex. 2.  The Plaintiffs were not covered under the Act by its own terms.

The relevant date for calculating Main Street's total number of employees for determining whether the layoffs of the November 6th to December 5th period were more than 33 percent of the workforce is the date on which the first notice is required to be given to those employees laid off within the statutory 30 day period, namely 60 days prior to the mass layoff.  See 20 CFR § 639.5(a)(2); Roquet v. Arthur Anderson, 2004 U.S. Dist. LEXIS, *7-8 (N.D. Ill. 2004); United Paperworkers Int'l Union, AFL-CIO, CLC, et al. v. Alden Corrugated Container Corp., et al., 901 F. Supp. 426, 436 (D. Mass. 1995).  When all employees are not terminated on the same date for the purposes of considering whether there has been a "mass layoff", the date of the first termination within the statutory 30 day period triggers the 60 day notice requirement.  See 20 CFR 639.5(a)(1).  Here, this "snapshot" of Main Street's employee roster should be taken 60 days prior to the first layoffs that were part of the mass layoff.  See Reyes, et al. v. Greater Texas Finishing Corp., et al., 19 F. Supp. 2d 717, 718 (W.D. Texas 1998).  Accordingly, the date on which the total number of employees is to be measured is 60 days prior to November 6, 2003, or September 7, 2003.[14]

On September 7, 2003, Main Street employed 348 full-time employees and one part-time employee.[15]  See Ex. 4 at ¶ 2.  Part-time workers are not counted as employees for purposes of determining coverage.  See 29 U.S.C. § 2101(a)(3)(B); 20 CFR § 639.3(c)(2).  One-third of Main Street's 348 member workforce as of September 7, 2003 was 116 employees.  Accordingly, the

---

[14] The "snapshot" date is not intended to broaden the scope of employees who are entitled to WARN notification.  Rather, the regulations make clear that, after determining the total number of employees as of the "snapshot date", only the first and each subsequent group of employees terminated within the period of the mass layoff are entitled to a full 60 days' notice under WARN.  See 20 CFR § 639.5.

[15] For WARN purposes, a part-time employee is one who is employed, on average, less than 20 hours per week or has been employed for fewer than six of the preceding twelve months.  See 29 U.S.C. § 2101(a)(8).

118 employees Main Street laid off between November 6, 2003 and December 5, 2003 exceeds the requisite 50 employees and 33 percent of Main Street's workforce as of the date notice would have been required. It therefore constitutes a mass layoff under the Act. See 29 U.S.C. § 2101(a)(3)(B); 20 CFR § 639.3(c).

That Main Street laid off only one employee on each of November 21, 2003 and November 28, 2003 does not change this analysis. Any employment loss within a 30-day period constitutes a group for purposes of WARN analysis, even if the layoff involves only a single employee on a single day. See Hollowell v. Orleans Regional Hospital, 217 F.3d 379, 383, 384 (5th Cir. 2000) (holding that a mass layoff had occurred even though many "groups" of layoffs involved only a single employee on a single day).

For the WARN Act to apply to the Plaintiffs, the numbers have to add up. In this case, they simply do not. Because the Plaintiffs were not part of the "mass layoff" or "plant closing," they were not entitled to notice and cannot collect the back pay they seek.

### 2. The WARN Act's Aggregation Rule Does Not Apply.

Recognizing that they are not covered by the express terms of the mass layoff or plant closing provisions of the Act, the Plaintiffs apparently contend that this Court should aggregate employment losses over the 90-day period prior to the mass layoff pursuant to Section 2102(d) of the Act and thereby include them as part of the mass layoff. This argument also fails as a matter of law.

WARN only provides for the aggregation of employment losses over a 90-day period if two pre-conditions are satisfied. First, the employment losses for 2 or more groups in a 30-day period must be less than the minimum number of employees specified in 29 U.S.C. § 2101(a)(3) to constitute a mass layoff - - i.e., 50 employees and 33% of the workforce. See 29 U.S.C. §

2102(d). Second, the losses over the 90-day period must exceed the 50 employees and 33% of the workforce thresholds set in Section 2101(a)(3). See id. "Clearly, Congress intended that Section 2102(d) [the 90-day aggregation rule] only applies if 2101(a)(2) [plant closing] or (3) [mass layoff] are not met." Roquet v. Arthur Anderson, 2004 U.S. Dist. LEXIS, 3909 *11-12 (N.D. Ill. 2004); see also United Paperworkers, 901 F. Supp. at 435 (only aggregating employment losses over 90-day period when layoffs fail to satisfy the requirements of § 2101(a)(3)); United Electrical, Radio and Machine Workers of America (UE) and UE Local 291 v. Maxim, Inc., 1990 U.S. Dist. LEXIS 5988, *8-9 (D. Mass. 1990) (refusing to aggregate employment losses over 90-day period because layoffs satisfied the requirements of § 2101(a)(2)). Here, Main Street's layoffs between November 6, 2003 and December 5, 2003 meet the requirements of 29 U.S.C. § 2101(a)(3) and constituted a mass layoff under the Act. Therefore, the 90-day aggregation scheme contained in § 2102(d) simply does not apply.

The Plaintiffs seem to suggest as an alternative argument that this Court should aggregate employment losses over the 90 days immediately preceding the issuance of the WARN Notice (*i.e.*, July 17, 2003 through October 17, 2003), for purposes of determining whether the Act applies to the Plaintiffs. Even if there were legal support for this position, which there is not, Main Street laid off an insufficient number of employees in the 90-day period preceding the issuance of the WARN Notice to exceed WARN's threshold. Between July 17, 2003 and October 17, 2003, Main Street initially laid off a total of 53 employees, of whom 15 were recalled and continued to work beyond October 17, 2003. See Ex. 2 at Ex. B, Ex. C. Accordingly, because 15 employees did not sustain a layoff exceeding six months, only 38 employees experienced an "employment loss" during the 90 days immediately preceding the WARN Notice, which is insufficient under WARN to constitute either a plant closing or a mass

layoff. See 29 U.S.C. §§ 2101(a)(2), (a)(3), (a)(6). In short, Main Street had no legal obligation under WARN to pay compensation to those 38 employees, including the Plaintiffs, during that period of time. Based on the undisputed facts of this case, and the express meaning of the relevant provisions of the Act, the Defendants are entitled to summary judgment on all claims under the WARN Act (Counts I and II).

### B. The Plaintiffs Have No Right To Receive "Vacation Pay" For Main Street's 2003 Holiday Work Stoppage.

#### 1. The Plaintiffs' Wage Act Claims Should be Dismissed Because They Failed to Satisfy the Statutory Prerequisites to Filing Suit.

The Plaintiffs are prohibited from maintaining their Wage Act suit because there is no evidence in the record to show that they filed a complaint with the Massachusetts Attorney General, or otherwise obtained written permission from the Attorney General to pursue their civil action. Mass. Gen. Laws c. 149, § 150 provides that a party may only bring a private claim based on a violation of the Massachusetts Wage Act, M.G.L. c. 149, § 148, at the expiration of 90 days after filing a complaint with the Attorney General, or sooner, if the Attorney General assents in writing. Failure to comply with this statutory prerequisite bars subsequently filed civil actions. See Daly v. Norton Co., 10 Mass. L. Rptr. 674, *5, *9 (Mass. Super. 1999) (dismissing claim for unpaid bonus and vacation pay because employee failed to file a complaint with the Attorney General or seek written permission from the Attorney General before filing a civil action in Superior Court); Axton-Cross Co., Inc. v. Blanchette, 2 Mass. L. Rptr. 646, *9-10 (Mass. Super. 1994) (dismissing claim for unpaid wages and vacation pay because employee did not satisfy statutory prerequisite of filing complaint with Attorney General or receiving Attorney General's written approval before bringing a private claim under M.G.L. c. 149, § 148).

The Plaintiffs do not allege in their Complaint that they filed a complaint with the Attorney General's Office against Main Street based on their purported Wage Act claims, nor do

they allege that they otherwise obtained permission from the Attorney General to pursue their civil action. There is simply no evidence in the record to demonstrate that the Plaintiffs have complied with the statutory prerequisites in M.G.L. c. 149, § 150 before filing the instant suit. Accordingly, the Defendants are entitled to a judgment as a matter of law on the Plaintiffs' claims for vacation pay under the Wage Act, M.G.L. c. 149, § 148 (styled as the second Count II of the Complaint). See Daly, 10 Mass. L. Rptr. at *5, *9; Axton-Cross Co., Inc., 2 Mass. L. Rptr. at *9-10.

### 2. The Plaintiffs Have No Right To Receive "Vacation Pay" For Main Street's 2003 Work Stoppage, Which Occurred Months After They Were Laid Off.

Even if the Plaintiffs were to satisfy the statutory prerequisites to bringing suit, the Defendants are entitled to summary judgment on the Plaintiffs' Wage Act claims for the separate and independent reason that Main Street does not owe them any "vacation pay" for the week during which Main Street closed the plant between the Christmas and New Year's Holidays in 2003. Only employees who were actually employed during the annual closure of the plant for the Christmas Holidays received vacation pay for that period. Because the Plaintiffs were not employed at the time of the 2003 Holiday plant closure, they were not entitled to receive "vacation pay" under the express terms of the policy. See Ex. 11.

Each year, Main Street traditionally stopped work and closed its plant for one week in July and one week in December. See Ex. 10. Production Hourly Associates, like the Plaintiffs, were eligible for paid time off during those work stoppages so long as they were actually employed at the time of the stoppage. See Ex. 11 ("An Associate *must be employed at vacation time* or on an approved medical leave of absence to receive vacation pay, or unless they return prior to their next scheduled shift.") (emphasis added); Ex. 3 at 92:21-93:3, 96:7-10; Ex. 6 at

57:2-7, 59:5-13; Ex. 1 at 63:20-64:2. Main Street's policy also stated that "[n]ew associates must have worked prior to the last week in May to be eligible for vacation pay during the July 4th vacation and prior to the last week in November to be eligible for vacation pay during the Holiday [*i.e.*, Christmas] vacation." Ex. 11; see also Ex. 3 at 93:4-12, 94:4-8. Employees who were laid off prior to the work stoppages and not recalled by December 31 of the year of layoff were not eligible for vacation pay. See Ex. 5; Ex. 6 at 57:14-23.

The Plaintiffs contend that they should be paid for the period of the December 2003 Holiday plant closure, even though they were not then employed by Main Street because, they argue, their vacation pay accrued. Nowhere in the vacation pay policy is there any statement that the pay for this period of work stoppage was something that accrued over time. See Ex. 11. Moreover, the Human Resources Manager who was responsible for administering this policy, testified in her deposition that "vacation pay" did not accrue. See Ex. 6 at 60:13-61:21; see also Ex. 1 at 61:4-14. Although Main Street computed an employee's actual pay during these work stoppages based upon the employee's seniority and total earnings for the preceding six months, see Ex. 11, this is not a proxy for an accrual policy, as the Plaintiffs seem to suggest. Instead, it is merely the calculation of how much pay the employee would receive during the Holiday vacation.

For example, an employee with up to three years of service as of the date of the work stoppage would be entitled to "vacation pay" during the work stoppage in an amount equal to 2% of his or her total earnings for the preceding six months. See Ex. 11. An employee with greater than three years, but less than five years, of service as of the date of the work stoppage would be entitled to "vacation pay" during the work stoppage in an amount equal to 3% of his or her total earnings for the preceding six months. See id. This percentage computation of vacation pay

increased with an employee's seniority, and was calculated at the time of the vacation.  See id.; Ex. 6 at 61:14-21.  That Main Street did not intend for the Plaintiffs to accrue vacation is even more clear when considered against the vacation policies for Office Hourly and Salaried Associates, which specifically stated that "[v]acation time accrues from July 1, - June 30th of each fiscal year" and provided a schedule over which "full-time Salaried Associates['] [and Office Hourly Associates'] vacation time will accrue."  See Salaried Vacation Policy, a copy of which is attached to the Statement as Ex. 12; Office Hourly Associate Vacation Policy, a copy of which is attached to the Statement as Ex. 13.  If Main Street had intended vacation to accrue for Hourly Production Associates as well, it knew how to say so in its vacation pay policy.

The Plaintiffs rely in their Complaint on Massachusetts v. Morash, 490 U.S. 107 (1989), for the proposition that all vacation is earned, accrues and has monetary value.  This simply is not the case.  In Morash, the Commonwealth issued criminal complaints charging that an employer had failed to compensate two discharged employees for accrued, but unused, vacation time on the date of their discharge.  See Morash, 490 U.S. at 109-10.  The employer stipulated that it had agreed to pay the employees in lieu of unused vacation time, but moved to dismiss the complaints on the ground that its vacation policy constituted an "employee welfare benefit plan" under ERISA, and, therefore, the state law claims were preempted.  See id. at 110.  The United States Supreme Court held that the requirement in M.G.L. c. 149, § 148 that employers pay discharged employees for their unused accrued vacation time did not constitute an "employee welfare benefit plan" where the payments at issue were for ordinary vacation, and that the state law claims were not preempted.  See id. at 120-21.

Morash does not extend any new rights to the Plaintiffs.  First, there is no legal requirement that an employer provide vacation, paid or unpaid, to its employees.  Employers

-17-

who choose to provide paid vacation to their employees must treat vacation pay like ordinary wages - it becomes due and payable only after it is <u>earned</u> and <u>accrued</u>.  <u>See</u> G.L. c. 149, § 148.  Unlike <u>Morash</u>, where there was no dispute that the employees had earned and accrued the vacation benefits that they sought and that were due upon termination, the Plaintiffs simply did not accrue vacation time while employed by Main Street.  Moreover, nothing in the Wage Act or <u>Morash</u> would preclude Main Street from establishing preconditions to eligibility for vacation time or vacation pay.  <u>See</u> <u>id.</u>;  <u>see</u> <u>also</u> Attorney General Advisory 99/1 (September 7, 1999).[16]

     Main Street's policy governing its work stoppages is unambiguous.  Hourly Production employees like the Plaintiffs did not earn a certain amount of vacation time depending on how much they worked during a given year, nor did they accrue vacation pay.  Rather, all Hourly Production employees, regardless of their length of service, were eligible to take one week off in July and one week off in December so long as they were on the active payroll at the vacation time when the plant temporarily ceased operations.  Whether and how much an employee was paid for that time off was computed as of the date of the work stoppage based on the employee's seniority and his preceding six month's earnings.  This method of computation, however, was not accrual-based.  Main Street's policy did not violate any then existing wage or hour laws, and the Plaintiffs are unable to identify any facts in the record on which they can reasonably rely to carry their burden of proof on this issue with a rational fact finder at trial.

     In short, Main Street does not now owe the Plaintiffs any "vacation" pay because they were not employed by the Company at the time of the 2003 Holiday vacation.  <u>See</u> Ex. 11; Ex. 5.

---

[16] In 1999, the Attorney General advised that an employer and employee may not agree that the employee will forfeit earned vacation payments upon termination of employment because no employer shall "by special contract with an employee or by any other means exempt himself" from M.G.L. c. 149, §  148.  <u>See</u> Attorney General Advisory 99/1 (September 7, 1999).  However, Attorney General Advisory 99/1 has no application here.  The Plaintiffs did not forfeit earned vacation time when they were laid off because they had not earned any vacation time to forfeit.  Main Street's policy governing its work stoppages is clear that Hourly Production Associates did not earn or accrue vacation pay; rather, they were eligible to receive vacation pay for two weeks per year so long as they were on the active payroll when the plant temporarily ceased operations in July and December.

Thus, Defendants are entitled to summary judgment on this count (styled as the second Count II of the Complaint) as well.

## **CONCLUSION**

This Court should grant the Defendants' motion for summary judgment on all counts of the Complaint. The Plaintiffs did not experience an employment loss entitling them to notice and a continuation of pay and benefits under the WARN Act because they were laid off prior to the mass layoff that took place during the 30-day period from November 6, 2003 through December 5, 2003. Moreover, the Act's 90-day aggregation rule does not apply to the circumstances of this case. Likewise, because the Plaintiffs have failed to satisfy the statutory prerequisites of M.G.L. c. 149, § 150, they may not maintain their action for vacation pay under the Massachusetts Wage Act. Even if the claim for vacation pay were properly brought, however, the Plaintiffs are not eligible for any "vacation pay" under the unambiguous terms of the Main Street vacation pay policy because they were not employed by Main Street at the time of the December 2003 work stoppage.

    MAIN STREET TEXTILES, L.P.
    JOAN FABRICS SERVICES, LLC
    JOAN FABRICS CORPORATION

    By their attorneys,

    /s/ Neil V. McKittrick
    Neil V. McKittrick (BBO# 551386)
    Elizabeth L. Schnairsohn (BBO# 658532)
    GOULSTON & STORRS
    A Professional Corporation
    400 Atlantic Avenue
    Boston, MA 02210
    617-482-1776
    nmkittrick@goulstonstorrs.com

GSDOCS\1607666.1

## **CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and that all counsel of record are so registered.

                                            /s/ Neil V. McKittrick
                                            Neil V. McKittrick

Dated: July 13, 2006