UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

DONNA MANCHESTER and )
NOEMIA CAMARA, )
Individually, and on behalf of all others )
similarly situated, )
                                          Plaintiffs, )
                                                         )    C.A. NO. 04-10439 RCL
VS. )
MAIN STREET TEXTILES, L.P., )
JOAN FABRICS SERVICES, LLC and )
JOAN FABRICS CORPORATION, )
                                          Defendants. )

## **DEFENDANTS' LOCAL RULE 56.1 STATEMENT OF UNDISPUTED FACTS**

Pursuant to Local Rule 56.1, the defendants, Main Street Textiles, L.P. ("Main Street" or the "Company"), Joan Fabrics Services, LLC and Joan Fabrics Corporation (collectively, the "Defendants") submit this Statement of Undisputed Facts.

## **STATEMENT OF UNDISPUTED FACTS**

1. Main Street was formed in 1996 as part of the Tyng Textiles Group, a subsidiary of Joan Fabrics Corporation. See Deposition of Penny Richards ("Richards Dep.") at 6:14-17, 8:8-9:12.[1] Until it closed in April, 2004, Main Street operated a weaving plant in Fall River, Massachusetts, that produced and supplied decorative fabrics for the home furnishing and contract industries.

2. Main Street's Fall River facility experienced a decline in productivity after the events of September 11, 2001 as a result of a downturn in the United States economy generally, and in the home furnishings market in particular. See Defendant Main Street Textiles, L.P.'s

---

[1] The relevant excerpts from the Richards Dep. are attached as Exhibit 1, hereinafter "Ex. ___"..

-1-

Response to Plaintiffs' Interrogatories[2]; Deposition of Edward DiPetrillo ("DiPetrillo Dep.") at 33:19-34:15, 40:12-41:1[3]; Ex. 1 at 18:12-20.  These productivity problems became more acute in the Spring of 2003, and progressed through the Summer of 2003, forcing Main Street to reorganize its workforce and lay off employees.  See Ex. 2 at Ex. B;  Ex. 3 at 43:9-44:8;  Ex. 1 at 18:18-20.  By September 7, 2003, Main Street had reduced its workforce to 348 full-time employees and one part-time employee.  See Affidavit of Lou-Ann Laporte ("Laporte Aff.") at ¶ 2, attached as Exhibit 4.

   3. The Plaintiffs were included among the employees Main Street laid off in accordance with its seniority system of layoffs because of then existing market conditions.  See Layoff Policy, a copy of which is attached as Exhibit 5.  Specifically, Main Street laid off Ms. Camara on September 28, 2003 and Ms. Manchester on October 3, 2003.  See Ex. 2 at Ex. B.

   4. It became apparent to management by the second week of October 2003 that Main Street's Fall River facility may ultimately have to close at some point.  See Ex. 2;  Ex. 3 at 55:16-23 (Company principals decided to close the plant "maybe a week before [the October 17, 2003 WARN Notice] at the most"); see also Ex. 3 at 35:4-7, 35:17-24; Ex. 1 at 24:3-21; Cf. Deposition of Lou-Ann Laporte ("Laporte Dep.") at 13:5-13 (Main Street's Human Resources Manager testified that she was not informed of the proposed shut down until the October 17, 2003 WARN notice was actually posted).[4]

   5. By letter dated October 17, 2003 (the "WARN Notice"), Main Street notified its active employees (and inadvertently some former employees who were recently laid off) that it

---

[2] Defendant Main Street Textiles, L.P.'s Response to Plaintiffs' Interrogatories is attached as Exhibit 2.

[3] The relevant excerpts from the DiPetrillo Dep. are attached as Exhibit 3.

[4] The relevant excerpts from the Laporte Dep. are attached as Exhibit 6.

intended to permanently close its Fall River plant by April 30, 2004. Specifically, the WARN Notice provided as follows:

> The Company regrets to inform you that Main Street Textiles has made the decision to permanently discontinue its manufacturing operations in Fall River. As a result, the Company expects the plant to close permanently by April 30, 2004. The first separations are expected to occur on or about October 17, 2003. Employees will be laid off at various times subject to the availability of work. Unfortunately, the Company does not know the exact dates that individual employees will be laid off and would like to delay lay offs as long as possible depending on the availability of work. If you are laid off prior to the expiration of the 60 day WARN Act notice period, the Company will continue your pay and benefits for the full 60 day notice period.

WARN Notice, a copy of which is attached as Ex. 7.

6. On October 17, 2003, Main Street also provided notice of its anticipated plant closing to the Mayor of Fall River, Edward M. Lambert, Jr., see letter to Mayor Lambert, a copy of which is attached as Ex. 8, and to Jonathan Raymond of the Commonwealth Corporation, the entity designated by the Commonwealth as the state dislocated worker unit. See Letter to Jonathan Raymond, a copy of which is attached as Exhibit 9.

7. As contemplated by the WARN Notice, and prior to the plant closing on April 30, 2004, Main Street began permanently laying off groups of employees after the October 17, 2003 notice. See Ex. 2 at Ex. C.[5] On November 6, 2003, Main Street permanently laid off 36 employees. See id. The Company permanently laid off 67 additional employees on November 7, 2003. See id. It permanently laid off two more employees on November 14, 2003, one employee on November 21, 2003 and one more on November 28, 2003. See id. Finally, Main Street permanently laid off eight employees on December 2, 2003 and three employees on

---

[5] Defendant Main Street Textiles, L.P.'s Response to Plaintiffs' Interrogatories contains, as its Ex. C, a list of employees who were laid off between October 17, 2003 and April 30, 2004.

December 5, 2003. See id. Between November 6, 2003 and December 5, 2003, a total of 118 employees were laid off. See id.

8. On September 7, 2003, Main Street employed 348 full-time employees and one part-time employee. See Ex. 4 at ¶ 2.

9. The layoffs that took place between November 6, 2003 and December 5, 2003 comprise more than more than one-third of Main Street's workforce as of September 7, 2003. Compare Ex.2 at Ex. C with Ex. 4 at ¶ 2.

10. The Plaintiffs were **not** included among the layoffs that took place between November 6, 2003 and December 5, 2003; rather, they were laid off prior to the layoffs that took place between November 6, 2003 and December 5, 2003 and, indeed, prior to the issuance of the October 17, 2003 WARN Notice. See Ex. 2 at Ex. B.[6]

11. Each employee who was laid off between November 6, 2003 and December 5, 2003 was paid for each day from the date of the layoff until 60 days from the date of the WARN Notice. See Ex. 2.

12. Additional layoffs followed those of November and December 2003. See Ex. 2 at Ex. C. Main Street permanently closed the Fall River plant on April 30, 2004. See id.; Ex. 3 at 42:16-19.

13. Between July 17, 2003 and October 17, 2003, Main Street initially laid off a total of 53 employees, of whom 15 were recalled and continued to work beyond October 17, 2003. See Ex. 2 at Ex. B, Ex. C.

---

[6] Defendant Main Street Textiles, L.P.'s Response to Plaintiffs' Interrogatories contains, as its Ex. B, a list of employees, including the Plaintiffs, who were laid off prior to October 17, 2003.

14. Main Street historically shut down its manufacturing facility for one week in July and one week in December each year. See Defendant Main Street Textiles, L.P.'s Supplemental Response to Plaintiffs' Interrogatories, a copy of which is attached as Ex. 10.

15. Production Hourly Associates were eligible for paid time off during those work stoppages, referred to as "vacation pay" under the Company's policy, so long as they were on the active payroll at the time of the stoppage, which was referred to as vacation time. See Production Hourly Vacation Pay Policy, a copy of which is attached as Ex. 11 ("An Associate must be employed at vacation time or on an approved medical leave of absence to receive vacation pay, or unless they return prior to their next scheduled shift."); Ex. 3 at 92:21-93:3, 96:7-10; Ex. 6 at 57:2-7, 59:5-13; Ex. 1 at 63:20-64:2.

16. Main Street's policy also provided that "[n]ew associates must have worked prior to the last week in May to be eligible for vacation pay during the July 4th vacation and prior to the last week in November to be eligible for vacation pay during the Holiday vacation [*i.e.*, the last week of December between Christmas and New Year's]." Ex. 11; Ex. 3 at 93:4-12, 94:4-8.

17. Employees who were laid off prior to the work stoppages and not recalled by December 31 of the year of layoff were not eligible for vacation pay. See Ex. 5.

18. Employees were not paid the same amount of vacation pay during the work stoppage. See Ex. 11. Rather, Main Street computed the amount of any particular employee's vacation pay based upon the employee's seniority and total earnings for the preceding six months. See id.

19. Pursuant to the express terms of the written policy, vacation time did not accrue. See id.; see also Ex. 6 at 60:13-61:21; Ex. 1 at 61:4-14.

-5-

GSDOCS\1630074.1

20. Nowhere in the vacation pay policy is there any statement that the pay for this period of work stoppage was something that accrued over time. See Ex. 11.

21. The Human Resources Manager who was responsible for administering this policy testified in her deposition that "vacation pay" did not accrue. See Ex. 6 at 60:13-61:21; see also Ex. 1 at 61:4-14.

22. Although Main Street computed an employee's actual pay during these work stoppages based upon the employee's seniority and total earnings for the preceding six months, see Ex. 11, this is not a proxy for an accrual policy, instead, it is merely the calculation of how much pay the employee would receive during the Holiday vacation. See id.

23. An employee with up to three years of service as of the date of the work stoppage would be entitled to "vacation pay" during the work stoppage in an amount equal to 2% of his or her total earnings for the preceding six months. See Ex. 11.

24. An employee with greater than three years, but less than five years, of service as of the date of the work stoppage would be entitled to "vacation pay" during the work stoppage in an amount equal to 3% of his or her total earnings for the preceding six months. See id.

25. This percentage computation of vacation pay increased with an employee's seniority, and was calculated at the time of the vacation. See id.; Ex. 6 at 61:14-21.

26. The vacation policies for Office Hourly and Salaried Associates specifically stated that "[v]acation time accrues from July 1, - June 30th of each fiscal year" and provide a schedule over which "full-time Salaried Associates['] [and Office Hourly Associates'] vacation time will accrue." See Salaried Vacation Policy, a copy of which is attached as Ex. 12; Office Hourly Associate Vacation Policy, a copy of which is attached as Ex. 13.

27.     The Plaintiffs do not allege in their Complaint, and they have produced no evidence to demonstrate, that they filed a complaint with the Attorney General's Office against Main Street based on their purported Wage Act claims.  Nor do they allege that they otherwise obtained permission from the Attorney General to pursue their claim for vacation pay in this action.

>MAIN STREET TEXTILES, L.P.
>JOAN FABRICS SERVICES, LLC
>JOAN FABRICS CORPORATION
>
>By their attorneys,
>
>/s/ Neil V. McKittrick
>Neil V. McKittrick (BBO# 551386)
>Elizabeth L. Schnairsohn (BBO# 658532)
>GOULSTON & STORRS
>A Professional Corporation
>400 Atlantic Avenue
>Boston, MA  02210
>617-482-1776
>nmkittrick@goulstonstorrs.com

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and that all counsel of record are so registered.

>/s/ Neil V. McKittrick
>Neil V. McKittrick

Dated:  July 13, 2006