## Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

No: 04-10439RCL                     Rule 30 Deposition

DONNA MANCHESTER and NOEMIA CAMARA, Individually, and on behalf of all other Similarly Situated

Vs.

MAIN STREET TEXTILES, L.P., and JOAN FABRICS SERVICES L.L.C., and JOAN FABRICS CORPORATION

DEPOSITION OF EDWARD DiPETRILLO, taken pursuant to Rule 30 of the Massachusetts Rules of Civil Procedure on behalf of the Plaintiffs, before Salvina S. Ferreira, RPR, a Notary Public in and for the Commonwealth of Massachusetts, at the Offices of Brian Cunha & Associates, 311 Pine Street, Fall River, MA, commencing at 12:45 P.M., on Friday, October 15, 2004, pursuant to Notice and agreement of parties as to the date and time of taking said deposition.

* * * * *

LEDGEWOOD COURT REPORTING
23 Last Street
Tiverton, RI 02878
(401) 625-5455

Ledgewood Court Reporting (401) 625-5455

## Page 2

APPEARANCES:  Brian R. Cunha, Esq.
BRIAN CUNHA & ASSOCIATES
311 Pine Street, Fall River
Representing the Plaintiffs

Neil v. McKittrick, Esq.
GOULSTON & STORRS
400 Atlantic Avenue
Boston, MA 02110-3333
Representing the Defendants

COPY

## Page 3

### INDEX

| Examinations | Page |
| --- | --- |
| Edward DiPetrillo | 4 |
| Direct Examination By Mr. Cunha | 4 |

### EXHIBITS

| Exhibit No. | Description | Page |
| --- | --- | --- |
| 1 | Defendant's answers to plaintiff's 65 interrogatories | |
| 2 | Standard procedure instruction | 92 |
| 3 | Attorney General's Fair Labor and Business Practices Division Advisory | 97 |
| 4 | Supplemental response | 104 |

## Page 4

### STIPULATIONS

It is hereby agreed and stipulated by and between counsel for the respective parties that all objections, except as to the form of the question, are reserved until the time of trial, including motions to strike.

It is further agreed and stipulated that the witness will read and sign the deposition transcript.

EDWARD DiPETRILLO, having been satisfactorily identified by the production of his driver's license, and called on behalf of the plaintiffs, having been duly sworn on oath, deposes and says as follows:

**Direct Examination By Mr. Cunha:**

Q  What is your name?
A  **Edward N. DiPetrillo.**
Q  Where do you live?
A  **18 Glenn Drive, Smithfield, Rhode Island.**
Q  How old are you?
A  **52.**
Q  What is your birth date?

Page 33

```
 1     terminations would have been from that site on
 2     Airport Road that single site; is that correct?
 3  A  To my knowledge, yes.
 4  Q  Now, were there any events that occurred in 2002 or
 5     2003 to your knowledge that lead to the layoffs or
 6     terminations of employees in 2003?
 7  A  I don't know.
 8  Q  Okay. You answered -- you signed some
 9     interrogatories.
10  A  Right.
11  Q  Do you recall answering these questions?
12  A  I believe I have knowledge of it.
13  Q  Well, did you read the answers before you signed
14     them?
15  A  Yes.
16  Q  Well, do you remember stating that there were
17     production activity problems at the plant?
18  A  Yes.
19  Q  All right. So again were there reasons that lead to
20     the layoffs in the year 2003 at the plant in Fall
21     River?
22  A  It was economics.
23  Q  All right. Tell me about the economics. What were
24     the key components?
```

Page 34

```
 1  A  The economic problems were that the textile industry
 2     in general was very hard hit by overseas competition
 3     nationally; Mexico and China. And that the entire
 4     textile industry was being hurt by this and we were
 5     losing a lot of our sales to China and Mexico.
 6  Q  And when did this international competition and the
 7     fact that you were being hurt first begin?
 8  A  I personally don't know.
 9  Q  How about was it after September 11th, 2001 that it
10     became particularly acute?
11  A  Yes, I believe so.
12  Q  All right. And was there a steady decline from
13     September 2001 through 2003 with regard to the
14     profitability of Main Street Textiles?
15  A  To my knowledge, yes.
16  Q  So this wasn't a sudden dramatic change, that was a
17     change that was occurring over time; is that
18     correct?
19  A  It was on-going; correct?
20  Q  So you had clear warning as time went on of this
21     problem; is that correct?
22  A  Yes.
23     MR. McKITTRICK: Objection.
24  Q  Did you participate at all with regard to the
```

Page 35

```
 1     closing of the Fall River plant? Did you
 2     participate in the management?
 3  A  I was involved.
 4  Q  Okay. And when did you first become involved with
 5     regard to the anticipating closing of the Fall River
 6     plant?
 7  A  I believe it was in October of '03.
 8  Q  Okay. Well, how about prior to October of '03 did
 9     you participate in any meetings with any management
10     people with regard to the closing of the Fall River
11     plant?
12  A  I don't really remember.
13  Q  Well, were there any memos sent back and forth
14     between yourself and other management personnel
15     prior to October of 2003?
16  A  I don't remember.
17  Q  What was your first memory that the Fall River plant
18     was going to be closed?
19  A  My first memory was when the owner contacted me just
20     before advising me that he wanted to close the plant
21     down.
22  Q  What date was that?
23  A  As I stated earlier it was in October of '03.
24     Specifically I don't remember the date.
```

Page 36

```
 1  Q  Well, was it before '03?
 2  A  Yes, it was.
 3  Q  Well, how long before October 17th, '03 was it?
 4  A  I don't remember.
 5  Q  Was it in the summer of '03?
 6  A  No.
 7  Q  How do you know that?
 8  A  Because I stated earlier it was in October of '03.
 9  Q  That's the first information that you ever received
10     either written or oral?
11  A  To my recollection, yes.
12  Q  Okay. Did you ever receive any memos, e-mails or
13     other documents from management prior to October of
14     '03 with regard to the closing of the plant in Fall
15     River?
16  A  I don't remember.
17  Q  All right. Well, are there certain documents that
18     you have in your file back in the office that would
19     help you remember?
20  A  If I went through my files, yeah, I would recollect
21     that.
22  Q  Okay.
23  A  If it did happen.
24  Q  All right. Now one of the things I have asked for,
```

37

1  you may have to come back with records to that is a
2  review of those documents which I asked your lawyer
3  to provide me. You can go back and maybe your
4  memory would be refreshed after looking at those
5  documents; okay?
6  A  That's fine.
7  Q  Is it fair to say that there were a series of
8     layoffs before October of '03 is it fair to say at
9     the textile location in August and September?
10 A  There could have been, yes.
11 Q  Okay. Was that the first time that there were a
12    number of layoffs over a relatively short period of
13    time August and September of '03?
14    (Brief Pause)
15 A  I don't remember really.
16 Q  Well, you were in charge of layoffs?
17 A  You're asking me for specifics and I don't have
18    specific numbers; okay. I oversaw those things;
19    okay.
20    I may if I had documentation in front of
21    me, it's a different issue but I'm not just going on
22    record and making statements that I'm not -- I don't
23    remember.
24 Q  Well, did you prepare for this deposition?

38

1  A  Yes, I did.
2  Q  Did you review documents?
3  A  I reviewed your interrogatory questions.
4  Q  All right. Did you review any other documents in
5     relation for today's deposition?
6  A  Just the WARN notices that were posted.
7  Q  You didn't review any of your layoff records; did
8     you review those?
9  A  Just what was provided to you in the
10    interrogatories.
11 Q  So you didn't review any of your own personal
12    records?
13 A  No, sir.
14 Q  All right. Well, you had to review records in order
15    to provide the answers to these interrogatories,
16    didn't you?
17 A  I provided, yes.
18 Q  You reviewed records in your office?
19    MR. McKITTRICK: Let me just object. The
20    answers to interrogatories are the answers of the
21    corporation let me clearly say not interrogatories
22    posed to him. He signed as a representative of the
23    company and he said he had certain expended
24    knowledge and other information was provided to him

39

1  by people in the corporation. So don't try to put
2  him in a box as having personal information of this
3  information. He said so under oath to you.
4     MR. CUNHA: Okay. Neil, I know that you
5  know that I know what's a proper way to make an
6  objection and what we have agreed to in this
7  deposition; okay. And I am not going to allow you
8  to make talking, speaking objections.
9     MR. McKITTRICK: Then don't miss
10 characterize the witness's testimony, the witness's
11 statements and I won't have to say anything.
12    MR. CUNHA: Again, the rule is objection,
13 period.
14    MR. McKITTRICK: As long as you don't miss
15 characterize the documents.
16    MR. CUNHA: Again, objection, period.
17 That's the procedure we have agreed to. If you go
18 and make talking objections again, I'm going to stop
19 this deposition because we have a long road to hoe
20 on this case and I don't want them. I don't
21 practice law like that and I know you don't either.
22    MR. McKITTRICK: If you miss characterize
23 the documentation, I am going to say something. I'm
24 just not going to let you --

40

1     MR. CUNHA: I was not talking about the
2  documentation. I asked him if he reviewed any
3  documents then you started making talking objection.
4     Mr. McKITTRICK: I'm not objecting to the
5  question. That's not true.
6     MR. CUNHA: You're clearly prompting the
7  witness.
8     Mr. McKITTRICK: No, I am not. I am not
9  clearly prompting anybody. What I am saying you
10 referred to the interrogatories. You're saying that
11 the interrogatories he signed them, he had to do
12 things. I am telling you as we stated in the
13 interrogatories, they're interrogatories posed to
14 the corporation. He's signed on behalf of the
15 corporation. He signed a certificate saying I have
16 some personal information of some things, as to
17 other things I do not have personal information. It
18 was information provided to me by the company
19 employee's as any employee as any corporate answer
20 to interrogatories would say. That's all I am
21 talking about.
22    I am not objecting to your question. I am
23 objecting to what you characterize the interrogatory
24 answers.

Page 41

1  MR. CUNHA: You have put forth this witness as the person most knowledgeable.
3  Mr. McKITTRICK: No, it's a 30(b)(6) deposition.
5  MR. CUNHA: Okay.
6  Mr. McKITTRICK: You noticed his deposition personally. It this is not 30(b)(6) deposition.
9  Q  Okay. Are you the person most knowledgeable with regard to what occurred in the layoffs, terminations that occurred during the summer and fall of 2003?
12  MR. McKITTRICK: Objection to form.
13  A  No.
14  Q  Who was?
15  A  The HR manager at the time at Main Street Textiles.
16  Q  Who was that?
17  A  Lou-Ann LaPorte.
18  Q  Where is she now?
19  A  She is presently working for Joan Fabrics Corporation.
21  Q  And what's the office location?
22  A  She is still located in Fall River and Tyngsboro.
23  Q  Okay. Does Main Street Textiles still have a location in Fall River or does Joan Fabrics still

Page 42

1  have a location in Fall River?
2  A  Joan Fabrics does.
3  Q  Where is that located?
4  A  At the Commerce Driver.
5  Q  Address.
6  A  Yes.
7  Q  Are there any employees of Joan Fabrics that currently still work for Joan Fabrics in Fall River?
9  A  Yes.
10  Q  How many employees?
11  A  A dozen.
12  Q  Okay.
13  A  Approximately.
14  Q  And is there any manufacturing going on?
15  A  No.
16  Q  When did manufacturing cease at the Main Street Textile location?
18  A  Approximately around April 30th of this present year 2004.
20  Q  Was there manufacturing going on at that facility from October 17th to April of '04?
22  A  Yes.
23  Q  All right. Prior to October 17th of '03 --
24  A  Okay.

Page 43

1  Q  -- how many shifts where operating at the Main Street Textile location?
3  MR. McKITTRICK: Objection.
4  Q  You may answer.
5  A  Approximately three.
6  Q  How about prior to August of '03 how many shifts were operating?
8  A  I believes it was three at that time also.
9  Q  Now at any time between before October of '03, were any shifts eliminated?
11  A  Prior to '03?
12  Q  Prior to October of '03 were any shifts eliminated?
13  A  Yes.
14  Q  And what shifts were eliminated?
15  A  We went and I don't remember the date but we went from a four shift seven day operation to a three shift five day operation.
18  Q  When was that?
19  A  I do not recollect that.
20  Q  Approximately?
21  A  It could have been the last quarter of '02 I think maybe first quarter of '03 approximately.
23  Q  What was the reason for that?
24  A  Again, it was due to economics, loss of business due

Page 44

1  to overseas competition.
2  Q  Are there records that would indicate when you went from the four shift to the three shift?
4  A  I believe there would be.
5  Q  On whose recommendation did that go from four shifts to three shifts? Whose decision was that?
7  A  I believe it was Penny Richards.
8  Q  Did you have any conversations with her with regard to that?
10  A  Just advising me what they were going to do.
11  Q  What did she tell you?
12  A  That due to economics they were going to have to cut back from four shifts seven day operation to a three shift five day operation.
15  Q  Was that in the beginning of '03 or was that during the summer of '03 do you recall?
17  A  Very honestly as I stated earlier I don't remember. I give you my best recollection.
19  Q  There must have been correspondence that went back and forth or memos, e-mails with regard to reduction in force; is that correct?
22  MR. McKITTRICK: Objection.
23  A  Probably there would have been.
24  Q  And those would be in your file would they not?

Page 53

1  Q  When was that?
2  A  **I believe it was just after October 17th.**
3  Q  Of '03?
4  A  **Yes.**
5          MR. CUNHA: So you wouldn't have to be
6  deposed, Neil.
7          MR. McKITTRICK: I wouldn't have to be
8  deposed, Brian. No question about that.
9  Q  All right. Now, it's fair to say that the October
10    17th '03 WARN letter was not submitted that the
11    circumstances had long been foreseeable. In other
12    words, you knew that there was going to be a
13    closing; correct?
14         MR. McKITTRICK: Objection.
15 Q  You may answer.
16 A  **Personally?**
17 Q  Well, you're the person in charge of human
18    resources; correct?
19 A  **Right.**
20 Q  You knew that productivity was decreasing; right?
21 A  **Huh-huh.**
22 Q  Yes?
23 A  **Yes.**
24 Q  You knew profits where off; correct?

Page 54

1  A  **Yes.**
2  Q  I mean, there was steady decline?
3  A  **There was decline; right.**
4  Q  So certainly the plant closing did not come as any
5     great surprise to you with regard to what occurred
6     on October 17th; correct?
7          MR. McKITTRICK: Objection.
8  A  **Yes, to a certain degree.**
9  Q  Well, you were in contact with legal counsel;
10    correct with regard to this plant closing; right?
11 A  **Once I was advised what they wanted to do, yes.**
12 Q  How long had you or to your knowledge; okay?
13 A  **Yeah.**
14 Q  Had either you or a member of your company been in
15    touch with Mr. Almond with regard to the plant
16    closing?
17         MR. McKITTRICK: Objection. No, no.
18 Q  How long had you been in touch.
19         MR. McKITTRICK: No. You're asking for
20    him to talk about how long they were talking to Mr.
21    Almond about anything about the plant closing.
22         MR. CUNHA: Fine.
23         MR. McKITTRICK: Objection. I am
24    instructing him not to answer to the extent, you

Page 55

1     know, communication with counsel. You should not
2     disclose those communications.
3          MR. CUNHA: Again, I am going to move that
4     that be for the federal judge to rule on that, that
5     it goes to the very heart of this case. It's not
6     asking for what they advised him. I am just asking
7     the date that legal counsel became involved with
8     regard to the plant closing.
9          MR. McKITTRICK: Right, with respect to
10    the plant closing. That's attorney/client
11    communication.
12         MR. CUNHA: Okay. We'll let the judge
13    decide that.
14         MR. McKITTRICK: That's fine. Make your
15    motion.
16 Q  When did you first start discussing the plant
17    closing with any of the principals of the company?
18 A  **Probably maybe a week before that at the most.**
19 Q  To your knowledge, was there any correspondence
20    between you and any of the other persons in your
21    company with regard to the plant closing prior to
22    that week?
23 A  **Not to my knowledge, no.**
24 Q  When the employees where laid off in August and

Page 56

1     September and prior to October 17th, 2004, were they
2     told -- did you talk to any of those employees?
3  A  **No, I did not.**
4  Q  Who did?
5  A  **Lou-Ann LaPorte.**
6  Q  Did she have to meet with each of them or did she
7     just send them notice?
8  A  **I believe the supervisors spoke to the associates at**
9     **that point.**
10 Q  Who was the supervisors?
11 A  **The department supervisor the employees there that**
12    **worked.**
13 Q  Did you give the department supervisors any
14    instructions as to what to tell those employees?
15 A  **Lou-Ann did at that point.**
16 Q  What did she tell them?
17 A  **To my knowledge that we were going to have to cut**
18    **back and that we would advise those associates that**
19    **they were going to be laid off.**
20 Q  Did you instruct her to advise them as to the
21    likelihood of recall?
22 A  **No.**
23 Q  Was there anything told to the employees the
24    likelihood of recall?

### Page 89

1  Q  The other principal in Tyngsboro is?
2  A  Penny Richards and Elkin.
3  Q  The layoffs that occurred on November 6 and November
4     7, '03, were the numbers in and of themselves
5     sufficient to satisfy the threshold requirement for
6     requiring the WARN notice?
7  A  I believe they were. Again, without the numbers in
8     front of me I can't specifically state that but I
9     believe they were.
10 Q  So just the employees that were laid off on those
11    two days satisfied the 50 employee requirement and
12    the one-third requirement just on those two days?
13 A  Going back to November 17th the day it triggered
14    from that point through 6 and 7 it would.
15 Q  October 17th?
16 A  Right. From that point and including the 6th and
17    7th, yes.
18 Q  My understanding is that the time the 30 day
19    timeframe that you used was November 6th through
20    December 5th, is that the relevant time period that
21    you used in terms of determining the 30 day
22    timeframe?
23 A  That was counsel's advice to us.
24 Q  So again you relied on counsel?

### Page 90

1  A  That's correct.
2  Q  And that was Mr. McKittrick?
3  A  That's correct.
4  Q  So you don't know what the 30 day timeframe was; is
5     that right?
6  A  I didn't calculate it.
7  Q  Mr. McKittrick would know that?
8  A  That's correct.
9  Q  As to whether the November 6th and November 7th
10    either individually or together satisfied the
11    threshold requirement is something that you don't
12    have any knowledge of?
13 A  That's correct.
14 Q  That would be something that Mr. McKittrick knew and
15    advised you?
16         MR. McKITTRICK: Objection.
17 A  Right.
18 Q  Now, with regard to whether there was a requirement
19    to look back either 30 days or 90 days again that's
20    not something you had any independent knowledge of,
21    is it?
22 A  That's correct.
23 Q  Again, you relied on counsel with regard to that?
24         MR. McKITTRICK: Objection.

### Page 91

1  A  That's correct
2  Q  Now, you understand that there was a difference
3     between WARN Act with regard to mass layoff versus a
4     plant closing; right?
5  A  Yes.
6  Q  And there's a statutory provision that define what a
7     mass layoff is versus a plant closing and what the
8     requirements are under WARN Act under each; right?
9  A  Right.
10 Q  Is it fair to say that you don't have independent
11    knowledge as to whether there was mass layoff and
12    when it occurred; is that correct?
13 A  That's correct.
14 Q  That's something again you relied on counsel for; is
15    that right?
16 A  Right.
17 Q  And with regard to what the requirements were for
18    plant closing on WARN Act again you relied on
19    counsel; is that right?
20 A  That's correct.
21 Q  All right. Now we're going to talk about something
22    else.
23         You had a vacation policy at Main Street
24    Textile; correct?

### Page 92

1  A  Yes.
2  Q  Now, are you the one that drafted that or did
3     someone else draft that?
4  A  I believe I drafted that.
5  Q  Did you consult with any attorneys with regard to
6     drafting that or is that something you drafted on
7     your own?
8  A  I believe we consulted Edwards & Angell at the time.
9  Q  In Rhode Island?
10 A  Yes.
11 Q  Do you know if they ever consulted Mass. law at all
12    with regard to that?
13 A  No, I do not.
14 Q  What?
15 A  No, I do not.
16 Q  My understanding of the policy --
17         MR. CUNHA: And we'll mark this as exhibit
18    2.
19         (Exhibit 2, Standard procedure
20    instruction, was marked for identification)
21 Q  It says hourly associates or employees were eligible
22    for vacation pay; right?
23 A  Production hourly.
24 Q  And they must be employed at vacation time or on

**Page 93**

1 medical leave in order to receive that vacation pay;
2 correct?
3 A  Yes.
4 Q  And then it looks like under the vacation pay policy
5 that new employees must have been employed the last
6 week in May to be eligible for the July 4th vacation
7 pay; right?
8 A  Yes.
9 Q  And new employees must be employed the last week of
10 November to be eligible for the vacation pay in
11 December; right?
12 A  Yes.
13 Q  So that according to your policy they only had to be
14 employed for three or four weeks to be eligible for
15 vacation pay?
16 A  It was -- the policy was based on seniority.
17 Q  I am just asking -- just answer my question.
18 A  Okay.
19 Q  According -- and I am reading it.
20 A  Yeah, right.
21 Q  It says last week in November.
22 A  Yeah.
23 Q  Correct? Right?
24 A  Yes.

**Page 94**

1 Q  All right. So that if I began working on November
2 25th; right?
3 A  Yes.
4 Q  What was the week that the plant traditionally shut
5 down in December?
6 A  Usually between Christmas and New Years.
7 Q  Last week?
8 A  Correct.
9 Q  So I could work four weeks then I get paid a
10 vacation week; right?
11      MR. McKITTRICK: Objection.
12 Q  Is that right?
13 A  You get vacation, yes. You get something. I don't
14 know if you get a full week.
15 Q  Well, you get paid according to your --
16 A  Policy.
17 Q  -- policy here?
18 A  Right. Which was based on seniority and percentage
19 of gross earnings.
20 Q  So according to 4.0 you get 2 percent of your
21 earnings?
22 A  Through November 30th.
23 Q  So you get something?
24 A  Correct.

**Page 95**

1 Q  All right. There was some answers to
2 interrogatories that your lawyer sent me yesterday.
3 A  Yes.
4 Q  And in those answers you changed that somewhat and
5 said that in order to be eligible you had to have
6 six months of continuous service to accrue vacation,
7 paid vacation time?
8 A  I believe that was for the office hourly and salary
9 plan. There was a miscommunication there.
10 Q  Okay. So this was different than the hourly --
11 A  Correct.
12 Q  -- policy that was a separate policy?
13 A  Yes.
14 Q  So the manufacturing people were subject to this
15 procedure?
16 A  That's correct.
17 Q  But that the office personnel and the full-time
18 personnel such as yourself --
19 A  Yes.
20 Q  -- had to work at least six weeks before you were
21 entitled to vacation pay?
22 A  I believe it was six months.
23 Q  Six months?
24 A  Yes.

**Page 96**

1      MR. McKITTRICK: Brian, just when you
2 refer to this procedure you mean the one for the
3 production hourly? Are you marking this?
4      MR. CUNHA: I marked it as Exhibit 2.
5      MR. McKITTRICK: Exhibit 2, thanks. I
6 didn't know that.
7 Q  And then on page 2 of your policy it says that those
8 people that aren't actively employed on vacation pay
9 time they don't get any vacation pay; right?
10 A  That's correct.
11 Q  So if I work from -- I have been working for your
12 company for 20 years; right?
13 A  (Witness nodding in the affirmative)
14    Yes.
15 Q  Then I would be eligible under your plan under 4.0
16 to 8 percent of yearly salary for my vacation pay if
17 I have been there the last week of December; right?
18 A  Correct.
19 Q  But if you laid me off the week before, I received
20 nothing?
21 A  That's correct.
22 Q  And that was your decision; correct?
23 A  That was the policy of the organization.
24 Q  But it was your decision to lay a person off or not?

C E R T I F I C A T E

    I, Salvina S. Ferreira, RPR and Notary Public within and for the Commonwealth of Massachusetts, duly commissioned, qualified and authorized to administer oaths and to take and certify depositions do hereby certify that heretofore, to wit, on the 15th day of October, 2004, personally appeared before me EDWARD DiPETRILLO, at the Law Office of Brian Cunha & Associates, 311 Pine Street, Fall River, MA in the afore-captioned cause now pending in the United States District Court that the witness was by me duly sworn to testify to the truth, the whole truth and nothing but the truth; that thereupon and while said witness was under oath, at the time and place herein named and was thereafter reduced to typewriting under my supervision.

    I further certify that I am not interested in the event of the action.

    IN WITNESS WHEREOF, I have hereunto subscribed my hand and affixed my seal of office this 19th day of November, 2004.

                              Salvina S. Ferreira, RPR

My commission expires: May 19, 2011.