# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

CA NO.: 04-10439-RGS

DONNA MANCHESTER and NOEMIA CAMARA
 Individually, and on behalf of all others similarly
 situated

       Plaintiffs

VS.

MAIN STREET TEXTILES, L.P.,  and
JOAN FABRICS SERVICES L.L.C. and
JOAN FABRICS CORPORATION

       Defendant

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

### PRELIMINARY STATEMENT

Plaintiffs' submit this Memorandum in support of their Motion For Summary Judgement. This is an action brought by former employees of Main Street Textiles, L.P., (hereinafter referred to as "Main Street") formerly located at Commerce Drive, Fall River, Massachusetts, a wholly owned subsidiary of Tyng Textile Group, L.L.C., located at 100 Vesper Executive Park, Tyngsboro, Massachusetts, who were permanently laid-off in a series of layoffs commencing on August 26, 2003 through November 26, 2003, against their prior employer "Main Street," for violation of the Worker Adjustment and Retraining Notification Act (hereinafter referred to as "Warn Act") 29 U.S. C. § 2101 et.

seq.[1]  The action is also brought for all employees laid off by the Defendant for the period commencing on August 26, 2003 through December 31, 2003, for failure to pay vacation pay, owed to them at the time of their lay-off.

The Plaintiffs claim under the "WARN ACT" that as "affected employees" within the meaning of the statute, they were entitled to sixty (60) day advance written notice of lay-off and that "Main Street" is wholly liable for sixty (60) days back pay under the terms of the statute 29 U.S.C. §2104 (a) (1) (A), and seek Summary Judgment on this issue.

Under the vacation pay claim all employees that were laid off during the time frame, August 25, 2003 through December 31,2003 claim that under M.G.L.A. c.149 §148 that they accrued and are owed vacation pay for the time period that they were employed prior to their lay-off.

At present, the issue with respect to a class certification has not been addressed, however, the parties had agreed to move forward on the legal issues regarding liability under the "WARN ACT" and vacation pay claims; as the parties felt that the issue could be decided as a matter of law.  Unfortunately, that may not be the case as the parties now have a factual dispute over the date that the mass lay offs commenced.  The plaintiffs contend that the mass lay offs commenced on August 25, 2003 and the

_____

[1] (a) Purpose of WARN.  The Worker Adjustment and Retraining Notification Act (WARN or the Act) provides protection to workers, their families and communities by requiring employers to provide notification 60 calendar days in advance of plant closings and mass layoffs.  Advance notice provides workers and their families some transition timer to adjust to the prospective loss of employment, to seek and obtain alternative jobs and, if necessary, to enter skill training or retraining that will allow these workers to successfully compete in the job market.  WARN also provides for notice to State dislocated worker units so that dislocated worker assistance can be promptly provided.

defendants contend that the mass lay offs commenced on November 6, 2003.  The resolution of this disputed factual issue is central to a determination of whether the defendant complied with the WARN statute notice requirements.  The plaintiffs' position is supported by the testimony of the defendants that in the summer of 2003 they met with their attorneys to prepare for the mass lay off.  (See Ex 1 Interrogatory #6); that the lay offs commenced in August 2003 (see Ex 4) and that a decision to close the plant occurred early in September 2003.  (See Ex 1, Interrogatory #6).  This factual information is in contradiction to the deposition testimony of the defendants, who claim the decision wasn't reached until one week before October 17, 2003.  In light of the above, a jury determination will have to be made on this issue.

In the event that the Court deems a trial necessary to resolve the above issue, the plaintiffs would respectfully request leave to certify the class as it was unanticipated that the issue would arise until plaintiff received the defendants' motion for summary judgment.  The matter can easily be resolved as this action clearly fits within the requirements under F.R.C.P. Rule 23 in that the class is so numerous that joinder is impracticable; there are questions of law in fact common to the class; the claims of the representative parties are identical to the claims of the class and that the representatives will fairly and adequately represent the interests of the class.

### Facts "WARN ACT" Claim

The Plaintiffs, Donna Manchester and Noemia Camara are former employees of the Defendant who have brought this action on behalf of themselves and all similarly situated employees  laid off pursuant to a "mass lay-off" as defined by the WARN ACT and who have failed to receive adequate notice or compensation as required under the

statute.

The Defendant "Main Street," was incorporated in 1996 at the location of the former Joan Fabrics Corporation in Fall River, Massachusetts, and operated an extensive manufacturing business in textiles for furniture fabrics, employing in excess of three hundred (300) employees.

After September 11, 2001 "Main Street" in particular, and the textile industry in general, began to experience declining sales and profits primarily due to the U.S. economy and overseas competition, particularly from Mexico and China, whose very low cost imports prevented "Main Street" from increasing its prices to customers as it was incurring higher production costs. (See Answers to Interrogatories #6) (Dep Trans of Edward DiPetrillo P. 34 L. 1, Ex 7) (Dep Trans of Penny Richards P. 15 L 18, Ex 7).

Moreover, the "Main Street" factory in Fall River was not productive. The economic and productivity problems at the plant became progressively grim in 1991 due to the loss of business volume and low sales. In 2002 things got worse and in 2003 very bad. (Dep Trans Penny Richards P. 18, Ex 7) Its revenues declined substantially between 2001 and 2003. The business down- turn became very significant by April of 2003. Initially management sought to address the problems by shift reductions and lay-offs. For the first time in ten (10) years the company was forced to abandon around-the-clock, seven day operations at Fall River. It cut back from a four (4) shift, seven (7) day production schedule to a three (3) shift, five (5) day schedule. (Ans. To Int. No. 6, Ex 1) In July or August of 2003, there were several meetings between Wade Martin, the Vice President of Operations, Ed DiPetrillo, Vice President of Human Resources for Joan Fabrics, Lou Ann LaPorte, Human Resource Manager for Main Street Textiles,

and Lincoln Almond, their attorney from Edwards and Angell, discussing the issues that triggered the "WARN ACT" and the amount and the percentages that would have to be paid to "Main Street" employees. (Dep Trans. Wade Martin P. 20-24, Ex 7) and (see Dep Trans Lou Ann LaPorte, P. 47 - P. 63, Ex 7).

In response to the worsening financial decline, the Defendant began a series of "mass layoffs" that commenced on August 26, 2003 and concluded with the closing of the plant on April 30, 2004.

During a 90 day period spanning August 26, 2003, through November 26, 2003 the Defendant, who as of August 25, 2003 had 356 employees,[2] (see attached Ex. A) laid-off, in a staggered series of layoffs, more than 50 employees and more than thirty-three percent of their full-time employees at the "Main Street" site, including the plaintiff's, which would, under 20 U.S.C. §2102(d), trigger the WARN notice requirements under the statute.

Although the plaintiff contends that the "mass layoff" commenced on August 26, 2003, the defendant contends that the "mass layoff" commenced on November 6, 2003, twenty-one days (21) after the October 17, 2003 issuance of a Warn Notice by "Main Street"[3]

---

[2]The records supplied by the Defendant document that as of August 30, 2003 "Main Street"employed three hundred and fifty-eight (356) full time employees. The records also document that from August 25 through August 30 two (2) employees were laid off resulting in the calculation that on the "snapshot" date the defendant employed (358) employees.

[3]On October 17, 2003, "Main Street" issued a so-called 60 day WARN Notice to all employees  advising its employees of the "plant closing" and "mass lay-off".   (See attached Ex 3)

Pursuant to its notice the Defendant compensated only the employees laid off during the 60 day time period between November 6,2003 and December 5,2003, claiming that under WARN these were the only employees entitled to notice or eligible for compensation. The Defendant failed to compensate the thirty-one plaintiffs, however, who were laid-off between August 26, 2003 and October 24, 2003, for whom this claim is now made.[4]

---

[4] The employees and date of lay-off, for whom claim is made is as follows:

| | | |
|---|---|---|
| 1. | Donald La Frenier | August  26, 2003 |
| 2. | Lorraine Craven | August  29, 2003 |
| 3. | Alberto Cortez, | September 5, 2003 |
| 4. | John Duarte, | September 5, 2003 |
| 5 | James Lowder, | September 5, 2003 |
| 6. | Richard Gibney, | September 15, 2003 |
| 7. | Margarida Rego, | September 16, 2003 |
| 8. | Luis Clara, | September 22, 2003 |
| 9. | Jose Pereira, | September 22, 2003 |
| 10. | Jose Pimental, | September 22, 2003 |
| 11. | Helen Texiera, | September 22, 2003 |
| 12. | Maria Fernandez, | September 22, 2003 |
| 13. | Guilherme Cabral, | September 22, 2003 |
| 14. | Vath Chhem, | September 26, 2003 |
| 15. | Augustine Apente, | September 26, 2003 |
| 16. | Alaro Damaso, | September 26, 2003 |
| 17. | Antonio Geruasio, | September 26, 2003 |
| 18. | Francisco Gomes, | September 26, 2003 |
| 19. | Guilherme Goncalves, | September 26, 2003 |
| 20. | Dolores Oliveira, | September 26, 2003 |
| 21. | Noemia Camara, | September 28, 2003 |
| 22. | Ben Hellman, | September 29, 2003 |
| 23. | Manuel Resendes, | September 29, 2003 |
| 24. | Maria D. Melo, | September 30, 2003 |
| 25. | Joshua Faria, | October 1, 2003 |
| 26. | Miguel Calheta | October 1, 2003 |
| 27. | Ken Leveque, | October 1, 2003 |
| 28. | Donna Manchester, | October 3, 2003 |
| 29. | Mario Ventura, | October 6, 2003 |
| 30. | Augustine Roderigues, | October 10, 2003 |
| 31. | John Freitas, | October 17, 2003 |

## STANDARD OF REVIEW

Summary judgment is appropriate where the moving party establishes that "there is no genuine issue as to any material fact that [it] is entitled to a judgment as a matter law." FED. R. CIV. P. 56 (c). A factual dispute between the parties will not defeat a motion for summary judgment unless it is both genuine and material. Anderson v. Liberty Lobby, Inc., 477 U.A. 242, 247-48 (1986). A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant and it is material if, under the substantive law, it would affect the outcome of the suit. Anderson v. Liberty Lobby, Inc., 477 U.S. at 248. The moving party must show that, if the evidentiary material of record where reduced to admissible evidence in Court, it would be insufficient to permit the non-moving party to carry its burden of proof. Celotex v. Catrett, 477 U.S. 317, 318 (1986).

Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts in question." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The opposing party must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings. Sound Ship Bldg. Co. v. Bethlehem Steel Co., 533 F. 2d 96, 99 (3d Cir. 1976), Cert. denied, 429 U.S. 860 (1976). At the summary judgment stage, the Court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. In doing so, the Court must construe the facts and inferences in the light most favorable to the non-moving party. Wahl v. Rexnord Inc., 624 F. 2d 1169, 1181 (3d Cir. 1980).

## Were Plaintiffs Entitled to Notice Under the Warn Act?

The Warn Act prohibits employers (with 100 or more full-time employees) from ordering a "plant closing" or "mass layoff" until the end of a 60-day period after the employer serves written notice" of the closing or layoff to its employees 29 U.S.C. §2102(a) (1).

Under the Act,

The term "mass layoff" means a reduction in force which-

(A)    is not the result of a plant closing; and

(B)    results in an employment loss at the single site of employment during any 30-day period for-

(i) (I) at least 33 percent of the employees (excluding any part-time employees):  and

(II) at least 50 employees (excluding any part-time employees); or

(ii) at least 500 employees (excluding any part-time employees);

29 U.S.C. §2101 (a) (3).

To trigger the 60 day notice requirement under this section, if the employer lays off fewer than 500 employees in an action unrelated to a plant closing, the number of employees laid off during that 30 day time period must exceed 50 and must also exceed 33 percent of the total number of employees.  The Department of Labor regulations governing WARN enforcement provides that these figures be calculated at a "snapshot" date, the date notice is first required to be given, which is generally 60 days prior to the first layoff.  20 C.F.R. §639.5 (a) (2).

However, in circumstances where, as here, the employer engages in a series of small terminations or layoffs, none of which individually would be covered under WARN, but which add up to numbers that would require Warn notice, The WARN Act provides for aggregating the number of laid-off employees over ninety (90) days. Section 2101(d) states:

> **For purposes of this section, in determining whether a "plant closing" or "mass layoff" has occurred or will occur, employment losses for 2 or more groups all at a single site of employment, each of which is less than the minimum number of employees specified in section 2101 (a) (2) or (3) of this title, but which in the aggregate exceed that minimum number, and which occur within any 90-day period shall be considered to be a "plant closing" or "mass layoff" unless the employer demonstrates that the employment losses are the result of separate and distinct actions and causes and are not an attempt by the employer to evade the requirements of this chapter, _29 U.S.C. § 2102_(d). [5]**

---

[5] The Preamble to the WARN Act regulations gives an example of 90-day aggregations. It suggests that an employer should look ahead and behind 90 days to determine whether separate but related events would trigger cover-age. Below is a specific example of a situation in which 90-day aggregation might apply under WARN.

| | |
|---|---|
| Day 1 | Company has 180 employees |
| Day 2 | Company terminates 30 employees |
| | (150 is now the number for WARN computations) |
| Day 31 | Company terminates 29 employees |
| | (Now 121 remaining employees) |
| Day 60 | Company terminates 6 employees |
| | (115 remaining employees) |
| Day 90 | Company terminates 5 employees |
| | (110 remain) |

Assuming no notice was given, the company is liable to all 70 employees who were terminated because the mass layoff threshold has been reached through separate actions that did not occur for separate and distinct causes within this 90-day period. All employees terminated within the 90 days have suffered a mass layoff and are entitled to 60 days' notice before the date of termination. For this purpose, the date on which the company size is measured in Day 1. (Note that aggregation period are rolling and the

The Department of Labor regulations provide guidance to employers for deciding whether notice is required- In order for an employer to decide whether issuing notice is required, the employer should-

> **(i) Look ahead 30 days and behind 30 days to and behind 30 days to determine whether employment actions both taken and planned will, in the aggregate for any 30-day period, reach the minimum numbers for a plant closing or a mass layoff and thus trigger the notice requirement; and**

> **(ii) Look ahead 90 days and behind 90 days to determine whether employment actions both taken and planned each of which separately is not of sufficient size to trigger WARN coverage will, in the aggregate for any 90-day period, reach the minimum numbers for a plant closing or mass layoff and thus trigger the notice requirement. An employer is not, however, required under section 3 (d) to give notice if the employer demonstrates that the separate employment losses are the result of separate and distinct actions and causes, and are not an attempt to evade the requirements of WARN.**

In the instant case the layoffs commenced on August 26, 2003. The calculated "snapshot date," in this instance is not 60 days prior to the first layoff, but the day preceding the first layoff, which under the regulations would be considered as Day one (1).[6] As such, the date notice is first required to be given, would be August 25, 2003 and not October 17,2003 as the defendant contends. See 20 C. F. R. §639.5 (a) (2) (notice was not given until October 17, 2003 and benefits not paid to any person laid off prior to November 5, 2003. (See Ex 4)

On August 25,2006 the Defendant employed 358 employees (see Ex 2). During the ensuing 90 days the Defendant had a series of terminations or layoffs, during which

_____

second layoff starts a second 90-day period where the applicable workforce is 121 workers.)

there was no thirty (30) day time period in which at least Fifty (50) and one-third 1/3 of the employees suffered an employment loss, but which, when aggregated, reached the minimum number to constitute a "mass layoff" requiring WARN notice.

The analysis is as follows:

**August 25 thru September 23**  Defendant laid off thirteen (13) employees./ plaintiffs; (See Ex 4)

**September 24 thru October 23**  the defendant laid off eighteen (18) Employees/ plaintiffs and; (See Ex 4)

**October 24 thru November 22**  the defendant laid off one hundred and seven (107) employees. (See Ex 4 & 5)

In aggregate, the total layoffs (136) were sufficient to meet the threshold requirement to meet the definition of "Mass Layoff" under the WARN statute in that at least 50 employees and more than one third of the full-time employees were laid off during the above 90 days.

As the largest number of "Main Street" lay-offs in any thirty day period was 107; after subtraction of the 31 employees previously laid off from their employment, (358-31); 327 full time employees remained and inasmuch as 107 is less than 33 percent of the 327 remaining employees, the WARN act provides that notice is required as "separate employment losses for 2 or more groups at a single site of employment, has occurred, each of which is less than the minimum number of employees specified in §2101(a)(2) or (3) of this title but which in the aggregate exceeded the minimum number, and which occurred within the above 90-day period.

Based on the above it is undisputed that Defendants laid off two or more groups of employees at the "Main Street" site (aggregating at least fifty full-time employees and thirty-three percent of the work site) during a single ninety-day period and under the clear terms of the Act, because Defendants failed to give the required notice to the Plaintiff's in a timely fashion violating the Act.

It is anticipated that the Defendant will argue that the pre- October 17th layoffs were "the result of separate and distinct actions and causes" from the layoffs that occurred from November 6th 2003 through December 5th 2003 and that the pre- October 17th laid off employees were not "affected employees" within the meaning of the act and 60 day notice was not required. The facts in this case  evidence otherwise in that from 2001, "Main Street" was experiencing a financial decline. Business levels, profits and sales dropped significantly each year. The fiscal fortunes of "Main Street" were readily apparent in the spring and summer of 2003, evidenced by the reduction in shifts, days worked and ever decreasing sales and orders.  (See Defendant's Answers to Interrogatories)

In light of the deepening downward spiral,  meetings were conducted during the summer months between top management and "Main Streets'" labor attorney to discuss layoffs and the WARN implications, further demonstrating the dramatic and accelerated financial decline of "Main Street".  In light of the above, the layoffs commencing on August 26th arose out of the same set of circumstances as those that gave rise to the October 17th Warn Notice and the layoffs that occurred in November and December 2003.  (See Defendant's Answers to Interrogatories Ex 1)

In <u>United Paperworkers v. Alden Corrugated </u>, 901 F. Supp. 426 (Mass. 1995), a

case closely analogous to the subject case, in which the employer, over a period of time, initiated a series of small layoffs that the employer claimed arose out of separate and distinct actions and causes, held that" the regulations and legislative history shed no light on the meaning of the phrase "separate and distinct actions and causes." However, applying a common sense interpretation, layoffs that are occasioned by a continuing and accelerating economic demise are not the result of separate and distinct causes.  The Court held that "as a matter of law in that case that the September and November layoffs at the plant must be aggregated such that a mass-layoff shall be deemed to have been ordered by Bates.

The Court further observed "It should be noted at the outset that the defendants' entitlement to rely upon these defenses at all is open to question.  The WARN Act clearly states that "[a]n employer relying on this subsection [§ 2101 (b)] shall give as much notice as is practicable and at that time shall give a brief statement of the basis for reducing the notification period." 29 U.S.C. § 2101 (b) (3).  The implementing regulations explain, in similar precatory language:

> **. . If one of the exceptions is applicable, the employer must give as much notice as is practicable to the union, non-represented employee, the State dislocated worker unit, and the unit of local government and this may, in some circumstances, be notice after the act.  The employer must, at the time notice actually is given, provide a brief statement of the reason for reducing the notice period, in addition to the other elements set out in § 639.7.**

20 C.F.R. §639.9.

The referenced section, §639.7, details the specific information that must be provided in the written notification.

In the case before this Court the "Main Street" lay-offs from August 26th thru October 17th were clearly motivated by the economic decline of the company and no notice at all was received by any of the twenty-eight (28) laid off plaintiff's until after October 17th. The remaining three (3) employees laid off after October 17th also received notice, albeit untimely and also were not compensated. For all of the reasons stated Plaintiffs would ask that the Court find that the Defendant violated WARN in failing to provide timely notice of the "mass layoff."

The Court is afforded the discretion to reduce the amount of the liability or penalty or penalty to be assessed against an employer if that employer proves that it acted in good faith and had reasonable grounds for believing that its acts or omissions were not a violation of the WARN Act. 19 U.S.C. §2104 (a) (4). It is anticipated that the defendants will propose that there are grounds for such a reduction in this case.

"Main Street" simply ignored the provisions of the Act. Indeed, it is noted that when the defendant laid off the thirty-one (31) employees/plaintiffs from August through October of 2003, at a time when more than one hundred (300) people were employed at the Plant, that they had consulted outside labor counsel with respect to their obligations under WARN and nevertheless chose not to give those employees Notice of the impending layoff. Moreover there was as of this date extensive case law available to offer guidance in this area, demonstrating bad faith.

To be sure, due to its long standing passage, in large measure the WARN Act represents charted waters. The legal issues involved in this case were quite ordinary in their complexity. These very circumstances, undercuts the reasonableness of the defendants' reliance upon what appears to be a rather simplistic opinion of labor

counsel and  barely scratched the surface of the jurisdictional inquiry required under the WARN Act.  Moreover, even a cursory review of the statute and regulations underscore the importance and significance of providing notification to employees.

For example, the regulations explicitly provide that in ambiguous situations,

**"It is civically desirable and it would appear to be good business practice for an employer to provide advance notice to its workers or unions, local government and the State when terminating a significant number of employees.  In practical terms, there are some questions and ambiguities of interpretation inherent in the application of WARN to business practices in the market economy that cannot be addressed in these regulations.  It is therefore prudent for employers to weigh the desirability of advance notice against the possibility of expense and time-consuming litigation to resolve disputes where notice has not been given.  The Department encourages employers to give notice in all circumstances."**

Finally, it is anticipated that "Main Street" will state that at all times they acted in the best interest of their employees.  Congress has determined that compliance with the provisions of the WARN Act is in the best interest of the employees, and employers are not permitted to substitute their subjective judgment about what is in the employees' best interest for the requirements of that Act.  Based on the above, Plaintiffs would request Summary Judgment against the Defendant.

## VACATION PAY

### Background

### Payment of Wages on a Timely Basis - Payment of Wages on Termination

**A. Whether the defendant "Main Street's" vacation policy, that requires the employee be employed as of the Christmas Holiday vacation to be eligible for vacation pay for the preceding six months, represents a forfeiture of wages violating M.G.L. c.149 §148.**

The Plaintiffs claim that the failure to pay Vacation Pay for all employees that were laid off between August 26, 2003 and December 25, 2003 violates M.G.L. c.149 §148.

At the outset the plaintiffs have complied with the c.149 that requires a complaint be first served with the Attorney General prior to bringing suit.   The Plaintiffs have done so and have amended their complaint in August 2006 to reflect this claim and the satisfaction of the statutory requirement. (See Ex 10).

Under "Main Street's" Layoff and recall policy dated October 1991 the guidelines stated:

**"Hourly associates who are not actively employed at the vacation pay time will not receive vacation pay.  If the associate is recalled prior to December 31 of the year in which he/she was laid off, the vacation check will be issued with the first check received upon return to work".**  (See Dep. Trans. Lou Ann LaPorte P. 57 - 63, Dep Trans. Penny Richards P. 59- 64 and Dep. Trans. Edward D. Petreillo P. 92 - 104, Ex 7).

Under "Main Street's" written personnel policy dated  November 1992, an associate to be eligible for vacation pay:

**"must be employed at vacation time or on an approved medical leave of absence, or return prior to their next scheduled shift". " New associates must have worked prior to the last week in May to be eligible for vacation pay during the July 4th vacation and prior to the last week in November to be eligible for vacation during the Holiday vacation".**  (See Ex 6)

The written policy includes a chart specifying the computation of Vacation Pay

depending on the earnings that they had earned in the preceding six (6) months based on percentages for length of service. Based on the above policy, the defendants claim that all employees laid off during the "mass layoff" from August 25, through the vacation week commencing December 25, 2003, were not entitled to vacation pay as they were "not employed at vacation time".

### B.  General Laws c. 149, §148

The Commonwealth's Payment of Wages Law, G.L. c. 149, §148, (Ex 8) mandates that, upon their termination, employees are to be paid  their earned wages  including any holiday or vacation payments due an employee under an oral or written agreement." G.L.c. 149, §148 (1996 ed. & 2001 Supp.).

The parties have differing interpretations of these statutory provisions. The Plaintiffs and the Massachusetts Attorney General are of the view (as expressed in a 1999 advisory from the Page 1021 division) (See Ex 9) that because paid vacation time constitutes "wages," such "wages" must be paid to any departing employee, and that any agreement requiring a departing employee to forfeit earned vacation violates the statute's prohibition against "special contract[s]" exempting the employer from the statute's requirements. The plaintiffs further claim that a semi-annual paid vacation is earned by labor performed throughout the year and vests as it is earned. Thus an employee who worked for some part of the last six months of 2003 has a vested right to a proportionate share of his or her vacation pay and that the "Main Street" vacation policy represents a fortfeiture of wages and therefore, violates the Wage Statute.

"Main Street" claims that, looking to  the statute, its vacation policy is consistent with G.L. c. 149 §148.  Specifically, "Main Street" asserts that the statute only mandates that

departing employees be paid wages that are "due" pursuant to the terms of the policy, which limits vacation pay to employees that are actively employed on the date of the vacation in December.  Because the "Main Street" vacation policy states that vacation is not earned and does not accrue, "Main Street" maintains that the vacation it gives its employees is not "due" as required under the statute. The company further maintains that under their vacation policy it is a condition precedent to the vesting of vacation rights. Hence, employees terminated, as in this case, prior to Christmas week 2003, have no "vacation time" due under the statute. For example, under "Main Street's" theory, if an employee were terminated a few days before Christmas 2003, no vacation pay would be forthcoming even though the worker had been employed the previous 180 days. (See Dep Trans DePetrillo  Pg 96, Ex 7)

However, such an interpretation of vacation time would run contrary to Massachusetts v. Morash, 490 U.S. 107 (1989), whereby the Supreme Court found that vacation pay is part of an employee's regular compensation. See id. at 120. Because an employee's vacation time is regular compensation, it is earned just as wages are earned. Thus, to the extent that "Main Street" policy runs contrary to this premise, those terms are invalid.

Courts in other jurisdictions which have considered whether discharged employees have a "vested" right to a pro rata share of vacation pay have uniformly held that the right vests as services are rendered. "It is beyond dispute that an agreement to pay vacation pay to employees made to them before they performed their services, and based upon length of service and time worked, is not a gratuity but is a form of compensation for services, and when the services are rendered, the right to secure the promised

compensation is vested as much as the right to receive wages or other form of compensation." (Livestock Feeds v. Local Union No. 1634, (1954) 221 Miss. 492, 502-503 [73 So.2d 128, 132', quoting Textile Workers Union v. Paris Fabric Mills (1952) 18 N.J. Super. 421 [87 A.2d 458, 459], affd. 22 N.J. Super. 381 [92 A.2d 40, 41]; accord Valeo v. J.I. Case Co., supra, 18 Wis. 2d at pp. 585-586 [119 N.W. 2d at p. 388]; see the discussion of the trend to grant vacation on a pro rata basis to laid-off employees in Amalg. Butcher Workmen Loc. Un. No. 641 v. Capitol Pack. Co. (10th Cir. 1969) 418 F.2d 668, 672, fn. 5.) The Supreme Courts of California and Illinois that have a wage statute similar to the Massachusetts wage statute, reached the same conclusion, that where vacation pay depended on specific dates and was subject to forfeiture, that the vacation policy violated their wage statute.  See Golden Bear Family Restaurants v. Murray 144 Ill. App. 3rd 616 , 494 N.E.2d 581 (1986). Suastez v. Plastic Dress Up Co. 31 Cal. 3rd 774, 647 P.2nd 122 (1982).  The facts in those two cases are very similar to those in the instant case and their reasoning is persuasive and plaintiffs would suggest that the Massachusetts S.J.C. would adopt their reasoning if the appropriate case is presented.

There is no settled law in Massachusetts on this issue and is a question of first impression.  The most recent Massachusetts case that was presented to the S.J.C. with this issue, (see Electronic Data Systems Corp. v. Attorney General 440 Mass. 1020, 798, N.E.2d 273 (2003)) ended in a decision that expressed no opinion "whether a  company policy provision forfeiting vacation pay in the event of a voluntary departure or involuntary termination was violative of G.L. c149 §148."  Instead the Court decided the case on whether the wording of the policy was ambiguous.

The plaintiffs contend that this Court should apply the principles in the better

reasoned cases, as stated above, and should find that the "Main Street" policy is violative of §148. It is important to note that the defendant has not provided this Court with a single case to support its position.

Moreover, the plaintiffs' position is in accord with the Attorney General's Advisory opinion.[7]  That Advisory acknowledges that employers are free to set requirements for vacation entitlements, including scheduling vacation, capping accrual of vacation time, and imposing a "use it or lose it" rule to prohibit employees from accumulating vacation time from year to year. The Advisory, however, takes a firm position that employers  may not evade the basic rule that accrued vacation entitlement is a form of wages by imposing forfeiture rules, such as rules barring employee who quit without notice or who are fired for cause from receiving vacation pay upon termination.  Similarly, employers may not retroactively deny employees the benefit of accrued vacation benefits by imposing caps on accrual and the like, but they may make prospective changes, so long as the employee has the opportunity to enjoy the benefit of vacation time or pay already "banked." The Advisory also states a form of presumption in favor of a gradual accrual system, so that if the employer wants to impose a cliff-vesting scheme of the type referred to above, but is ambiguous in describing the arrangement, the Attorney General will treat the arrangement as one calling for gradual accrual.  The example given is that if the employer provides 12 days of vacation "per year" or "on the employee's anniversary date" or "every 12 months,"

---

[7] Office of Attorney General, "Advisory 99/1, An advisory from the Attorney General's Fair Labor and Business Practices Division on Vacation Policies" (199). See Electronic Data Systems Corp. v. Office of Attorney General, 15 Mass. L. Rptr. 689, 2002 WL41554 (Mass. Super. 2002), ordering pro-rata payment of vacation pay on chapter 30A appeal from civil citation issued by Attorney General despite employer's contention that no pay was due under policy that stated vacation pay is not earned and does not accrue.

and the employee quits after 10 months, the presumption will be that the employee is entitled to 10 months, and that the employee is entitled to 10 days vacation or pay in lieu of that on termination. The typical vacation policy provides that the amount of vacation for which an employee is eligible depends on, among other things, earnings, the length of employment with the company and the title or position the employee holds. As stated earlier, the legislature has left these variables to the employer or the bargaining table. If the legislature had intended the contract to control the time of vesting, it could easily have drafted the statute to compel such a result. It did not. Instead the statute prohibited "special contacts" that forfeited earned wages as the "Main Street" policy does.

As discussed in the Advisory on Vacation Policies published by the Office of the Attorney General, Fair Labor and Business Practices Division on September 7, 1999, (see attached), a vacation policy that provides for a certain amount of vacation "a year," "per year," "on [the employee's] anniversary date" is ambiguous. See Administrative Record at 22. ) This is so "because the definitions of the time periods are imprecise and subject to confusion concerning their start and end dates." (See id.) This interpretation accords with the apparent intent of the statute and the holdings that view vacation pay as wages.

Finally, the defendant claims that it is the sole arbiter on whether vacation pay vests as it is earned and infers that its vacation policy trumps state law. However if vacation pay vests as it is earned, the company's policy requirement of employment at Christmas cannot prevent the right to vacation pay from vesting. At most, it is a condition subsequent which attempts to effect a forfeiture of vacation pay already vested. Suastez v. Plastic Dress Up Co., 647 p.2d 122 (1982). Under Section 148, of course, such a forfeiture is forbidden, as a "special Contract".

As such the vacation policy of "Main Street" is illegal and payment should be ordered paid to all eligible employees laid off during the subject time period.

By their Attorneys,
BRIAN CUNHA & ASSOCIATES

Brian R. Cunha, Esq., BBO #108560
311 Pine Street
Fall River, MA 02720
Tel: (508) 675-9500

## Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and that all counsel of record are so registered.

/s/ Brian R. Cunha

Dated: August 30, 2006                    Brian R. Cunha