1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

2

No: 04-10439RCL            Rule 30 Deposition

3

4    DONNA MANCHESTER and NOEMIA CAMARA, Individually,
and on behalf of all other Similarly Situated

5                                    Vs.

6

7    MAIN STREET TEXTILES, L.P., and JOAN FABRICS
SERVICES L.L.C., and JOAN FABRICS CORPORATION

8

9            DEPOSITION OF EDWARD DiPETRILLO, taken

10    pursuant to Rule 30 of the Massachusetts Rules of

11    Civil Procedure on behalf of the Plaintiffs, before

12    Salvina S. Ferreira, RPR, a Notary Public in and for

13    the Commonwealth of Massachusetts, at the Offices of

14    Brian Cunha & Associates, 311 Pine Street, Fall

15    River, MA, commencing at 12:45 P.M., on Friday,

16    October 15, 2004, pursuant to Notice and agreement

17    of parties as to the date and time of taking said

18    deposition.

19

20

21                        * * * * * *
                    LEDGEWOOD COURT REPORTING
22                        23 East Street
                    Tiverton, RI  02878
23                        (401) 625-5455

24

Ledgewood Court Reporting  (401) 625-5455

---

2

1    APPEARANCES:  Brian R. Cunha, Esq.
                    BRIAN CUNHA & ASSOCIATES
2                    311 Pine Street, Fall River
                    Representing the Plaintiffs
3

4            Neil v. McKittrick, Esq.
                GOULSTON & STORRS
5                400 Atlantic Avenue
                Boston, MA  02110-3333
6                Representing the Defendants
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

---

3

I N D E X

| Examinations | Page |
|---|---|
| Edward DiPetrillo | 4 |
| Direct Examination By Mr. Cunha | 4 |

E X H I B I T S

| Exhibit No. | Description | Page |
|---|---|---|
| 1 | Defendant's answers to plaintiff's 65 interrogatories | |
| 2 | Standard procedure instruction | 92 |
| 3 | Attorney General's Fair Labor and Business Practices Division Advisory | 97 |
| 4 | Supplemental response | 104 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

---

4

1            S T I P U L A T I O N S

2        It is hereby agreed and stipulated by and

3    between counsel for the respective parties that all

4    objections, except as to the form of the question,

5    are reserved until the time of trial, including

6    motions to strike.

7        It is further agreed and stipulated that the

8    witness will read and sign the deposition

9    transcript.

10

11            EDWARD DiPETRILLO, having been

12    satisfactorily identified by the production of his

13    driver's license, and called on behalf of the

14    plaintiffs, having been duly sworn on oath, deposes

15    and says as follows:

16

17    **Direct Examination By Mr. Cunha:**

18    Q    What is your name?

19    A    **Edward N. DiPetrillo.**

20    Q    Where do you live?

21    A    **18 Glenn Drive, Smithfield, Rhode Island.**

22    Q    How old are you?

23    A    **52.**

24    Q    What is your birth date?

**Page 33**

1   terminations would have occurred. Did the site on

2   Airport Road that single site; is that correct?

3   A   To my knowledge, yes.

4   Q   Now, were there any events that occurred in 2002 or

5       2003 to your knowledge that lead to the layoffs or

6       terminations of employees in 2003?

7   A   I don't know.

8   Q   Okay. You answered -- you signed some

9       interrogatories.

10  A   Right.

11  Q   Do you recall answering these questions?

12  A   I believe I have knowledge of it.

13  Q   Well, did you read the answers before you signed

14      them?

15  A   Yes.

16  Q   Well, do you remember stating that there were

17      production activity problems at the plant?

18  A   Yes.

19  Q   All right. So again were there reasons that lead to

20      the layoffs in the year 2003 at the plant in Fall

21      River?

22  A   It was economics.

23  Q   All right. Tell me about the economics. What were

24      the key components?

**Page 34**

1   A   The economic problems were that the textile industry

2       in general was very hard hit by overseas competition

3       nationally; Mexico and China. And that the entire

4       textile industry was being hurt by this and we were

5       losing a lot of our sales to China and Mexico.

6   Q   And when did this international competition and the

7       fact that you were being hurt first begin?

8   A   I personally don't know.

9   Q   How about was it after September 11th, 2001 that it

10      became particularly acute?

11  A   Yes, I believe so.

12  Q   All right. And was there a steady decline from

13      September 2001 through 2003 with regard to the

14      profitability of Main Street Textiles?

15  A   To my knowledge, yes.

16  Q   So this wasn't a sudden dramatic change, that was a

17      change that was occurring over time; is that

18      correct?

19  A   It was on-going; correct?

20  Q   So you had clear warning as time went on of this

21      problem; is that correct?

22  A   Yes.

23          MR. McKITTRICK: Objection.

24  Q   Did you participate at all with regard to the

**Page 35**

2       participate in the management?

3   A   I was involved.

4   Q   Okay. And when did you first become involved with

5       regard to the anticipating closing of the Fall River

6       plant?

7   A   I believe it was in October of '03.

8   Q   Okay. Well, how about prior to October of '03 did

9       you participate in any meetings with any management

10      people with regard to the closing of the Fall River

11      plant?

12  A   I don't really remember.

13  Q   Well, were there any memos sent back and forth

14      between yourself and other management personnel

15      prior to October of 2003?

16  A   I don't remember.

17  Q   What was your first memory that the Fall River plant

18      was going to be closed?

19  A   My first memory was when the owner contacted me just

20      before advising me that he wanted to close the plant

21      down.

22  Q   What date was that?

23  A   As I stated earlier it was in October of '03.

24      Specifically I don't remember the date.

**Page 36**

1   Q   Well, was it before '03?

2   A   Yes, it was.

3   Q   Well, how long before October 17th, '03 was it?

4   A   I don't remember.

5   Q   Was it in the summer of '03?

6   A   No.

7   Q   How do you know that?

8   A   Because I stated earlier it was in October of '03.

9   Q   That's the first information that you ever received

10      either written or oral?

11  A   To my recollection, yes.

12  Q   Okay. Did you ever receive any memos, e-mails or

13      other documents from management prior to October of

14      '03 with regard to the closing of the plant in Fall

15      River?

16  A   I don't remember.

17  Q   All right. Well, are there certain documents that

18      you have in your file back in the office that would

19      help you remember?

20  A   If I went through my files, yeah, I would recollect

21      that.

22  Q   Okay.

23  A   If it did happen.

24  Q   All right. Now one of the things I have asked for,

89

1  Q  The other principal in Tyngsboro is?

2  A  Penny Richards and Elkin.

3  Q  The layoffs that occurred on November 6 and November

4     7, '03, were the numbers in and of themselves

5     sufficient to satisfy the threshold requirement for

6     requiring the WARN notice?

7  A  I believe they were.  Again, without the numbers in

8     front of me I can't specifically state that but I

9     believe they were.

10 Q  So just the employees that were laid off on those

11    two days satisfied the 50 employee requirement and

12    the one-third requirement just on those two days?

13 A  Going back to November 17th the day it triggered

14    from that point through 6 and 7 it would.

15 Q  October 17th?

16 A  Right.  From that point and including the 6th and

17    7th, yes.

18 Q  My understanding is that the time the 30 day

19    timeframe that you used was November 6th through

20    December 5th, is that the relevant time period that

21    you used in terms of determining the 30 day

22    timeframe?

23 A  That was counsel's advice to us.

24 Q  So again you relied on counsel?

90

1  A  That's correct.

2  Q  And that was Mr. McKittrick?

3  A  That's correct.

4  Q  So you don't know what the 30 day timeframe was; is

5     that right?

6  A  I didn't calculate it.

7  Q  Mr. McKittrick would know that?

8  A  That's correct.

9  Q  As to whether the November 6th and November 7th

10    either individually or together satisfied the

11    threshold requirement is something that you don't

12    have any knowledge of?

13 A  That's correct.

14 Q  That would be something that Mr. McKittrick knew and

15    advised you?

16        MR. McKITTRICK:  Objection.

17 A  Right.

18 Q  Now, with regard to whether there was a requirement

19    to look back either 30 days or 90 days again that's

20    not something you had any independent knowledge of,

21    is it?

22 A  That's correct.

23 Q  Again, you relied on counsel with regard to that?

24        MR. McKITTRICK:  Objection.

91

1  A  That's correct

2  Q  Now, you understand that there was a difference

3     between WARN Act with regard to mass layoff versus a

4     plant closing; right?

5  A  Yes.

6  Q  And there's a statutory provision that define what a

7     mass layoff is versus a plant closing and what the

8     requirements are under WARN Act under each; right?

9  A  Right.

10 Q  Is it fair to say that you don't have independent

11    knowledge as to whether there was a mass layoff and

12    when it occurred; is that correct?

13 A  That's correct.

14 Q  That's something again you relied on counsel for; is

15    that right?

16 A  Right.

17 Q  And with regard to what the requirements were for

18    plant closing on WARN Act again you relied on

19    counsel; is that right?

20 A  That's correct.

21 Q  All right.  Now we're going to talk about something

22    else.

23        You had a vacation policy at Main Street

24    Textile; correct?

92

1  A  Yes.

2  Q  Now, are you the one that drafted that or did

3     someone else draft that?

4  A  I believe I drafted that.

5  Q  Did you consult with any attorneys with regard to

6     drafting that or is that something you drafted on

7     your own?

8  A  I believe we consulted Edwards & Angell at the time.

9  Q  In Rhode Island?

10 A  Yes.

11 Q  Do you know if they ever consulted Mass. law at all

12    with regard to that?

13 A  No, I do not.

14 Q  What?

15 A  No, I do not.

16 Q  My understanding of the policy --

17        MR. CUNHA:  And we'll mark this as exhibit

18    2.

19        (Exhibit 2, Standard procedure

20    instruction, was marked for identification)

21 Q  It says hourly associates or employees were eligible

22    for vacation pay; right?

23 A  Production hourly.

24 Q  And they must be employed at vacation time or on

93

1    medical leave in order to receive that vacation pay;
2    correct?
3  A   Yes.
4  Q   And then it looks like under the vacation pay policy
5    that new employees must have been employed the last
6    week in May to be eligible for the July 4th vacation
7    pay; right?
8  A   Yes.
9  Q   And new employees must be employed the last week of
10   November to be eligible for the vacation pay in
11   December; right?
12 A   Yes.
13 Q   So that according to your policy they only had to be
14   employed for three or four weeks to be eligible for
15   vacation pay?
16 A   It was -- the policy was based on seniority.
17 Q   I am just asking -- just answer my question.
18 A   Okay.
19 Q   According -- and I am reading it.
20 A   Yeah, right.
21 Q   It says last week in November.
22 A   Yeah.
23 Q   Correct?  Right?
24 A   Yes.

95

Ex 7

1  Q   All right.  There was some answers to
2    interrogatories that your lawyer sent me yesterday.
3  A   Yes.
4  Q   And in those answers you changed that somewhat and
5    said that in order to be eligible you had to have
6    six months of continuous service to accrue vacation,
7    paid vacation time?
8  A   I believe that was for the office hourly and salary
9    plan.  There was a miscommunication there.
10 Q   Okay.  So this was different than the hourly --
11 A   Correct.
12 Q   -- policy that was a separate policy?
13 A   Yes.
14 Q   So the manufacturing people were subject to this
15   procedure?
16 A   That's correct.
17 Q   But that the office personnel and the full-time
18   personnel such as yourself --
19 A   Yes.
20 Q   -- had to work at least six weeks before you were
21   entitled to vacation pay?
22 A   I believe it was six months.
23 Q   Six months?
24 A   Yes.

94

1  Q   All right.  So that if I began working on November
2    25th; right?
3  A   Yes.
4  Q   What was the week that the plant traditionally shut
5    down in December?
6  A   Usually between Christmas and New Years.
7  Q   Last week?
8  A   Correct.
9  Q   So I could work four weeks then I get paid a
10   vacation week; right?
11         MR. McKITTRICK:  Objection.
12 Q   Is that right?
13 A   You get vacation, yes.  You get something.  I don't
14   know if you get a full week.
15 Q   Well, you get paid according to your --
16 A   Policy.
17 Q   -- policy here?
18 A   Right.  Which was based on seniority and percentage
19   of gross earnings.
20 Q   So according to 4.0 you get 2 percent of your
21   earnings?
22 A   Through November 30th.
23 Q   So you get something?
24 A   Correct.

96

1         MR. McKITTRICK:  Brian, just when you
2    refer to this procedure you mean the one for the
3    production hourly?  Are you marking this?
4         MR. CUNHA:  I marked it as Exhibit 2.
5         MR. McKITTRICK:  Exhibit 2, thanks.  I
6    didn't know that.
7  Q   And then on page 2 of your policy it says that those
8    people that aren't actively employed on vacation pay
9    time they don't get any vacation pay; right?
10 A   That's correct.
11 Q   So if I work from -- I have been working for your
12   company for 20 years; right?
13 A   (Witness nodding in the affirmative)
14         Yes.
15 Q   Then I would be eligible under your plan under 4.0
16   to 8 percent of yearly salary for my vacation pay if
17   I have been there the last week of December; right?
18 A   Correct.
19 Q   But if you laid me off the week before, I received
20   nothing?
21 A   That's correct.
22 Q   And that was your decision; correct?
23 A   That was the policy of the organization.
24 Q   But it was your decision to lay a person off or not?

**97**

1    A    Based on the policy.

2    Q    Not policy whether they pay them or not. I

3        understand that.

4    A    As far as me laying them off?

5    Q    You or the company.

6    A    It was company decision to lay people off?

7    Q    Now had you ever reviewed the Attorney General's

8        Fair Labor and Business Practices Division Advisory

9        prior to or subsequent to preparing these layoff and

10       recall guidelines?

11    A    No, sir.

12    Q    I am going to show you a copy. See if you ever seen

13       them.

14            MR. CUNHA: We'll mark this as exhibit

15       three.

16            (Exhibit 3, Attorney General's Fair Labor

17       and Business Practices Division Advisory, was marked

18       for identification)

19            (Witness reading document)

20    Q    Do you see the first line, "employers who chooses to

21       provide paid vacation to their employees must treat

22       those payments like any other wages under Mass.

23       General Laws Chapter 149." See that?

24    A    Yes.

**98**

1    Q    Do you see the next line it says, "like wages,

2       vacation time promised to an employee is

3       compensation for services which vests as the

4       employee's services are rendered." See that?

5    A    Yes.

6    Q    Do you know what that means?

7    A    No.

8    Q    You have no idea what that means?

9    A    For the timeframe in which they worked as the

10       employee's services are rendered.

11    Q    Right. So as that employee works for example in

12       your company from July till December, what this says

13       is that this time is vesting and that the employees

14       have to be compensated with regard to the time

15       spent; is that your understanding of this?

16            MR. McKITTRICK: Okay. Don't you answer.

17       I am going to object and you're not going to answer

18       so go ahead.

19    Q    Let me ask you this.

20            MR. McKITTRICK: I am not going to let him

21       analyze the Attorney General's policies. You know

22       that's not fair. He's not a lawyer.

23            MR. CUNHA: I am asking if he's aware of

24       it.

**99**

1            MR. McKITTRICK: And you did and you asked

2       and I haven't objected and you can ask him what the

3       policy was and he told you about that.

4    Q    Is it fair to say under your policy the employees

5       were not compensated for vacation time earned?

6            MR. McKITTRICK: Objection.

7    Q    During the prior six months?

8            MR. McKITTRICK: Objection.

9    A    If they weren't employed at the time, they did not

10       receive compensation.

11    Q    I understand. So that your policy only compensated

12       them if they were employed on the date of the plant

13       shutdown or the vacation period during the last week

14       in December; correct?

15    A    Correct.

16    Q    They were not compensated for the time they worked

17       during the prior six months; is that correct?

18            MR. McKITTRICK: Objection.

19    A    They did not receive any monies.

20    Q    They were not compensated for vacation time for any

21       of the time they worked for the prior six months; is

22       that correct?

23    A    Correct.

24    Q    Were any of the employees including the full-time

**100**

1       salaried employees compensated for time earned for

2       services rendered during the prior six months?

3    A    No.

4    Q    Did the policy at all other than what I have read

5       you had to have worked for six months prior to

6       receiving any vacation, did the policy with regard

7       to the vesting of time was it at all different with

8       regard to salaried employees versus hourly

9       employees?

10    A    I believe there's a difference.

11    Q    What's the difference?

12    A    Under the salaried plan based on years of service

13       they would receive so many days per year of service

14       and it would only be accrued from July 1 to June 30

15       to be --

16    Q    What if a salaried employee left in October, would

17       they receive a percentage of what their vacation

18       time would be -- I guess it would be July, August

19       and September?

20    A    It would be prorated.

21    Q    Okay. However, for the hourly employees it was not

22       prorated; is that correct?

23    A    That's correct.

24    Q    Why was that?

101

1   A   It was just the way the policy was written.

2   Q   So the policy was different for salaried employee's

3       service than hourly employees?

4   A   Yes.

5   Q   Now, the policy that you established increases the

6       amount of money that an employee receives the longer

7       he works for the company; correct?

8   A   Correct.

9   Q   And under this computation of vacation pay up to

10      three years of service that employee receives 2

11      percent of his earnings; correct?

12  A   Correct.

13  Q   And that is paid twice a year?

14  A   Yes.

15  Q   Once in June or July and once in December; right?

16  A   Right.

17  Q   So if I worked -- if I made $30,000 a year; right?

18  A   Correct.

19  Q   If I earned $30,000 a year I would receive one

20      percent of that in July or June and one percent in

21      December; right?

22  A   No.

23  Q   Okay.

24  A   What you would receive is the gross wages from

102

1       November -- I'm sorry, December 1st through May 31st

2       you would receive 2 percent of that prior to the 4th

3       of July shutdown and then June 1st through November

4       30th you receive 2 percent of whatever those gross

5       earnings were for Christmas shutdown.

6   Q   Okay. So it would be actually 4 percent; they

7       receive 2 percent per time period; correct?

8   A   Yeah, but it's six month earnings only.

9   Q   But it's computed on six month timeframe?

10          MR. McKITTRICK: Just to be clear, but it

11      won't be 4 percent of annual.

12          MR. CUNHA: I understand 2 percent of six

13      months timeframe.

14  Q   So that's the timeframe you used six months?

15  A   That's correct.

16  Q   But then it increased depending as the employee

17      worked more time; is that correct?

18          So if I worked between three and five

19      years of employment at your company; right, I work

20      between November and June and then I continued

21      working at the company and then on November 15th you

22      laid me off; right?

23  A   Yes.

24  Q   You would not be obligated to pay me any vacation

103

1       time; is that your policy?

2   A   You would have received your vacation pay for

3       December through May but for the period June through

4       November you would not.

5   Q   You would not receive any vacation?

6   A   Correct.

7   Q   We can agree that the longer you worked the more

8       vacation you make; correct?

9   A   Correct.

10  Q   Who established the policy with regard to the

11      vacation pay?

12  A   That was established with the company prior to my

13      being there.

14  Q   It says October 1991 that I'm looking at. See that

15      on Exhibit 2?

16  A   Yes.

17  Q   Was that ever modified?

18  A   Not to my knowledge, no.

19  Q   And who established it if you know?

20  A   I most likely wrote that. It was approved by the

21      owner.

22  Q   When you wrote this, had you consulted any attorneys

23      with regard to establishing this policy?

24  A   I believe it was reviewed by Edwards & Angell at the

104

1       time.

2   Q   Did you ever review any of the advisory opinions by

3       the Attorney General with regard to the policy that

4       you had established regarding vacation pay prior to

5       adopting it?

6   A   No, I did not.

7   Q   Is today the first time you ever seen this advisory?

8   A   Yes, it is. Yes.

9           MR. CUNHA: All right.

10          (Exhibit 4, Supplemental response, was

11      marked for identification)

12          (Whereupon the deposition ended at 3:00

13      p.m.)

14

15

16

17

18

19

20

21

22

23

24

**Page 1**

```
        UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF MASSACHUSETTS

No: 04-10439RCL            Rule 30 Deposition

DONNA MANCHESTER and NOEMIA CAMARA, Individually,
and on behalf of all other Similarly Situated

Vs.

MAIN STREET TEXTILES, L.P. and
JOAN FABRICS SERVICES L.L.C.,
And JOAN FABRICS CORPORATION


        DEPOSITION OF LOU-ANN LAPORTE, taken

pursuant to Rule 30 of the Massachusetts Rules of

Civil Procedure on behalf of the Plaintiffs, before

Salvina S. Ferreira, RPR, a Notary Public in and for

the Commonwealth of Massachusetts, at the Offices of

Brian Cunha & Associates, 311 Pine Street, Fall

River, MA, commencing at 11:10 A.M., on Friday,

August 26, 2005, pursuant to Notice and agreement of

parties as to the date and time of taking said

deposition.



              * * * * *
          LEDGEWOOD COURT REPORTING
               23 Last Street
             Tiverton, RI  02878
               (401) 625-5455


        Ledgewood Court Reporting  (401) 625-5455
```

**Page 3**

| Examinations | Page |
| --- | --- |
| Lou-Ann Laporte | |
| Direct Examination By Mr. Cunha | 4 |
| Cross Examination By Mr. McKittrick | 63 |
| Redirect Examination By Mr. Cunha | 65 |

### E X H I B I T S

| Exhibit No. | Description | Page |
| --- | --- | --- |
| 1 | Answers to Interrogatories marked in | 63 |
| | Mr. DePetrillo's deposition | |
| 2 | Layoff recall policy | 68 |

Ledgewood Court Reporting  (401) 625-5455

**Page 2**

```
APPEARANCES:  Brian R. Cunha, Esq.
              BRIAN CUNHA & ASSOCIATES
              311 Pine Street
              Fall River, MA  02720
              Representing the Plaintiffs


              Neil V. McKittrick, Esq.
              GOULSTON & STORRS
              400 Atlantic Avenue
              Boston, MA 02110-3333
              Representing the Defendant
```

Ledgewood Court Reporting  (401) 625-5455

**Page 4**

### S T I P U L A T I O N S

It is hereby agreed and stipulated by and between counsel for the respective parties that all objections, except as to the form of the question, are reserved until the time of trial, including motions to strike.

It is further agreed and stipulated that the witness will read and sign the deposition transcript.

LOU-ANN LAPORTE, having been satisfactorily identified by the production of her driver's license, and called on behalf of the plaintiffs, having been duly sworn on oath, deposes and says as follows:

**Direct Examination By Mr. Cunha:**

Q  What is your name?

A  **Lou-Ann Laporte.**

Q  Where do you live, Lou-Ann?

A  **40 Abbey Avenue, Warwick, Rhode Island.**

Q  How old are you?

A  **58.**

Q  Birth date?

A  **9/12/46.**

Ledgewood Court Reporting  (401) 625-5455

49

| | |
|---|---|
| 1 | laid off within the timeframe. |
| 2 Q | And then you made a list of those people; correct? |
| 3 A | Yes. |
| 4 Q | And then based on that you then sent them all |
| 5 | notices; correct? |
| 6 A | They were all mailed notices, yes. |
| 7 Q | And you did that? |
| 8 A | Yes. |
| 9 Q | All right. And that was done when? |
| 10 A | The 17th. |
| 11 Q | That day? |
| 12 A | That day and the day after, yes. |
| 13 Q | Do you remember approximately how many you sent out? |
| 14 A | I don't know. |
| 15 Q | Over three hundred? |
| 16 A | Yes. |
| 17 Q | How did you physically do that? Did you go into a |
| 18 | computer file of all the employees? |
| 19 A | Yes, timeframe. Yes, people that were on the active |
| 20 | payroll at that time. |
| 21 Q | And you just went through your computer list and |
| 22 | that's how you did it? |
| 23 A | Yes. |
| 24 Q | And do you have an ability with your computer to |

Ledgewood Court Reporting (401) 625-5455

51

| | |
|---|---|
| 1 Q | It says to ensure that the layoffs complied with the |
| 2 | WARN Act. Well, what in the meetings if you can |
| 3 | recall, did you discuss? |
| 4 A | I don't remember what was discussed in these |
| 5 | meetings. |
| 6 Q | Well, did you discuss what WARN required in these |
| 7 | meetings? |
| 8 A | I don't recall. |
| 9 Q | Did you ever receive a memo or a notice or any |
| 10 | correspondence or e-mails between yourself and Mr. |
| 11 | DePetrillo or others regarding compliance with WARN? |
| 12 A | No. |
| 13 Q | You never saw anything? |
| 14 A | No. |
| 15 Q | It was just a meeting or it says meetings over |
| 16 | several months; correct? |
| 17 | How many meetings do you recall there was? |
| 18 A | I don't recall. |
| 19 Q | Well, was there more than ten? |
| 20 A | I don't recall. |
| 21 Q | Were there more than five? |
| 22 A | I don't recall. |
| 23 Q | Was there more than one? |

Ledgewood Court Reporting (401) 625-5455

50

| | |
|---|---|
| 1 | just take names and addresses and -- |
| 2 A | Yes, and print labels. |
| 3 Q | Is that what you did? |
| 4 A | Yes. |
| 5 Q | And then you just sent this notice to all of these |
| 6 | 300 some odd people; correct? |
| 7 A | Yes. |
| 8 Q | That was done on October 17th? |
| 9 A | 17th and the 18th. |
| 10 Q | Well, my understanding though is that you didn't |
| 11 | have any discussions about compliance until |
| 12 | November. |
| 13 A | I would not have knowledge of compliance issues. |
| 14 Q | Who would? |
| 15 A | I got my directive from Ed DePetrillo. |
| 16 Q | Well, I guess I keep going back to this answer to |
| 17 | interrogatory; okay. |
| 18 A | Hum. |
| 19 Q | It said that you had meetings -- several meetings |
| 20 | about compliance with WARN. And yet your testimony, |
| 21 | your sworn under oath testimony -- |
| 22 A | Huh-huh. |
| 23 Q | -- you say that you had no knowledge of compliance. |
| 24 A | I don't know knowledge of specific compliance |

Ledgewood Court Reporting (401) 625-5455

52

| | |
|---|---|
| 1 A | Yes. |
| 2 Q | Okay. More than two? |
| 3 A | I don't recall. |
| 4 Q | So we know there was more than one but not as many |
| 5 | as two? |
| 6 A | I don't know the numbers. |
| 7 Q | How would we know when the meetings were taking |
| 8 | place and who was in attendance? |
| 9 | MR. McKITTRICK: Objection. |
| 10 A | I don't know how you would know. |
| 11 Q | Is there a scheduling book? |
| 12 A | No. |
| 13 Q | So someone would just call up one day and say gee, |
| 14 | we happen to have a meeting come on over; is that |
| 15 | what would happen? |
| 16 A | A lot of times, yes. |
| 17 Q | And did they say we're going to have a meeting about |
| 18 | WARN come on over and we're going to have this |
| 19 | meeting and talk about it? |
| 20 A | No. |
| 21 Q | Well, how did this come about? |
| 22 A | Come have a meeting. I don't recall how it |
| 23 | happened. |
| 24 Q | Come have a meeting about compliance with WARN? |

Ledgewood Court Reporting (401) 625-5455

Case 1:04-cv-10489-RGS   Document 26-3   Filed 08/30/2006   Page 9 of 27

Ex 7

1 A  Not necessarily about WARN. It could be a
2    combination of things that the meeting was about.
3 Q  So one of the things might be compliance with WARN
4    during discussions?
5 A  It might have been, yes.
6 Q  Did you have them one day per week when you would
7    have meetings with Mr. DePetrillo and others or were
8    they --
9 A  No. We had meetings with usually weekly meetings on
10   Friday with managers and the VP of operations.
11 Q  Who was that?
12 A  Wade Martin.
13 Q  And he is one of the persons that's mentioned here.
14 A  Yes.
15 Q  And would Mr. DePetrillo participate in those
16   meetings too?
17 A  No.
18 Q  So would you have a meeting and discuss WARN if Mr.
19   DePetrillo weren't there?
20 A  No.
21 Q  So that the meetings wouldn't be the Friday morning
22   meetings when you had WARN compliance discussions?
23 A  Not regarding WARN, no.
24 Q  Okay. So when would the WARN compliance discussions

1    take place?
2         MR. McKITTRICK: Objection. Go ahead.
3 Q  When?
4 A  When Mr. DePetrillo may have been down at the plant.
5 Q  Go ahead. Tell me what would happen?
6 A  It was in the course of a day. I don't know. He
7    comes to the plant on a Friday. Sometime during the
8    course of a day we may have had a meeting. I don't
9    know.
10 Q  Give me your memory of that meeting or meetings?
11 A  I don't remember what happened in the meetings.
12 Q  Have you ever reviewed any written materials about
13   what WARN requires regarding mass layoffs?
14 A  Personally, no.
15 Q  Okay. You never read any written materials about
16   that?
17 A  No.
18 Q  But you have had discussions with Mr. DePetrillo and
19   others; correct?
20 A  After October 17th.
21 Q  All right. Tell me what your understanding is with
22   regard to WARN notice and when it has to be given?
23        MR. McKITTRICK: Objection.
24 A  WARN notice? My only knowledge is that WARN notice

1    is given and it's required by law to be posted 60
2    days to inform people.
3 Q  Under what circumstances?
4 A  Reduction of work force. Mass reduction, large
5    reduction or plant closing.
6 Q  Do you have any understanding of what number of
7    people have to be laid off?
8 A  No, I do not.
9 Q  Do you have an understanding of any percentages of
10   persons that have to be laid off in order to comply
11   with WARN?
12 A  No.
13 Q  Who would have at that information or know that
14   information?
15        MR. McKITTRICK: Objection.
16 A  Numbers?
17 Q  Yes.
18 A  I don't know who would have the exact knowledge of
19   that.
20 Q  All right. So you didn't sit down and look at the
21   total number of employees divided by three or
22   anything like that; is that correct?
23 A  No.
24 Q  Is that correct?

1 A  That's correct.
2 Q  You never sat down with pen and a pad of paper and
3    an adding machine and calculator?
4 A  I just had numbers of people being laid off.
5 Q  So you were just given numbers; is that right?
6 A  Given the names of people being laid off, yes.
7 Q  We took the long way to get you here.
8         MR. McKITTRICK: I thought we did. I
9    didn't think it would take that long, Brian.
10 Q  Were you responsible for implementing the vacation
11   policy?
12 A  Implementing it? Yes.
13 Q  Yes.
14 A  Yes.
15 Q  Did you have any role in drafting it?
16 A  No. Before my time.
17 Q  Before your time?
18 A  Yes.
19 Q  And what is your understanding as to who would be
20   entitled to vacation pay?
21 A  Who would be entitled?
22 Q  Yes, and when.
23 A  Depending on whether it's hourly or salaried.
24 Q  Well, let's talk about hourly employees.

57

1 A Okay.

2 Q Go ahead. Who would be entitled to vacation pay?

3 A People are entitled to vacation pay at the time of

4 plant closing, shut down, vacation shut down.

5 Q So if I worked one day before the shut down in

6 December, I would be entitled to --

7 A No, you had to be on the payroll.

8 Do you have the policy? I don't recall

9 the number. There was a specific timeframe a person

10 had to be hired let's put it that way.

11 Q You don't remember how long that was?

12 A No, I don't know.

13 (Witness reading document)

14 A This is layoff. This is not vacation.

15 Q Okay. Oh, I'm sorry. There was something dealing

16 with vacations on that. What is that?

17 A This is stating that someone is on layoff.

18 Q Okay. So what is that policy?

19 A It's stating that any hourly associate who is not

20 actively employed at vacation time will not receive

21 vacation pay. If they're recalled prior to December

22 31st of the year that they were laid off, that they

23 would receive it when they return to work.

24 MR. CUNHA: Off the record.

Ledgewood Court Reporting  (401) 625-5455

58

1 (Discussion off the record)

2 Q Is this the only written vacation policy that was in

3 place at the time of layoffs in the latter part of

4 2003?

5 (Witness reading document)

6 A For hourly, yes.

7 Q And is there any requirement that one would work six

8 months before being entitled to --

9 A The requirement is that they work prior to the last

10 week in May for July shut down and the last week in

11 November for December shut down.

12 Q So if I was hired on November 30th I would be

13 entitled to one week vacation even though --

14 A No, it's not weekly. It's percentage of pay.

15 Q I understand. But I would entitled to vacation pay

16 whatever that percentage is.

17 A If you're on the active payroll at the time it's

18 given out, yes.

19 Q So if I was hired November 30th then I would get a

20 vacation paycheck in December?

21 A Not much but, yes.

22 Q What do you mean not much?

23 A Two percent of what you earned in that one week

24 would be your vacation pay if you were hired

Ledgewood Court Reporting  (401) 625-5455

59

1 Q Okay. So I would get something?

2 A You would get something if you were hired prior to

3 that week that time.

4 Q And if I was laid off the day before that date, I

5 would not receive it event though I worked for five

6 years?

7 A That's correct, you would not receive it.

8 Q Even though I worked for all almost six months I

9 would not receive it?

10 A That's correct.

11 Q And that was your policy?

12 A That was our policy.

13 Q Has that ever been tested to your knowledge?

14 A What do you mean by tested?

15 Q By a lawsuit.

16 A Not to my knowledge.

17 Q Have you ever received any advisory opinions from

18 the attorney general while you were human resource

19 manager about your vacation policy?

20 A I don't recall, no.

21 Q You don't recall?

22 A No.

23 Q So if you wanted you could have your entire work

24 Ledgewood Court Reporting  (401) 625-5455

60

1 force -- let me just give you a hypothetical -- work

2 and be laid off the day before the vacation pay was

3 due and not pay them; is that correct under your

4 policy?

5 MR. McKITTRICK: I object to a

6 hypothetical question to a fact witness.

7 MR. CUNHA: I'm asking her about her

8 policy.

9 A Active payroll the week of when they distributed it.

10 So if it was the day before, they would have gotten

11 it. The week of. They have to be on the active

12 payroll.

13 Q All right. Let's say the week before I had to

14 layoff 500 employees and none of them would receive

15 vacation?

16 A Correct.

17 Q That's according to the policy?

18 A Correct. It's not accrued.

19 Q Okay. Is there anywhere in the policy that says

20 it's not accrued?

21 A The policy states that the pay is based on the prior

22 six months of earnings to determine pay. Nothing

23 else.

24 Q So that the prior six months of earnings determine

Ledgewood Court Reporting  (401) 625-5455

61

1  how much vacation pay you get at the end of
2  December; correct?
3  A  Yes, according to your length of service. Yes.
4  Q  So it is being accrued during those six months?
5  A  No, it is not.
6  Q  No? In terms of determining the amount that you
7  receive; correct?
8  MR. McKITTRICK: Objection.
9  A  No, it's not. It's a calculation. It's not
10  accrued. It's a calculation.
11  Q  It's a calculation based upon your accrued earnings?
12  A  No. Based upon your earnings not accrued.
13  MR. McKITTRICK: Objection.
14  Q  Well, they are accruing every week you're getting
15  paid; correct?
16  MR. McKITTRICK: Objection.
17  A  No, they're not.
18  Q  Aren't you counting their earnings during the last
19  six months?
20  A  Not until it's pay time. When it's pay time, that's
21  when it's calculated. We are not accruing it.
22  Q  So your answer is you don't know whether there were
23  ever any advisory opinions from the attorney general
24  as to whether your policy was complying with the law
Ledgewood Court Reporting (401) 625-5455

62

1  or not?
2  A  No, I'm not aware of any.
3  Q  Did you ever see any opinions from the Attorney
4  General as to whether you did or did not comply with
5  the law with regard to vacation pay?
6  A  No.
7  Q  Did you ever seek any yourself any opinions?
8  A  Myself, no.
9  Q  Did anyone ever tell you that your policy did not
10  comply with the law with regard to vacation pay?
11  A  No.
12  Q  Did you ever have any discussions with anyone with
13  respect to whether your policy complied with the law
14  with regard to vacation pay?
15  A  No.
16  Q  Did you ever talk to Mr. DePetrillo about it?
17  A  About complying?
18  Q  Vacation pay, yes.
19  A  I followed the policy according to the way it was
20  and I discussed with him the policy procedure.
21  Compliance with the law that was not my area.
22  Q  I understand. But the question is, did you ever
23  have a discussion with anyone with regard to whether
24  your procedure complied with the law?
Ledgewood Court Reporting (401) 625-5455

63

1  A  No, I did not.
2  Q  Did anyone ever discuss with you whether your policy
3  complied with the law?
4  A  No.
5  MR. CUNHA: All right. You're all set.
6  You may leave.
7  MR. McKITTRICK: I may have some
8  questions. Off the record for a second.
9  (Discussion off the record)
10
11  (Exhibit 1, Answers to Interrogatories
12  marked in Mr. DePetrillo's deposition, was marked
13  for identification)
14
15  Cross Examination By Mr. McKittrick:
16  Q  Mrs. Laporte, Mr. Cunha showed you the interrogatory
17  answers which has been marked as exhibit number one.
18  In particular he focused your attention on Exhibit
19  B. Do you remember Mr. Cunha asking you questions
20  about that?
21  A  Yes, I do.
22  Q  Exhibit B is entitled Associates laid off from June
23  30th, '03 to October 17th, '03. Did you prepare
24  that document?
Ledgewood Court Reporting (401) 625-5455

64

1  A  Yes.
2  Q  When did you prepare it?
3  A  For the interrogatory.
4  Q  Had you provided this document Exhibit B to Mr.
5  DePetrillo prior to the response to these
6  interrogatories?
7  A  No.
8  Q  You also testified about manager's meetings that you
9  held or you attended at the Main Street Textiles
10  plant.
11  A  Yes.
12  Q  And in those meetings you learned the identity of
13  the persons that the managers want to lay off; is
14  that right?
15  A  Was instructed for them to give me the names, yes.
16  Q  Did you decide what individuals would be laid off?
17  A  No.
18  Q  Where there any discussions about the business of
19  the plant at those meetings?
20  A  The meetings the business for all the meetings we
21  always were encouraged better production, better
22  quality, to increase our productivity for the mere
23  fact that we wanted to bring up work from other
24  plants.
Ledgewood Court Reporting (401) 625-5455

**1**

```
 1          UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF MASSACHUSETTS
 2
           No: 04-10439RCL          Rule 30 Deposition
 3
    DONNA MANCHESTER and NOEMIA CAMARA, Individually,
 4  and on behalf of all other Similarly Situated

 5          Vs.

 6  MAIN STREET TEXTILES, L.P. and
    JOAN FABRICS SERVICES L.L.C.
 7  And JOAN FABRICS CORPORATION

 8
 9          DEPOSITION OF PENNY RICHARDS, taken

10  pursuant to Rule 30 of the Massachusetts Rules of

11  Civil Procedure on behalf of the Plaintiffs, before

12  Salvina S. Ferreira, RPR, a Notary Public in and for

13  the Commonwealth of Massachusetts, at the Offices of

14  Brian Cunha & Associates, 311 Pine Street, Fall

15  River, MA, commencing at 12:50 P.M., on Friday,

16  August 26, 2005, pursuant to Notice and agreement of

17  parties as to the date and time of taking said

18  deposition.

19
20
21          * * * * * *
           LEDGEWOOD COURT REPORTING
22              23 Last Street
             Tiverton, RI  02878
23              (401) 625-5455
24
```

**3**

**I N D E X**

| Examinations | Page |
|---|---|
| Penny Richards | 4 |
| Direct Examination By Mr. Cunha | 4 |

**E X H I B I T S**

| Exhibit No. | Description | Page |
|---|---|---|
| 1 | Answers to interrogatories marked in<br>Mr. DePetrillo's deposition | 64 |
| 2 | Layoff recall policy | 64 |

**2**

```
 1  APPEARANCES:  Brian R. Cunha, Esq.
                  BRIAN CUNHA & ASSOCIATES
 2                311 Pine Street
                  Fall River, MA  02720
 3                Representing the Plaintiffs

 4

 5                Neil V. McKittrick, Esq.
                  GOULSTON & STORRS
 6                400 Atlantic Avenue
                  Boston, MA  02110-3333
 7                Representing the Defendant
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**4**

```
 1          S T I P U L A T I O N S

 2      It is hereby agreed and stipulated by and

 3  between counsel for the respective parties that all

 4  objections, except as to the form of the question,

 5  are reserved until the time of trial, including

 6  motions to strike.

 7      It is further agreed and stipulated that the

 8  witness will read and sign the deposition

 9  transcript.

10      PENNY RICHARDS, having been satisfactorily

11  identified by the production of her driver's

12  license, and called on behalf of the plaintiffs,

13  having been duly sworn on oath, deposes and says as

14  follows:

15

16  Direct Examination By Mr. Cunha:

17  Q  What is your name?

18  A  Penny Richards.

19  Q  Have you reviewed any documents to prepare for this

20     deposition today?

21  A  Yes.

22  Q  What did you review?

23  A  Interrogatories and I think that was it.

24  Q  And this has been previously marked in the
```

1 Q Well, did Joan Fabrics and Main Street Textiles make the
2 make the same products or were they separate in
3 terms of plant facilities or were they all in the
4 same plant?
5 A **We were separate as it relates to plant facilities**
6 **and the technology that we had at Main Street was**
7 **different than what we had at Joan Fabrics at the**
8 **time that we formed it.**
9 Q It was Main Street Textiles in terms of where the
10 plant was located different than Joan Fabrics or
11 were they in the same plant?
12 A **Different.**
13 Q Where was Joan Fabrics located?
14 A **Joan Fabrics had facilities in Lowell and North**
15 **Carolina.**
16 Q And Main Street Textiles?
17 A **Fall River.**
18 Q Now, before it became Main Street Textiles was it
19 Joan Fabrics? Did you call it Joan Fabrics?
20 A **Yes.**
21 Q So in 1996 Joan Fabrics in Fall River became Main
22 Street Textiles?
23 A **Yes.**
24 Q And you took over the day-to-day operations of Main

---

1 Street Textiles in 1996; right?
2 A **I was actually president of the Tyng Group and Main**
3 **Street was one of the companies.**
4 Q All right. Now, are there any other manufacturing
5 facilities in the Tyng Group other than Main Street?
6 A **Yes.**
7 Q And you named two others; right?
8 A **Yes.**
9 Q Are they located in Fall River too?
10 A **No.**
11 Q Where are they located?
12 A **They're located in Lowell.**
13 Q So you were responsible for day-to-day operations at
14 Main Street along with the other two operations in
15 Lowell?
16 A **The day-to-day operations again we had people in the**
17 **facilities that were running them.**
18 Q I understand. But you were president of those?
19 A **Yes. Huh-huh.**
20 Q What role did Kerry McCallum play in the operations
21 of Main Street Textiles?
22 A **She did not.**
23 Q She just owned part of the company?
24 A **She actually ran the other two companies, the Detton**

---

1 Yarn Company and Wesson Avenue Dyers.
2 Q In Lowell?
3 A **Yes.**
4 Q You ran the Main Street Textiles?
5 A **That was my primary focus.**
6 Q What about Elkin. What role did he play?
7 A **Elkin was running Joan Fabrics.**
8 Q Did he play any role in running Main Street
9 Textiles?
10 A **He was a partner and obviously we consulted on**
11 **issues.**
12 Q Now at some point, you began to have problems at
13 least according to your answers to interrogatories
14 with respect to production and profits; correct?
15 A **Yes.**
16 Q When did those problems begin?
17 A **Around 2001.**
18 Q And what do you attribute those problems to?
19 A **Economy.**
20 Q The U.S. economy or what economy?
21 A **The U.S. economy and in the textile industry in**
22 **general.**
23 Q What were the problems you were encountering in
24 2001?

---

1 A **Low business volume. We weren't getting enough**
2 **sales.**
3 Q And starting in 2001 your sales begin to decrease?
4 A **Yes.**
5 Q By what percentage starting in 2001, 2002, 2003?
6 Can you give me a percentage?
7 A **I really don't remember.**
8 Q Well, you have those records; correct?
9 A **Yes.**
10 Q So if I could ask your lawyer for copies of what
11 your records of what the decrease in sales volume
12 were in starting 2001?
13 A **Yes.**
14 Q How often did you compute your sales? Would you do
15 it monthly?
16 A **We computed our sales on a weekly basis.**
17 Q Did you have any monthly summaries?
18 A **Yes.**
19 Q So you have monthly summaries of your sales?
20 A **Yes.**
21 Q Now, did You have meetings starting in 2001 with Mr.
22 McCallum with regard to the decline in sales?
23 A **No, not just talking about the decline in sales.**
24 Q Well, did you talk to him about profitability?

---

**17**

| | | |
|---|---|---|
| 1 | A | We reviewed our financials. |
| 2 | Q | Did you have a meeting with him with regard to that? |
| 3 | A | We reviewed our financials. |
| 4 | Q | Did you prepare memorandums with regard to that? |
| 5 | A | Regards to? |
| 6 | Q | Profitability and problems with the economy? |
| 7 | A | It would be published in our financials. |
| 8 | Q | What do you mean published in your financials? |
| 9 | A | Our financials would in fact be what we reviewed |
| 10 | | which showed month to month or quarter to quarter. |
| 11 | | We always posted last quarter to this quarter. |
| 12 | Q | You had a chief financial officer? |
| 13 | A | Our chief financial officer was in Tyngsboro. |
| 14 | Q | What's his name? |
| 15 | A | His name was George Fahey. |
| 16 | Q | Is he still with the company? |
| 17 | A | No, he is not. |
| 18 | Q | Where is he now? |
| 19 | A | I don't know. |
| 20 | Q | But he would prepare for you as chief financial |
| 21 | | officer what was happening with the company's |
| 22 | | forecast, outlook and that sort of thing? |
| 23 | A | No. |
| 24 | Q | He would not do that? |

Ledgewood Court Reporting (401) 625-5455

**18**

| | | |
|---|---|---|
| 1 | A | No, he didn't. |
| 2 | Q | Did anyone do that for you? |
| 3 | A | No. That was my responsibility. I had sales |
| 4 | | design. |
| 5 | Q | Did you do that? |
| 6 | A | Yes. |
| 7 | Q | You still have all of those things somewhere? |
| 8 | A | I believe, yes. |
| 9 | Q | So if asked your lawyer for copies of those |
| 10 | | documents, you could supply them? |
| 11 | A | We could try to find them. |
| 12 | Q | And I assume starting in 2001 the sales forecast |
| 13 | | became increasing grim; is that fair to say? |
| 14 | A | Yes. |
| 15 | Q | And as you got to 2002, things were getting worse; |
| 16 | | is that fair to say? |
| 17 | A | Yes. |
| 18 | Q | And then in 2003, things became very bad; is that |
| 19 | | right? |
| 20 | A | Yes. |
| 21 | Q | And did you have any meetings with Mr. McCallum with |
| 22 | | regard to the decline in sales and profitability? |
| 23 | A | We had meetings to review our financials. |
| 24 | Q | Did you ever have any memos between yourselves with |

Ledgewood Court Reporting (401) 625-5455

**19**

| | | |
|---|---|---|
| 1 | A | regard to what was happening? |
| 2 | A | Not that I recall. |
| 3 | Q | Did you begin to take steps to try to deal with the |
| 4 | | declining sales and profits? |
| 5 | A | Yes. |
| 6 | Q | What did you do? |
| 7 | A | We looked at cost cuts and obviously we continued to |
| 8 | | adjust our manufacturing. |
| 9 | Q | Tell me what you did specifically. |
| 10 | A | We had had all our managers, we would in fact, again |
| 11 | | look at where we were spending our money and see |
| 12 | | what we could do in order to curtail spending. |
| 13 | Q | And what would you do? |
| 14 | A | We would stop spending or try to, in fact, look for |
| 15 | | what -- we would make changes to curtail spending. |
| 16 | Q | And the question is what were the changes. |
| 17 | A | Changes would be in our product codes, dropping |
| 18 | | skews, stop spending, watching supplies, you know |
| 19 | | all the stuff you would do in order to improve your |
| 20 | | profits. |
| 21 | Q | At some point did you cut the number of shifts? |
| 22 | A | We adjusted production as our business -- we had a |
| 23 | | make-to-order business so that production would in |
| 24 | | fact be adjusted based on what we had in front of us |

Ledgewood Court Reporting (401) 625-5455

**20**

| | | |
|---|---|---|
| 1 | | to produce. |
| 2 | Q | Before 2001, how many shifts did you have? |
| 3 | A | Four. |
| 4 | Q | 24 hours a day? |
| 5 | A | Seven days a week. |
| 6 | Q | At some point did that decline? |
| 7 | A | Yes. |
| 8 | Q | When did that first decline? |
| 9 | A | I believe I think it's in our interrogatory that we |
| 10 | | shut down our four shift operation in 2003 if I |
| 11 | | remember that correctly. |
| 12 | Q | And why was that? |
| 13 | A | We didn't have enough business to continue to run. |
| 14 | Q | And you cut it down to how many shifts? |
| 15 | A | Three. |
| 16 | Q | And what shifts were they, Penny? |
| 17 | A | First, second, third shift. |
| 18 | Q | So that would be what hours? |
| 19 | A | I don't recall the schedule because Fall River |
| 20 | | always ran different than our normal three shifts. |
| 21 | | I don't know whether they started at five or six in |
| 22 | | the morning. |
| 23 | Q | When did the Main Street factory stop -- let me ask |
| 24 | | you this. Prior to 2001, was the Main Street |

Ledgewood Court Reporting (401) 625-5455

**Page 57**

1    Q    Was that some information from?

2    A    **More than likely yes, but I don't remember.**

3    Q    Thank you.

4        And how often was that information relayed

5      to you?

6    A    **We reviewed our work force on a weekly basis.**

7    Q    Now, were you ever advised as to what the

8      requirements are under the WARN Act in terms of when

9      under what circumstances they would have to be paid?

10    A    **Advised? I had a general understanding of how the**

11      **WARN Act worked.**

12    Q    Well, tell me?

13    A    **That you made a notification to people that were**

14      **employed for 60 days would in fact if you laid them**

15      **off you would in fact you would be required to**

16      **continue to pay them. That was my general**

17      **understanding of WARN.**

18    Q    Do you have any specific understanding of what the

19      requirements are in terms of the number of people

20      that have to be laid off over what time period?

21    A    **No.**

22    Q    Do you have and understanding that there is a look

23      back period?

24      MR. McKITTRICK: Objection.

**Page 58**

1    A    **No. We used our HR department and our attorneys to**

2      **make sure that we were in fact complying.**

3    Q    Do you have an understanding that there is a 90 day

4      look back period? Do you have any understanding of

5      that?

6      MR. McKITTRICK: Objection.

7    A    **I don't have a total understanding of the word --**

8    Q    Well, tell me what your understanding of the 90 day

9      look back period is?

10    A    **I don't have an understanding of the 90 day look**

11      **back period.**

12    Q    You don't know anything about that?

13    A    **No.**

14    Q    Now, who developed the vacation guidelines?

15    A    **Vacation policies were written a long time ago.**

16      **They were Joan policies.**

17    Q    So you adopted the Joan policies as part of your

18      policies?

19    A    **Yes.**

20    Q    And you understood that if someone was employed on

21      the date of their vacation that they would then get

22      vacation pay; correct?

23      MR. McKITTRICK: Objection.

24    A    **I would have to refer to the policy to in fact be**

**Page 59**

1      able to give you a specific answer?

2    Q    So you're not familiar with the policy unless you

3      look at it?

4    A    **I didn't implement it on a daily basis. I had my**

5      **policy manual that I would refer to.**

6    Q    Did you have a chance to look at that?

7    A    **Huh-huh.**

8    Q    And it's been marked as exhibit --

9    A    **I just looked at that one page.**

10    Q    It was marked as exhibit two in the DePetrillo

11      deposition. Why don't you just look at the next

12      page too.

13      (Witness reading document)

14    Q    Was that the vacation policy in 2003?

15    A    **Yes. It's dated 1992. It's been our policy.**

16    Q    All right.

17      And under that policy it appears to say

18      that if you were working on the day of the week

19      before the lay off that you are entitled to vacation

20      pay for that week; is that correct?

21    A    **Yes.**

22      MR. McKITTRICK: Objection. You mean the

23      shut down. You said the layoff.

24    Q    I'm sorry. The shut down. And was that your

**Page 60**

1      understanding of the policy?

2    A    **Yes.**

3    Q    Did you have a role in developing this policy?

4    A    **I don't recall. This goes back to '92. It would**

5      **have been the HR department probably back in the**

6      **1960's.**

7    Q    Now, under that policy it appears that the amount

8      you are paid either I guess in July or December

9      depends on how much you earned the prior six months;

10      is that fair to say?

11    A    **I believe that's what the policy says here on the**

12      **compensation side.**

13    Q    So the more you worked during those six months the

14      more money you would receive in vacation pay;

15      correct?

16    A    **It's a percentage of years of service.**

17    Q    I understand. But it also says that it's based upon

18      your earnings for the prior six months; correct?

19    A    **Proceeding six months based on percentage on length**

20      **of service; that's what it says.**

21    Q    So if you worked for the full six months prior to

22      the lay off in December, you would be -- depending

23      on how long you worked for the company -- paid that

24      period of time on the entire six months; correct?

**Page 61**

1  A    You said for December?

2  Q    Yes.

3  A    Yes.

4  Q    All right. So the amount that you receive accrues

5       as the months accumulate; correct?

6              MR. McKITTRICK: Objection.

7  A    I'm not sure the word is accrued. It's years of

8       service, months of service. You have to be there.

9       The more months you work --

10 Q    The more money you will receive?

11 A    Right.

12 Q    So what's the problem with the word accrues?

13 A    Because it says proceeding six months that period of

14      time that you worked it was based on earnings.

15 Q    Well, do you know what the word accrues means?

16 A    Maybe not in the context that you're asking me.

17 Q    It means it's added on.

18 A    Huh-huh.

19 Q    Do you have a problem with that word added on as the

20      months go by that you get more money?

21             MR. McKITTRICK: Objection.

22 A    It's the pay, how much pay you earn during that six

23      month period of time you receive a percentage of it.

24 Q    And it accrues as --

Ledgewood Court Reporting (401) 625-5455

**Page 62**

1  A    Each month gets added together.

2              MR. McKITTRICK: Objection.

3  Q    Okay. However, under that policy is it your

4       position that if you laid off the entire work force

5       a week before December that none of them would

6       receive vacation pay for the prior six months?

7              MR. McKITTRICK: Objection.

8  Q    Is that your position?

9  A    The policy reads that you have -- the associates

10      have to be employed at vacation time and/or approved

11      medical leave of absence to receive their vacation

12      pay unless they return to their prior -- to the next

13      scheduled shift.

14 Q    Did you hear my question?

15 A    I am just reading it. We would implement the

16      policy.

17 Q    Did you hear my question?

18 A    No, I didn't.

19 Q    I said if the entire work force were laid off a week

20      before the December shut down, is it your

21      understanding as the president of the company that

22      no one would receive vacation pay for the preceding

23      six months?

24             MR. McKITTRICK: Objection.

Ledgewood Court Reporting (401) 625-5455

**Page 63**

1  A    You would have to be employed at the time of

2       vacation to get paid according to the policy.

3  Q    Again --

4  A    I'm answering your question to the best of my

5       ability.

6  Q    So is your answer yes that you would get paid or no

7       not answer it with a statement. Answer the

8       question?

9              MR. McKITTRICK: Objection. She has

10      answered the question twice.

11             MR. CUNHA: She hasn't answered the

12      question.

13             MR. McKITTRICK: You don't like the

14      answer.

15             MR. CUNHA: No, no. Not at all.

16 Q    I will ask you one more time and I will keeping

17      asking you until you answer my question.

18 A    I am answering your question. I am reading the

19      policy.

20 Q    Is it your position -- and it calls for a yes or no.

21 A    Okay.

22 Q    That if the entire work force were laid off one week

23      before the December shut down that they would not

24      get vacation pay; yes or no?

Ledgewood Court Reporting (401) 625-5455

**Page 64**

1              MR. McKITTRICK: Objection.

2  A    Yes.

3  Q    Thank you.

4              MR. CUNHA: I have nothing else. Thank

5       you so much.

6              MS. RICHARDS: Thank you.

7              MR. McKITTRICK: Great.

8              (Exhibit 1, Answers to interrogatories

9       marked in Mr. DePetrillo's deposition, was marked

10      for identification)

11             (Exhibit 2, Layoff recall policy, was

12      marked for identification)

13             (Whereupon the deposition ended at 2:00

14      p.m)

Ledgewood Court Reporting (401) 625-5455

DEPOSITION OF WADE MARTIN

**Page 1**

1          UNITED STATES DISTRICT COURT
               DISTRICT OF MASSACHUSETTS
2

3     No: 04-10439 RCL          Deposition
4

5    DONNA MANCHESTER AND NOEMIA CAMARA,
      Individually and on behalf of all others
6    similarly situated

7    vs.

8    MAIN STREET TEXTILES, L.P. and
     JOAN FABRICS SERVICES L.L.C. and
9    JOAN FABRICS CORPORATION
10

11          DEPOSITION OF WADE MARTIN, taken pursuant
12   to Rule 30 of the Massachusetts Rules of Civil
13   Procedure on behalf of the Plaintiffs, before Mary
14   Ann C. Escobar, a Notary Public in and for the
15   Commonwealth of Massachusetts, at the Offices of
16   Brian Cunha & Associates, 311 Pine Street, Fall
17   River, MA, commencing at 10:32 A.M., on Thursday,
18   September 29, 2005, pursuant to Notice and agreement
19   of parties as to the date and time of taking said
20   deposition.
21
22                  * * * * *
23              LEDGEWOOD COURT REPORTING
                    23 Last Street
24                 Tiverton, RI  02878
                    (401) 625-5455

**Page 2**

1    APPEARANCES:  Brian R. Cunha, Esquire
                   BRIAN CUNHA & ASSOCIATES
2                  311 Pine Street
                   Fall River, MA  02720
3                  Representing the Plaintiff

4
                   Neil V. McKittrick, Esquire
5                  GOULSTON & STORRS, P.C.
                   400 Atlantic Avenue
6                  Boston, MA  02110
                   Representing the Defendant
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

**Page 3**

1                      I N D E X

2    Examinations                            Page

3    WADE MARTIN
        Direct Examination By Attorney Cunha  4
4

5                    E X H I B I T S

6    Exhibit No.    Description         Page

7             * none marked *
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

**Page 4**

1                (September 29, 2005
                  Thursday, 10:32 a.m.)
2

3              S T I P U L A T I O N S
4          It is hereby agreed and stipulated by and
5    between counsel for the respective parties that all
6    objections, except as to the form of the question,
7    are reserved until the time of trial, including
8    motions to strike.
9          It is further agreed and stipulated that the
10   witness will read and sign the deposition transcript
11   under the pains and penalties of perjury within 30
12   days of receipt or said transcript will be deemed
13   signed.
14

15         WADE MARTIN, having been satisfactorily
16   identified by the production of his driver's
17   license, and called on behalf of the Plaintiff,
18   having been duly sworn on oath, deposes and says as
19   follows:
20

21   Direct Examination By Attorney Cunha:
22   Q   What is your name?
23   A   Wade Martin.
24   Q   What's your address?

**17**

```
1    again like I said watching the order levels,
2    watching the manpower levels and trying to make sure
3    that they were agreeing with each other and that was
4    -- we were making continuous adjustments from that
5    point, up or down.
6  Q  According to the interrogatory answer signed by Mr.
7    DiPetrillo, he said that the business downturn
8    became very significant in April of 2003; is that
9    accurate?
10 A  Yes.
11 Q  Initially management -- you were part of the
12   management; right?
13 A  Yes.
14 Q  Sought to address the problems by shift reductions
15   and layoffs?
16 A  Um hum.
17 Q  Is that accurate?
18 A  Yes.
19 Q  And it said for the first time in 10 years the
20   company was forced to abandon around the clock seven
21   day operations in Fall River; is that accurate?
22 A  Yes. I know about the ten years, but we did have to
23   reduce to three shifts.
24 Q  And it cut back from a four shift seven day
```

**18**

```
1    production schedule to a three shift five day
2    schedule?
3  A  Correct.
4  Q  And then it says by early September 2003, the
5    productivity issues and lack of business had forced
6    management to conclude that the facility in Fall
7    River would have to be closed early September, 2003
8    and then it says that you, Penny Richards, Elkin
9    McCallum, Ed DiPetrillo and Lou-Ann Laponte
10   consulted with Main Street attorneys on multiple
11   occasions over the course of several months to
12   insure the layoffs complied with the WARN Act?
13       Did you participate in those meetings?
14 A  As the layoffs were being considered to size the
15   business, correct, because that's what I was
16   concentrating on, okay.
17       There was an awareness of the WARN issues,
18   and there was communication going on between Ed and
19   Lou-Ann and occasionally me with the lawyers out of
20   Rhode Island, I guess.
21 Q  And where did those meetings take place?
22 A  Usually at Main Street.
23 Q  And would the lawyers from Rhode Island come and
24   meet with you --
```

**19**

```
1  A  Um hum.
2  Q  -- and the other persons?
3  A  Yeah.
4  Q  And did you have -- did you e-mail each other about
5    those --
6  A  I never did.
7  Q  -- compliance issues?
8  A  I never did.
9  Q  Do you have e-mail on your computer?
10 A  No.
11 Q  You didn't have e-mail?
12 A  From the lawyer about --
13 Q  No, no, no, e-mail? Did you use e-mail?
14 A  Did I use e-mail, yes.
15 Q  Did you ever e-mail any of your other folks, Elkin,
16   Penny, Wade, Ed about the WARN Act issues?
17 A  I did not, no.
18 Q  Did you ever receive any from them?
19 A  No, not that I recall.
20 Q  Okay.
21       And did you ever have any memos between
22   yourselves with regard to the WARN Act issues?
23 A  No.
24 Q  Is there any written documentation between you and
```

**20**

```
1    any of the other persons with regard to the WARN Act
2    issues prior to October 17 of '03?
3  A  Not that I recall.
4  Q  Okay.
5        And if there were, where would that
6    information be?
7  A  It would be at Main Street.
8  Q  Okay.
9        What do you recall about these meetings
10   with regard to the WARN Act?
11       MR. MCKITTRICK: Objection. I'm just
12   going to -- I don't think you're asking this, but if
13   you were in any meetings with lawyers, you're not
14   going to get into any things that the lawyers have
15   said in connection with the WARN Act. I don't think
16   Brian is asking for that, but if you had meetings
17   with the other people, the non-lawyers about it, you
18   can certainly talk about anything you can remember
19   about those meetings.
20 A  Well, the discussions that we had in general were to
21   make sure we understood the issues that surrounded
22   triggering the WARN Act and the amount, obviously
23   the percentages that applied as it related to
24   needing to move into that position.
```

**23**

| | | |
|---|---|---|
| 10 58 44 | 1 | Q When did those meetings first begin -- |
| 10 58 44 | 2 | A I don't remember exactly. |
| 10 57 02 | 3 | Q -- approximately in terms of months before the |
| 10 57 05 | 4 | October 15 date when you were learning? |
| 10 57 11 | 5 | A I would say probably -- I know that we talked about |
| 10 57 18 | 6 | it probably during the summer. |
| 10 57 20 | 7 | Q That would be July or August of 2003? |
| 10 57 22 | 8 | A Yeah. |
| 10 57 23 | 9 | Q So that as early as the summer of '03 you began to |
| 10 57 28 | 10 | discuss some of the WARN Act issues in terms of |
| 10 57 30 | 11 | layoffs; correct? |
| 10 57 31 | 12 | A Yeah. |
| 10 57 31 | 13 | Q And that's because you obviously were downsizing; |
| 10 57 34 | 14 | correct? |
| 10 57 35 | 15 | A Yeah. |
| 10 57 36 | 16 | Q And that was something that was certainly important |
| 10 57 38 | 17 | in terms of complying with Federal law? |
| 10 57 40 | 18 | A That's correct. |
| 10 57 41 | 19 | Q Was that something that was emphasized in your |
| 10 57 43 | 20 | meeting with the various management personnel that |
| 10 57 47 | 21 | you discussed this? |
| 10 57 48 | 22 | A Yeah, we needed to understand the rules if we were |
| 10 57 52 | 23 | going to go -- if we were going to trigger something |
| 10 57 54 | 24 | or not. |

**23**

| | | |
|---|---|---|
| 10 58 00 | 1 | issues. |
| 10 58 00 | 2 | A That would be Ed. |
| 10 58 00 | 3 | Q Ed DiPetrillo? |
| 10 58 11 | 4 | A Yes. |
| 10 58 11 | 5 | Q And that's because he was in charge of human |
| 10 58 14 | 6 | resources? |
| 10 58 15 | 7 | A Absolutely. |
| 10 58 15 | 8 | Q So he would be the person that would probably be the |
| 10 58 18 | 9 | most knowledgeable with regard to those issues; is |
| 10 58 21 | 10 | that right? |
| 10 58 21 | 11 | A Yeah. |
| 10 58 22 | 12 | Q All right. |
| 10 58 24 | 13 | Now, you are the person that actually |
| 10 58 25 | 14 | signed the WARN notice; is that right? |
| 10 58 28 | 15 | A Yes. |
| 10 58 28 | 16 | Q How did you get that job? |
| 10 58 31 | 17 | A It was brought to me and I was told to sign it. |
| 10 58 34 | 18 | Q By whom? |
| 10 58 35 | 19 | A By Ed and Penny, I believe. |
| 10 58 40 | 20 | Q What did they say to you? |
| 10 58 42 | 21 | A They said here is the WARN -- here is the paperwork. |
| 10 58 45 | 22 | You need to sign it and return it. |
| 10 58 47 | 23 | Q Who said that? |
| 10 58 48 | 24 | A I think it was Ed. |

**22**

| | | |
|---|---|---|
| 10 57 54 | 1 | Q And those meetings generally consisted of as the |
| 10 57 58 | 2 | answer says Elkin, Penny, yourself, Ed and Lou-Ann? |
| 10 58 08 | 3 | MR. MCKITTRICK: Objection. |
| 10 58 08 | 4 | Q You may answer. |
| 10 58 10 | 5 | A Those meetings were generally, you know, meetings |
| 10 58 16 | 6 | between Ed and Lou-Ann and I and Penny. Elkin was |
| 10 58 24 | 7 | occasionally involved. |
| 10 58 25 | 8 | Q Okay. |
| 10 58 25 | 9 | So generally it was between the four -- |
| 10 58 29 | 10 | the five of you and Elkin would be involved somehow? |
| 10 58 33 | 11 | A Sometimes. |
| 10 58 33 | 12 | Q Sometimes, okay. |
| 10 58 35 | 13 | How many times do you think you had -- how |
| 10 58 37 | 14 | often would you have those discussions starting in |
| 10 58 40 | 15 | the summer until the fall of '03? |
| 10 58 41 | 16 | A We might have had two, maybe three. |
| 10 58 50 | 17 | Q Meetings? |
| 10 58 51 | 18 | A Yes. |
| 10 58 52 | 19 | Q How long did the meetings last? |
| 10 58 54 | 20 | A Not long, half an hour. |
| 10 58 57 | 21 | Q Okay. |
| 10 58 58 | 22 | And was there one person as opposed to |
| 10 59 03 | 23 | other persons that was considered to be the point |
| 10 59 05 | 24 | person with regard to compliance with these WARN Act |

**24**

| | | |
|---|---|---|
| 10 59 51 | 1 | Q Did he come to your office? |
| 10 59 52 | 2 | A Yes. |
| 10 59 53 | 3 | Q Was it that day, October 17, or was it the day |
| 10 59 57 | 4 | before? |
| 10 59 57 | 5 | A It might have been that day or the day before, I |
| 11 00 01 | 6 | don't recall, but it was within that 12 hour period. |
| 11 00 03 | 7 | Q Tell me exactly what happened in that meeting? |
| 11 00 08 | 8 | A I think I received a phone call from Ed that said |
| 11 00 20 | 9 | that he was coming down with some paperwork that I |
| 11 00 22 | 10 | needed to sign. You know, it was the announcement |
| 11 00 27 | 11 | that the plant was closing and that -- I don't |
| 11 00 31 | 12 | remember if he brought it or if he sent it to |
| 11 00 33 | 13 | Lou-Ann who gave it to me, but, you know, between |
| 11 00 37 | 14 | the conversation with him and the paperwork being |
| 11 00 40 | 15 | delivered there was not a whole lot of conversation. |
| 11 00 42 | 16 | I mean, I knew what was going on and as |
| 11 00 47 | 17 | the VP of operations I was basically told it was my |
| 11 00 51 | 18 | responsibility to sign that piece of paper. |
| 11 00 53 | 19 | Q And you did? |
| 11 00 57 | 20 | A And I did. |
| 11 01 04 | 21 | Q And then on October 24 you yourself were laid off? |
| 11 01 02 | 22 | A Yes. |
| 11 01 02 | 23 | Q Now, did you receive any WARN Act benefits yourself? |
| 11 01 07 | 24 | A I received a severance package. |

Case 1:04-cv-10439-RGS    Document 26-3    Filed 08/30/2006    Page 20 of 27    *Exhibit 8*

## General Laws of Massachusetts

⌐ **General Laws of Massachusetts**
⌐ **PART I ADMINISTRATION OF THE GOVERNMENT**
⌐ **TITLE XXI LABOR AND INDUSTRIES**
⌐ **CHAPTER 149 LABOR AND INDUSTRIES**
⌐ **WEEKLY PAYMENT OF WAGES.**

[Previous Document in Book]                                    [Next Document in Book]

**G.L.c. *149*, *§ 148*. Payment of wages; commissions; exemption by contract; persons deemed employers; provision for cashing check or draft; violation of statute.**

   Section 148. Every person having employees in his service shall pay weekly or bi-weekly each such employee the wages earned by him to within six days of the termination of the pay period during which the wages were earned if employed for five or six days in a calendar week, or to within seven days of the termination of the pay period during which the wages were earned if such employee is employed seven days in a calendar week, or in the case of an employee who has worked for a period of less than five days, hereinafter called a casual employee, shall, within seven days after the termination of such period, pay the wages earned by such casual employee during such period, but any employee leaving his employment shall be paid in full on the following regular pay day, and, in the absence of a regular pay day, on the following Saturday; and any employee discharged from such employment shall be paid in full on the day of his discharge, or in Boston as soon as the laws requiring pay rolls, bills and accounts to be certified shall have been complied with; and the commonwealth, its departments, officers, boards and commissions shall so pay every mechanic, workman and laborer employed by it or them, and every person employed in any other capacity by it or them in any penal or charitable institution, and every county and city shall so pay every employee engaged in its business the wages or salary earned by him, unless such mechanic, workman, laborer or employee requests in writing to be paid in a different manner; and every town shall so pay each employee engaged in its business if so required by him; but an employee absent from his regular place of labor at a time fixed for payment shall be paid thereafter on demand; provided, however, that the department of telecommunications and energy, after hearing, may authorize a railroad corporation or a parlor or sleeping car corporation to pay the wages of any of its employees less frequently than weekly, if such employees prefer less frequent payments, and if their interests and the interests of the public will not suffer thereby; and provided, further, that employees engaged in a bona fide executive, administrative or professional capacity as determined by the attorney general and employees whose salaries are regularly paid on a weekly basis or at a weekly rate for a work week of substantially the same number of hours from week to week may be paid bi-weekly or semi-monthly unless such employee elects at his own option to be paid monthly; and provided, further, that employees engaged in agricultural work may be paid their wages monthly; in either case, however, failure by a railroad corporation or a parlor or sleeping car corporation to pay its employees their wages as authorized by the said department, or by an employer of employees

Case 1:04-cv-10439-RGS    Document 26-3    Filed 08/30/2006    Page 21 of 27

*Exhibit 8*

engaged in agricultural work to pay monthly the wages of his or
her employees, shall be deemed a violation of this section; and
provided, further, that an employer may make payment of wages
prior to the time that they are required to be paid under the
provisions of this section, and such wages together with any
wages already earned and due under this section, if any, may be
paid weekly, bi-weekly, or semi-monthly to a salaried employee,
but in no event shall wages remain unpaid by an employer for more
than six days from the termination of the pay period in which
such wages were earned by the employee. For the purposes of this
section the words salaried employee shall mean any employee whose
remuneration is on a weekly, biweekly, semi-monthly, monthly or
annual basis, even though deductions or increases may be made in
a particular pay period. The word "wages" shall include any
holiday or vacation payments due an employee under an oral or
written agreement. An employer, when paying an employee his wage,
shall furnish to such employee a suitable pay slip, check stub or
envelope showing the name of the employer, the name of the
employee, the day, month, year, number of hours worked, and
hourly rate, and the amounts of deductions or increases made for
the pay period.

   Every railroad corporation shall furnish each employee with a
statement accompanying each payment of wages listing current accrued
total earnings and taxes and shall also furnish said employee
with each such payment a listing of his daily wages and the method
used to compute such wages.

   This section shall apply, so far as apt, to the payment of commissions
when the amount of such commissions, less allowable or authorized
deductions, has been definitely determined and has become due
and payable to such employee, and commissions so determined and
due such employees shall be subject to the provisions of section one
hundred and fifty.

   This section shall not apply to an employee of a hospital which is
supported in part by contributions from the commonwealth or from
any city or town, nor to an employee of an incorporated hospital
which provides treatment to patients free of charge, or which is
conducted as a public charity, unless such employee requests such
hospital to pay him weekly. This section shall not apply to an
employee of a cooperative association if he is a shareholder therein,
unless he requests such association to pay him weekly, nor to casual
employees as hereinbefore defined employed by the commonwealth or
by any county, city or town.

   No person shall by a special contract with an employee or by any
other means exempt himself from this section or from section one
hundred and fifty. The president and treasurer of a corporation and
any officers or agents having the management of such corporation
shall be deemed to be the employers of the employees of the corporation
within the meaning of this section. Every public officer whose
duty it is to pay money, approve, audit or verify pay rolls, or perform
any other official act relative to payment of any public employees,
shall be deemed to be an employer of such employees, and shall be
responsible under this section for any failure to perform his official
duty relative to the payment of their wages or salaries, unless he is
prevented from performing the same through no fault on his part.

   Any employer paying wages to an employee by check or draft

*Exhibit 8*

shall provide for such employee such facilities for the cashing
of such check or draft at a bank or elsewhere, without charge by
deduction from the face amount thereof or otherwise, as shall be
deemed by the attorney general to be reasonable. The state
treasurer may in his discretion in writing exempt himself and any
other public officer from the provisions of this paragraph.

An employer paying his employees on a weekly basis on July first,
nineteen hundred and ninety-two shall, prior to paying said employees
on a bi-weekly basis, provide each employee with written notice of
such change at least ninety days in advance of the first such bi-weekly
paycheck.

Whoever violates this section shall be punished or shall be
subject to a civil citation or order as provided in section 27C.

[Previous Document in Book]                    [Next Document in Book]

Copyright © 2004 Loislaw.com, Inc. All Rights Reserved

## ADVISORY 99/1

### An Advisory from the Attorney General's
### Fair Labor and Business Practices Division
### on Vacation Policies

Pursuant to G.L. c. 23, § 1(b), the Attorney General issues the following advisory:

## VACATION POLICIES

### Vacation Payments Are Wages

Employers who choose to provide paid vacation to their employees must treat those payments like any other wages under G.L. c. 149, § 148. See Massachusetts v. Morash, 490 U.S. 107 (1989). Like wages, the vacation time promised to an employee is compensation for services which vests as the employee's services are rendered. Upon separation from employment, employees must be compensated by their employers for vacation time earned "under an oral or written agreement." G.L. c. 149, § 148. Withholding vacation payments is the equivalent of withholding wages and, as such, is illegal.

Employers may establish the terms of employment and determine the hourly rate or salary to be paid as well as how many hours the employee is expected to work. Employers may likewise establish the amount of paid vacation the employee will receive and/or a specific time of the year when the employee can take a vacation, depending on the needs or demands of the business. Employers may establish procedures regarding the scheduling of vacations; (i.e., whether employees must notify the employers as to their intent to take vacation, when they intend to take it, and how much vacation time they plan to take.)

## No Forfeiture of Earned Vacation Time

General Laws c. 149, § 148 provides that no employer shall "by special contract with an employee or by any other means exempt himself" or herself from the statute or from its penalty provision in Section 150. Since the statute provides for the timely payment of all wages earned, an employer may not enter into an agreement with an employee under which the employee forfeits earned wages, including vacation payments. Examples of these agreements are vacation policies that condition the payment of vacation time on continuous employment or that require that employees provide notices to quit. Employees who have performed work and leave or are fired, whether for cause or not, are entitled to pay for all the time worked up to the termination of their employment, including any earned, unused vacation time payments.

Generally, time earned under any vacation policy need be compensated only with the equivalent time off. The exception is where an employee separates from employment or where an employee agrees to receive monetary compensation in lieu of vacation time.

## Accrual of Vacation

An employer may cap the amount of vacation time that an employee may accrue or earn. For example, an employer may state that after accruing a total of four weeks of vacation leave, the employee will cease to earn any additional vacation time until the employee uses some of the accumulated vacation time. Thus, the employee would not earn additional vacation time until the employee's total vacation time falls below four weeks. While the employee retains all earned vacation leave, the employer is permitted to cap, prospectively, the amount of vacation time or pay which it must

2

*Exhibit 9*

provide to the employee.

An acceptable variation of an accrual cap is the vacation policy known as "use it or lose it." Under this policy, employees must use all of their accumulated vacation time by a certain period of time or lose all or part of it. Some policies allow the employees to "carry over" a certain number of hours of vacation after the expiration of the designated time period. The "use it or lose it" policy effectuates a cap on accrual by limiting the total amount of vacation time that an employee may accrue during the term of their employment. Under such policies, the employer must provide adequate prior notice of the policy to employees and must ensure that employees have a reasonable opportunity to use the accumulated vacation time within the time limits established by the employer. Otherwise, a cap on accrual or a "use it or lose it" policy may result in an illegal forfeiture of earned wages.

<u>Pro-rating Vacation Pay</u>

Employers can protect themselves by adopting clear and unambiguous vacation policies. For example, an employer may provide that employees begin to earn vacation time after a specific probationary period, such as after six months of employment. Another example of an unambiguous policy is one that provides that an employee earns vacation time at a rate of one day at the end of each month.

However, a policy that provides for employees to earn a given amount of vacation "a year," "per year," "on their anniversary date," or "every six months" is not clear because the definitions of the time periods are imprecise and subject to confusion concerning their start and end dates. Where an employer's policy is ambiguous, the actual time earned by the employee will be pro-rated according to the time period in which the employee actually works. For example, if an employee is to receive twelve

3

vacation days "in a year," and the employee voluntarily or involuntarily terminates his or her employment after ten months of employment, the employee would be entitled to ten vacation days or one day per month worked. Discharge prior to one year without pro rata payment constitutes failure to pay wages earned under Section 148.

<u>Annual Leave</u>

Some employers combine sick leave, personal leave, vacation leave, and/or other types of leave into one general category called "annual leave." This combined leave is also called paid time off, earned time, or paid days off. Employers who provide annual leave instead of vacation leave should designate the amount of hours or days of the leave which are considered vacation time. Employers who have previously designated vacation time in this manner, whether orally or in writing, shall produce proof of such designation to rebut a complaint of unpaid wages pursuant to G.L. c. 149, § 148.

<u>All Amendments to Vacation Policies Apply Prospectively</u>

As is the case with any condition of employment affecting wages, employers may amend the terms of their vacation policies at any time. Any such amendment, however, must be prospective in nature.

We urge employers to give employees copies of their written vacation policy in advance and to have each employee acknowledge in writing his or her understanding of the policy.

4



THE COMMONWEALTH OF MASSACHUSETTS APR 1 1 2006
OFFICE OF THE ATTORNEY GENERAL
Southeastern Massachusetts Division
105 William Street
New Bedford, Massachusetts 02740

THOMAS F. REILLY
ATTORNEY GENERAL

April 10, 2006

Tel: (508) 990-9700
Fax: (508) 990-8686
www.ago.state.ma.us

Attorney Brian R. Cunha
Law Offices Brian Cunha & Associates
311 Pine Street
Fall River, MA  02720

**Re:  Authorization for Immediate Private Suit/Main Street Textiles**

Dear Sir:

Thank you for contacting the Office of the Attorney General's Fair Labor and Business Practices Division.

This letter is to inform you that we have carefully reviewed your clients' complaints and have determined that the proper resolution of this matter may be through a private suit in civil court. Accordingly, we are authorizing you to pursue this matter through a civil lawsuit immediately.

Massachusetts General Laws chapter 149, § 150, and chapter 151, §§ 1B and 20 establish a private right of action for employees who believe they are victims of certain violations of the state wage laws.  If you elect to sue in civil court, you may bring an action on behalf of the complainants and others similarly situated, and you may obtain injunctive relief, treble damages for any loss of wages and other benefits, as well as the costs of litigation and reasonable attorneys' fees.

Without making a judgment on the merits of the complaints, this correspondence represents this office's written assent to sue and grants you the authority to pursue this matter against your clients employer immediately, as permitted by Massachusetts General Laws chapters 149 and 151.  This office will not take further enforcement action at this time.

Thank you for your attention to this matter.

Sincerely,

Cecile B. Byrne
Supervising Inspector
Fair Labor and Business Practices Division
(508) 990- 9700, extension 102