UNITED STATES DISTRICT COURT
FOR THE  DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| DONNA MANCHESTER and | ) | |
| NOEMIA CAMARA, | ) | |
| Individually, and on behalf of all others | ) | |
| similarly situated, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | C.A. NO. 04-10439 RCL |
| VS. | ) | |
| | ) | |
| MAIN STREET TEXTILES, L.P., | ) | |
| JOAN FABRICS SERVICES, LLC and | ) | |
| JOAN FABRICS CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

The Plaintiffs' Motion for Summary Judgment should be denied on all counts.  The

Worker Adjustment and Retraining Notification Act (the "WARN Act") claims should be denied

because the WARN Act does not apply to the Plaintiffs under the circumstances of this case.

The undisputed facts demonstrate that plaintiffs, Donna Manchester and Noemia Camara

(collectively, the "Plaintiffs"), were laid off in September and October 2003, well before the

"mass layoff" that took place between November 6, 2003 and December 5, 2003, which

triggered the obligations of their employer, defendant Main Street Textiles, L.P. ("Main Street"),

under the WARN Act.  Because the Plaintiffs are not covered by the Act, they are not entitled to

any back pay under the Act, and Main Street, Joan Fabrics Services, LLC and Joan Fabrics

Corporation (the "Defendants") are entitled to summary judgment on the WARN Act claims as a

matter of law.[1]

---

[1] The Plaintiffs' Motion should also be denied on its own terms because it contends that there is a factual dispute concerning the date on which the mass layoffs giving rise to WARN Act liability occurred.  Although this is a

Likewise, the Plaintiffs' claims to "vacation pay," as demanded in Counts II and VI of the Amended Complaint, styled respectively as "Reparations and Liability M.G.L. Ch. 149, § 148" and "State Claim", which assert a claim under the Massachusetts Wage Act,[2] must also fail. The Plaintiffs' Motion for Summary Judgment should be denied as to the Wage Act claim because, by the undisputed terms of Main Street's written policy, the Plaintiffs were not awarded a certain amount of "vacation pay" per year, nor did they accrue vacation time. Instead, only employees who were actually employed by Main Street during the annual closure of the plant between Christmas 2003 and New Year's Day were entitled to receive "vacation pay" for the week of the work stoppage. Because the Plaintiffs were laid off in September and October 2003, they were not employed at the time of the 2003 Holiday plant closure, and they were, therefore, not entitled to receive "vacation pay" for the 2003 Holiday plant closure. Under the express terms of the policy, the Defendants are entitled to summary judgment on the Wage Act claims as well.[3]

---

dispute over the appropriate legal analysis, not a dispute of material fact, Plaintiffs' contention that there is a dispute of material fact, if true, necessarily defeats its Motion for Summary Judgment.

[2] Although the Plaintiffs bring two differently styled claims based upon the Defendants' purported violation of the Massachusetts Wage Act, the claims are essentially the same.

[3] Although the Plaintiffs purport to bring this action as a class action, they have not moved to certify a class. Their explanation for why they have failed to move to certify a class appears to be that, as they now claim, "it was unanticipated that the issue [concerning the date on which the mass layoffs giving rise to WARN Act liability actually occurred] would arise until plaintiff [sic] received the defendants' motion for summary judgment". Defendants do not understand why this issue, which Plaintiffs characterize as a factual dispute but which is in fact a legal dispute involving an interpretation of the WARN Act, would have any bearing on when or if the Plaintiffs would move to certify a class. Moreover, Plaintiffs' suggestions that they did not understand that Defendants took the view that the "mass layoff" that triggered obligations under the Act occurred between November 6, 2003 and December 5, 2003, is disingenuous. Defendants made clear on July 31, 2004 in Defendant Main Street Textiles, L.P.'s Response to Plaintiffs' Interrogatories that the Plaintiffs were not entitled to notice and could not collect the back pay and benefits that they seek because they were not part of the mass layoff that took place between November 6, 2003 and December 5, 2003. See Local Rule 56.1 Statement of Undisputed Facts filed by Defendants on July 13, 2006 at Ex. 2. If the Court permits the Plaintiffs to move to certify a class at this late date, the Defendants respectfully request the opportunity to challenge any class certification proposed by the Plaintiffs because they cannot meet the requirements of Fed. R. Civ. P. 23.

2

## STATEMENT OF UNDISPUTED FACTS[4]

Main Street was formed in 1996 as part of the Tyng Textiles Group, a subsidiary of Joan Fabrics Corporation. See Deposition of Penny Richards ("Richards Dep.") at 6:14-17, 8:8-9:12.[5] Until it closed in April, 2004, Main Street operated a weaving plant in Fall River, Massachusetts, that produced and supplied decorative fabrics for the home furnishing and contract industries.

### Main Street's Decline in Productivity

Main Street's Fall River facility experienced a decline in productivity after the events of September 11, 2001 as a result of a downturn in the United States economy generally, and in the home furnishings market in particular. See Defendant Main Street Textiles, L.P.'s Response to Plaintiffs' Interrogatories[6]; Deposition of Edward DiPetrillo ("DiPetrillo Dep.") at 33:19-34:15, 40:12-41:1[7]; LR 56.1 Statement Ex. 1 at 18:12-20. These productivity problems became more acute in the Spring of 2003, and progressed through the Summer of 2003, forcing Main Street to reorganize its workforce and lay off employees. See LR 56.1 Statement Ex. 2; LR 56.1 Statement Ex. 3 at 43:9-44:8; LR 56.1 Statement Ex. 1 at 18:18-20. By September 7, 2003, Main Street had reduced its workforce to 348 full-time employees and one part-time employee.

---

[4] The Plaintiffs have failed to file a concise statement of the material facts of record as to which they contend that there exists no genuine issue to be tried, as required by Local Rule 56.1. The Defendants maintain that there are no material facts of record that are disputed for purposes of deciding the claims brought by the Plaintiffs, and that would warrant a trial on this matter, as set forth in the Local Rule 56.1 Statement of Undisputed Facts that the Defendants filed in support of their Motion for Summary Judgment. Plaintiffs have not filed a response to Defendants' Rule 56.1 Statement; therefore, all the material facts set forth in Defendants' Rule 56.1 Statement should be deemed admitted. LR D.Mass. 56.1.

[5] The relevant excerpts of the Richards Dep. are attached to the Defendants' Local Rule 56.1 Statement filed on July 13, 2006 as Ex. 1. All other Exhibits referred to herein are likewise attached to the Defendants' Local Rule 56.1 Statement (the "LR 56.1 Statement") and are referred to by exhibit number as "Ex. __".

[6] Defendant Main Street Textiles, L.P.'s Response to Plaintiffs' Interrogatories is attached to the LR 56.1 Statement as Exhibit 2.

[7] The relevant excerpts from the DiPetrillo Dep. are attached to the LR 56.1 Statement as Ex. 3.

GSDOCS\00527:0069\1645612.2

See Affidavit of Lou-Ann Laporte ("Laporte Aff.") at ¶ 2, attached to the LR 56.1 Statement as Ex. 4.

The Plaintiffs were included among the employees Main Street laid off in accordance with its seniority system of layoffs because of then existing market conditions.  See Layoff Policy, a copy of which is attached to the LR 56.1 Statement as Ex. 5.  Specifically, Main Street laid off Ms. Camara on September 28, 2003 and Ms. Manchester on October 3, 2003.  See LR 56.1 Statement Ex. 2 at Ex. B.[8]

On or about October 10, 2003, Main Street determined that it would likely have to close the plant at some point.  See LR 56.1 Statement Ex. 3 at 55:16-23 (Company principals decided to close the plant "maybe a week before [the October 17, 2003 WARN Notice] at the most"); see also id. at 35:4-7, 35:17-24; LR 56.1 Statement Ex. 1 at 24:3-21; Cf. Deposition of Lou-Ann Laporte ("Laporte Dep.") at 13:5-13 (Main Street's Human Resources Manager testified that she was not informed of the proposed shut down until the October 17, 2003 WARN notice was actually posted).[9]  By letter dated October 17, 2003 (the "WARN Notice"), Main Street notified its active employees (and inadvertently some former employees who were recently laid off) that it intended to close its Fall River plant permanently by April 30, 2004.  Specifically, the WARN Notice provided:

> The Company regrets to inform you that Main Street Textiles has made the decision to permanently discontinue its manufacturing operations in Fall River.  As a result, the Company expects the plant to close permanently by April 30, 2004.  The first separations are expected to occur on or about October 17, 2003.  Employees will be laid off at various times subject to the availability of work.  Unfortunately, the Company does not know the exact dates that

---

[8] Defendant Main Street Textiles, L.P.'s Response to Plaintiffs' Interrogatories contains, as its Ex. B, a list of employees who were laid off prior to October 17, 2003.

[9] The relevant excerpts from the Laporte Dep. are attached to the LR 56.1 Statement as Ex. 6.

> individual employees will be laid off and would like to delay lay offs as long as possible depending on the availability of work. If you are laid off prior to the expiration of the 60 day WARN Act notice period, the Company will continue your pay and benefits for the full 60 day notice period.

WARN Notice, a copy of which is attached to the LR 56.1 Statement as Ex. 7.[10]

As contemplated by the WARN Notice, and prior to the plant closing on April 30, 2004, Main Street began permanently laying off groups of employees after the October 17, 2003 notice. See LR 56.1 Statement Ex. 2 at Ex. C.[11] On November 6, 2003, Main Street permanently laid off 36 employees. See id. The Company permanently laid off 67 additional employees on November 7, 2003. See id. It permanently laid off two more employees on November 14, 2003, one employee on November 21, 2003 and one more on November 28, 2003. See id. Finally, Main Street permanently laid off eight employees on December 2, 2003 and three employees on December 5, 2003. See id. Between November 6, 2003 and December 5, 2003, a total of 118 employees were laid off. See id. This constituted more than one-third of Main Street's workforce, thereby qualifying it as a "mass layoff" under the Act. See id. The mass layoff between November 6, 2003 and December 5, 2003, triggered Main Street's obligations under the Act to those employees who were terminated as part of the mass layoff.

Additional layoffs followed those of the November through December 2003 time period. See id. Main Street permanently closed the Fall River plant on April 30, 2004. See id.; Ex. 3 at 42:16-19.

---

[10] On October 17, 2003, as required by the Act, Main Street also provided notice of its anticipated plant closing to the Mayor of Fall River, Edward M. Lambert, Jr., see letter to Mayor Lambert, a copy of which is attached to the LR 56.1 Statement as Ex. 8, and to Jonathan Raymond of the Commonwealth Corporation, the entity designated by the Commonwealth of Massachusetts as the state dislocated worker unit. See Letter to Jonathan Raymond, a copy of which is attached to the LR 56.1 Statement as Ex. 9.

[11] Defendant Main Street Textiles, L.P.'s Response to Plaintiffs' Interrogatories contains, as its Ex. C, a list of employees who were laid off between October 17, 2003 and April 30, 2004.

## Main Street's "Vacation" Policy

Main Street historically shut down its manufacturing facility for one week in July and one week in December each year.  <u>See</u> Defendant Main Street Textiles, L.P.'s Supplemental Response to Plaintiffs' Interrogatories, a copy of which is attached to the LR 56.1 Statement as Ex. 10.   Production Hourly Associates were eligible for paid time off during those work stoppages, referred to as "vacation pay" under the Company's policy, so long as they were on the active payroll at the time of the stoppage, which was referred to as "vacation time".  <u>See</u> Production Hourly Vacation Pay Policy, a copy of which is attached to the LR 56.1 Statement as Ex. 11 ("An Associate must be employed at vacation time or on an approved medical leave of absence to receive vacation pay, or unless they return prior to their next scheduled shift.");  LR 56.1 Statement Ex. 3 at 92:21-93:3, 96:7-10; LR 56.1 Statement Ex. 6 at 57:2-7, 59:5-13; LR 56.1 Statement Ex. 1 at 63:20-64:2.  Main Street's policy also states that "[n]ew associates must have worked prior to the last week in May to be eligible for vacation pay during the July 4th vacation and prior to the last week in November to be eligible for vacation pay during the Holiday vacation [<i>i.e.</i>, the last week of December between Christmas and New Year's]."  LR 56.1 Statement Ex. 11; LR 56.1 Statement Ex. 3 at 93:4-12, 94:4-8.  Employees who were laid off prior to the work stoppages and not recalled by December 31 of the year of layoff were not eligible for vacation pay.  <u>See</u> LR 56.1 Statement Ex. 5.

Employees were not paid the same amount of vacation pay during the work stoppage.  <u>See</u> LR 56.1 Statement Ex. 11.  Rather, Main Street computed the amount of any particular employee's vacation pay based upon the employee's seniority and total earnings for the preceding six months.  <u>See id.</u>  Pursuant to the express terms of the written policy, vacation time did not accrue.  <u>See id.</u>; <u>see also</u> LR 56.1 Statement Ex. 6 at 60:13-61:21; LR 56.1 Statement Ex. 1 at 61:4-14.

**ARGUMENT**

**A.     This Court Should Dismiss The Plaintiffs' WARN Act Claims.**

There is no legal support for the Plaintiffs' argument that all employees laid off by Main Street in the 90 days between August 26, 2003 and November 26, 2003 who did not receive 60 days of pay and benefits in lieu of notice are entitled to recover under the WARN Act because, under the undisputed circumstances of this case, the only "mass layoff" took place between November 6, 2003 and December 5, 2003. Because the Plaintiffs were not part of the mass layoff, Main Street had no obligation to them under the WARN Act.

**1.     The 90-Day Aggregation Rule Does Not Apply to the Circumstances of this Case.**

The WARN Act requires covered employers[12] to provide at least 60 days notice of a "plant closing" or "mass layoff" to employees affected by the plant closing or mass layoff. <u>See</u> 29 U.S.C. § 2102; 20 CFR §§ 639.2, 639.6. The Plaintiffs admit in their papers that they were not laid off as part of a plant closing. Accordingly, the only issue is whether the Plaintiffs qualify as employees who were affected by a mass layoff.

WARN defines a "mass layoff" as a reduction in force which:

(A)     is not the result of a plant closing; and

(B)     results in an employment loss at the single site of employment during any 30-day period for

---

[12] Although Main Street does not dispute that it is a "covered employer" under the Act because it employed at least 100 employees at or about the time that it was required to provide WARN notification to affected employees, the Plaintiffs have failed to show that Joan Fabrics Corporation and Joan Services Corporation, LLC (the "Joan Defendants") are also "covered employers" under the Act. <u>See</u> 29 U.S.C. § 2101. First, neither of the Joan Defendants actually employed the Plaintiffs. Second, the Plaintiffs have not attempted to demonstrate that the Joan Defendants constituted a "single employer" with Main Street for WARN Act liability. In short, there simply are no facts in the record to support a conclusion that these three entities acted together as a single employer. <u>See</u> <u>United Paperworkers Int'l Union, AFL-CIO, CLC, et al. v. Alden Corrugated Container Corp.</u>, 901 F. Supp. 426, 436-439 (D. Mass. 1995) (discussing tripartite test used to determine whether related companies are a single business enterprise for WARN Act purposes).

     i.  at least 33 percent of the employees (excluding any part-time employees); and

     ii.  at least 50 employees (excluding any part-time employees); or

     iii.  at least 500 employees (excluding any part-time employees).

29 U.S.C. § 2101(a)(3); see also 20 CFR § 639.3(c).

The term "employment loss" means:

(A)    an employment termination, other than a discharge for cause, voluntary departure, or retirement;

(B)    a layoff exceeding 6 months; or

(C)    a reduction in hours of work of more than 50 percent during each month of any 6-month period.

29 U.S.C. § 2101(a)(6); see also 20 CFR § 639.3(f). Although Main Street issued its WARN Notice on October 17, 2003 (which provided ample notice of its April 30, 2004 plant closing), the Defendants demonstrated in their Summary Judgment Memorandum at pages 8 – 12 that the actual layoffs that triggered the mass layoff notice requirements under the Act took place during the 30 day period between November 6, 2003 through December 5, 2003. This was the only layoff within any 30 day period that satisfied the necessary elements to constitute a "mass layoff" under the Act. Because the Plaintiffs were not included among these layoffs, they now contend that this Court should aggregate employment losses over a 90-day period (including the largest portions of the mass layoff from November 6, 2003 through December 5, 2003) pursuant to Section 2102(d) of the Act to bring them within coverage of the WARN benefits. However, this argument fails as a matter of law.

WARN only provides for the aggregation of employment losses over a 90-day period if two pre-conditions are satisfied. First, the employment losses for 2 or more groups in a 30-day period must be less than the minimum number of employees specified in 29 U.S.C. § 2101(a)(3)

8

to constitute a mass layoff - - *i.e.*, 50 employees and 33% of the workforce.  See 29 U.S.C. §
2102(d).  Second, the losses over the 90-day period must exceed the 50 employees and 33% of
the workforce thresholds set in Section 2101(a)(3).  See id.  "Clearly, Congress intended that
Section 2102(d)  [the 90-day aggregation rule] only applies if 2101(a)(2) [plant closing] or (3)
[mass layoff] are not met."  Roquet v. Arthur Anderson, 2004 U.S. Dist. LEXIS, 3909, *11-12
(N.D. Ill. 2004); see also United Paperworkers Int'l Union, AFL-CIO, CLC, et al. v. Alden
Corrugated Container Corp., et al., 901 F. Supp. 426, 435 (D. Mass. 1995) (only aggregating
employment losses over 90-day period when layoffs fail to satisfy the requirements of §
2101(a)(3)); United Electrical, Radio and Machine Workers of America (UE) and UE Local 291
v. Maxim, Inc., 1990 U.S. Dist. LEXIS 5988, *8-9 (D. Mass. 1990) (refusing to aggregate
employment losses over 90-day period because layoffs satisfied the requirements of §
2101(a)(2)).

Main Street's layoffs between November 6, 2003 and December 5, 2003 satisfied the
requirements of 29 U.S.C. § 2101(a)(3) and constituted a mass layoff under the Act.  Between
November 6, 2003 and December 5, 2003, Main Street laid off a total of 118 employees.  See LR
56.1 Statement Ex. 2 at Ex. C.  The relevant date for calculating Main Street's total number of
employees to analyze whether the layoffs of the November 6th to December 5th period were
more than 33 percent of the workforce is the date on which the first notice is required to be given
to those employees laid off within the statutory 30 day period, namely 60 days prior to the mass
layoff.  See 20 CFR § 639.5(a)(2); Roquet, 2004 U.S. Dist. LEXIS at *7-8; United Paperworkers,
901 F. Supp. at 436.  When all employees are not terminated on the same date for the purposes of
considering whether there has been a "mass layoff", the date of the first termination within the
statutory 30 day period triggers the 60 day notice requirement.  See 20 CFR 639.5(a)(1).  Here,

9

this "snapshot" of Main Street's employee roster should be taken 60 days prior to the first layoffs that were part of the mass layoff. See Reyes, et al. v. Greater Texas Finishing Corp., et al., 19 F. Supp. 2d 717, 718 (W.D. Texas 1998). Accordingly, the date on which the total number of employees is to be measured is 60 days prior to November 6, 2003, or September 7, 2003.

On September 7, 2003, Main Street employed 348 full-time employees and one part-time employee. See LR 56.1 Statement Ex. 4 at ¶ 2. Part-time workers are not counted as employees for purposes of determining coverage. See 29 U.S.C. § 2101(a)(3)(B); 20 CFR § 639.3(c)(2). One-third of Main Street's 348 member workforce as of September 7, 2003 was 116 employees. Accordingly, the 118 employees Main Street laid off between November 6, 2003 and December 5, 2003 exceeds the requisite 50 employees and 33 percent of Main Street's workforce as of the date notice would have been required. It therefore constitutes a mass layoff under the Act. See 29 U.S.C. § 2101(a)(3)(B); 20 CFR § 639.3(c). Thus, the 90-day aggregation scheme contained in § 2102(d), on which the Plaintiffs' rely here, simply does not apply.[13]

### 2.    Even if the 90-Day Aggregation Rule Applied, the Plaintiffs Have Miscalculated Main Street's Workforce at the Relevant Date.

Even if the 90-day aggregation rule applied, however, the Plaintiffs have not carried their burden of demonstrating that the layoffs that took place between August 26, 2003 and November 26, 2003 exceed 33% of Main Street's workforce at the relevant time to constitute a mass layoff. The Plaintiffs acknowledge that the total number of employees for WARN Act purposes should be calculated at a "snapshot" date on which notice is first required to be given, or 60 days prior

---

[13] At footnote 5 in their summary judgment brief, the Plaintiffs attempt to provide an example of a situation in which they claim that the 90-day aggregation rule might apply. However, the Plaintiffs offer no legal authority for this analysis (which does not appear in the WARN Act itself or the relevant regulations), and the analysis is simply wrong. In their example, the Plaintiffs contend that the date on which the total number of employees should be determined for WARN purposes is the day immediately preceding the first termination in the mass layoff. This interpretation is incorrect. As demonstrated above, the date on which the total number of employees is to be measured is 60 days prior to first layoff that is part of a mass layoff. See 20 CFR 639.5(a); Roquet, 2004 U.S. Dist. LEXIS at *7-8; United Paperworkers, 901 F. Supp. At 436; Reyes, 19 F. Supp. 2d at 718.

to the first layoff that is part of the "mass layoff". Plaintiffs' Memorandum at p. 8. Accordingly, based on the Plaintiffs' contention that August 26, 2003 is the relevant date of the initial layoff, and their own stated interpretation of the "snapshot" date, the relevant date on which Main Street's work force should be calculated under the Plaintiffs' analysis is 60 days prior to August 26, 2003, or June 27, 2003. However, the Plaintiffs use the total number of Main Street employees for WARN Act purposes as of August 25, 2006, or the day prior to when they argue that the first layoffs (in what they believe to be the mass layoff) occurred. The Plaintiffs provide absolutely no justification for why the August 25, 2003 date is relevant. In fact, it has no legal relevance. Therefore, even if the Court were persuaded to apply the aggregation rule, despite the lack of legal support for the Plaintiffs' argument, the Plaintiffs have not shown that the employees who were terminated between August 26, 2003 and November 26, 2003 exceed 33% of Main Street's workforce at the relevant time because they have not appropriately calculated the correct number of employees against which to make this determination.[14]

### 3. Main Street's Alleged Motivations for Laying Off Employees before the October 17, 2003 WARN Notice Is Not Legally Relevant.

In anticipation that Main Street may argue that the pre-October 17 layoffs were "the result of separate and distinct actions and causes" from the subsequent layoffs, the Plaintiffs contend that because the pre-October 17, 2003 layoffs were allegedly motivated by Main Street's steady economic decline, this Court should aggregate the Company's losses. However, Main

---

[14] There are other mistakes in the Plaintiffs' tortured analysis. First, the time period from August 26, 2003 through and including November 26, 2003 on which the Plaintiffs rely, actually contains 93 days, and therefore exceeds any "90-day" aggregation period. Second, as Exhibit 4 to the LR 56.1 Statement demonstrates, 132 employees were permanently laid off during that time period, not 136 as the Plaintiffs suggest. Finally, even if the Plaintiffs had accurately calculated the correct number of employees at June 27, 2003, and assuming that the layoffs between August 26, 2003 and November 26, 2003 exceeded one-third of Main Street's then workforce, the 90-day aggregation rule still would not apply because the layoffs that took place between November 6, 2003 and December 5, 2003 met the requirement of 29 U.S.C. § 2101(a)(3) and constituted a mass layoff under the Act, precluding the application of 29 U.S.C. § 2102(d) and the 90-day aggregation rule.

Street's motivations for the pre-October 17, 2003 layoffs are of no legal significance in this action. All that matters are the numbers of layoffs within the Act's relevant timeframes, and in this case, the numbers do not support the Plaintiffs' position.

Plaintiffs reliance on United Paperworkers, 901 F. Supp. 426 (D. Mass. 1995), is misplaced. In United Paperworkers, the employer engaged in a series of terminations over a period of approximately 3 months. 901 F. Supp. at 435. The Court found that, taken separately, the individual layoffs did not satisfy the requirements of Section 2101(a)(3) of the Act because they did not exceed the Act's minimum thresholds for a mass layoff. See id. The Court then went on to aggregate the employment losses over 90 days and determined that, taken together, the employment losses constituted a mass layoff. See id. The employer argued that this finding was erroneous because the layoffs were the result of separate and distinct actions and causes, a defense under the Act. See id. The Court ultimately disagreed with the employer, finding that the layoffs were occasioned by its continuing and accelerating economic demise, and aggregated the losses. See id. at 436.

However, the Court in United Paperworkers only undertook its analysis of the three months of layoffs because it initially determined, as it should under the Act, that there were no layoffs in any 30-day period that constituted a "mass layoff" under Section 2101(a)(3). See id. at 435. Without this necessary precondition, the aggregation rule does not apply. See id.

As described above and as demonstrated in the Defendants' Summary Judgment Memorandum, the 118 employees Main Street laid off between November 6, 2003 and December 5, 2003 exceeded the requisite 50 employees and 33 percent of Main Street's workforce as of the date notice would have been required, and therefore constituted a mass layoff under Section 2101(a)(3) of the Act. See 29 U.S.C. § 2101(a)(3)(B); 20 CFR § 639.3(c).

12

Accordingly, the aggregation rule does not apply, and Main Street's motivations as to the pre-October 17, 2003 layoffs are irrelevant.  For this additional reason, the Plaintiffs' motion should be denied, and the Court should enter summary judgment in favor of the Defendants.

    **B.**    **The Defendants Are Entitled to Summary Judgment on the Plaintiffs' Wage Act Claim.**

        **1.**    **Plaintiffs Have No Claim to "Vacation Pay" for Main Street's December 2003 Work Stoppage Because They Were Not Employed at the Time of the Plant Closure.**

The Plaintiffs' vacation pay argument rests on a central misapprehension (or mischaracterization) of Main Street's vacation policy.  Plaintiffs assert that they had vacation time that accrued and for which they were entitled to receive vacation pay upon the termination of their employment.  If an employer maintains a vacation policy pursuant to which an employee accrues vacation time, the unused vacation pay is in fact part of an employee's regular compensation and should be treated as "wages" for purposes of M.G.L. c. 149, § 148.  <u>See</u> <u>Massachusetts v. Morash</u>, 490 U.S. 107 (1989);  <u>see also</u> Attorney General Advisory 99/1 (September 7, 1999).  However, not all paid time off accrues as though an employee is provided with a certain amount of annual vacation time to take when he or she chooses.[15]  The record here is undisputed that the Plaintiffs simply did not accrue vacation time while employed by Main Street.  Instead, they were eligible to receive "vacation pay" if they were employed at the time of Main Street's annual plant closure for the week between the Christmas and New Year's holidays.  Because the Plaintiffs were laid off months before the end of year Holiday plant closing, they were not entitled to be paid for the week when the plant shut down its operations.

---

[15] Although there are few reported cases addressing this issue, the Attorney General acknowledges that employers are not required to offer their employees paid vacation and are free to set requirements for vacation entitlement including scheduling vacation, capping accrual of vacation time, and imposing a "use it or lose it" policy, as long as those requirements are unambiguous and employers do not evade the basic rule that <u>accrued</u> vacation entitlement is a form of wages.  <u>See</u> Attorney General Advisory 99/1 (September 7, 1999)

GSDOCS\00527:0069\1645612.2

As described in full detail in Defendants' Summary Judgment Memorandum at pages 15-17, each year Main Street traditionally stopped work and closed its plant for one week in July and one week in December. See LR 56.1 Statement Ex. 10. All Production Hourly Associates, like the Plaintiffs, regardless of their length of service, were eligible to be paid for the week when the plant closed as long as they were actually employed at the time of the work stoppage. See LR 56.1 Statement Ex. 11; Ex. 3 at 92:21-93:3, 96:7-10; Ex. 6 at 57:2-7, 59:5-13; Ex. 1 at 63:20-64:2. How much an employee was paid for that time off was computed as of the date of the work stoppage based on the employee's seniority and his or her preceding six month's earnings. See LR 56.1 Statement Ex. 11. As the deposition testimony of the Defendants' employees demonstrated, the Main Street production hourly associates, like the Plaintiffs, did not accrue vacation, and the amount of vacation pay one received was in no way deferred wages for services rendered. See id.; see also LR 56.1 Statement Ex. 6 at 60:13-61:21; LR 56.1 Statement Ex. 1 at 61:4-14. Under Main Street's written policy, the Plaintiffs were not entitled to receive "vacation pay" for the 2003 Holiday plant closure because they were not employed at the time of the work stoppage.

That Main Street did not intend for the Plaintiffs to accrue vacation is even more clear when considered against the very different vacation policies that covered Main Street's Office Hourly and Salaried Associates who did not work on the production line. Those vacation policies specifically stated that vacation accrued at a certain rate based on past services. See LR 56.1 Statement Ex. 12 and Ex. 13. If Main Street had intended vacation time or pay to accrue for Hourly Production Associates as well, it knew how to say so.

The out-of-state cases on which the Plaintiffs rely for the proposition that they should be entitled to "vacation pay" during Main Street's Holiday work stoppage have no application to the

14

facts of this case.  For example, the vacation policy at issue in Golden Bear Family Restaurants v. Murray, 144 Ill. App. 3d 616 (Ill. App. Ct. 1st Dist. 1986), provided that accrued vacation days would not be paid to departing employees when termination of employment occurs within the same calendar year as vacation accrual, and that earned vacation in a calendar year may only be taken if the employee is on the payroll and working a regular schedule on the Wednesday preceding January 1.  See Golden Bear, 144 Ill. App. 3d at 618.  The Illinois Court of Appeals held that requiring an employee to forfeit accrued or earned vacation pay upon termination of employment ran afoul of the Illinois statute governing the payment of wages.  See id. at 627. Because Main Street's policy did not provide for accrual of vacation or vacation pay, Golden Bear is inapposite.

Suastez v. Plastic Dress-Up Co., 31 Cal. 3d 774 (Cal. Sup. Ct. 1982), is similarly distinguishable.  In Suastez, the defendant company's vacation policy provided that each employee was entitled to between one and four weeks of paid vacation annually depending on the length of his or her employment, but the company routinely refused to pay vacation benefits to those persons whose employment was terminated before their anniversary date.  See Suastez, 31 Cal. 3d at 776-77.  The California Supreme Court found that "annual paid vacation" vests as it is earned and as labor is rendered throughout the year and that, on termination of employment, such earned vacation pay was protected by statute from forfeiture.  See id. at 782-84.  However, Suastez has little application to this case because the Main Street policy did not provide for "annual paid vacation".[16]

---

[16] The remaining out-of-state cases cited by the Plaintiffs have no relevance to this case.  See Amalgamated Butcher Workmen v. Capitol Packing Co., 413 F.2d 668 (10th Cir. 1969); Livestock Feeds, Inc. v. Local Union No. 1634, 221 Miss. 492 (Miss. 1954); Textile Workers Union v. Paris Fabric Mills, Inc., 18 N.J. Super. 421 (N.J. Super. 1952).  Capitol Packing, Livestock Feeds and Paris Fabric each involved the payment of vacation wages allegedly due under collective bargaining agreements, contractual arrangements that have no application to this case.

Electronic Data Systems Corp. v. Office of the Attorney General, 440 Mass. 1020 (2003), cited by Plaintiffs does not require a different result. The EDS vacation policy provided that employees were entitled to a specific number of weeks of vacation time in each calendar year depending on years of service performed for the company. See EDS Corp., 440 Mass. at 1020. Employees were further informed that "[i]f you leave the company, you do not receive vacation pay for unused vacation time." See id. After his involuntary termination, a former employee brought suit seeking payment for his unused vacation time. See id. The Court reasoned that the vacation policy as drafted was ambiguous and held that it did not apply to employees who were involuntarily terminated and given no opportunity to use their accrued, but unused, vacation time prior to their departure. See id. Again, EDS Corp. has little to do with the issue in this case. The Main Street policy was unambiguous and provided "vacation pay" to active employees when the plant closed for the holidays. This vacation pay was neither earned in advance nor did it accrue over the course of the year. Employees simply received it if they were then employed when the plant closed.

As the deposition testimony of the Main Street employees who developed and administered the "vacation pay" policy makes clear, there was no earned or accrued vacation pay benefit at issue here. Main Street traditionally stopped its operations and shut down its Fall River plant each year over the Christmas Holidays. Because the production lines were not running, then current Production Hourly employees of Main Street were not required to work that week. Main Street compensated such employees during the work stoppage with a sum that was based upon their seniority and total earnings for the preceding six months. This method of computation is not a proxy for vacation time accrual -- it is merely the calculation of how much pay an individual would receive if he was a then current Main Street employee who was not

16

required to come to work during the Holiday plant closure.  Accordingly, the Plaintiffs' claim to

one week of vacation pay under the Wage Act must fail.

> **2.     Plaintiffs' Wage Act Claim Should Also Be Dismissed Because Plaintiffs Failed to Satisfy the Statutory Prerequisites to Filing Suit.**

In their Summary Judgment Memorandum, the Defendants demonstrated that the

Plaintiffs' Wage Act claim should be dismissed for the additional reason that the Plaintiffs had

failed to satisfy the statutory prerequisite of filing a complaint with the Attorney General's

Office and obtaining permission from the Attorney General prior to pursuing the instant civil

action.  See Mass. Gen. Laws c. 149, § 150; See, e.g., Daly v. Norton Co., 10 Mass. L. Rptr.

674, *5, *9 (Mass. Super. 1999) (dismissing claim for unpaid bonus and vacation pay because

employee failed to file a complaint with the Attorney General or seek written permission from

the Attorney General before filing a civil action in Superior Court); Axton-Cross Co., Inc. v.

Blanchette, 2 Mass. L. Rptr. 646, *9-10 (Mass. Super. 1994) (dismissing claim for unpaid wages

and vacation pay because employee did not satisfy statutory prerequisite of filing complaint with

Attorney General or receiving Attorney General's written approval before bringing a private

claim under M.G.L. c. 149, § 148).  Despite a document request from the Defendants on October

29, 2004 seeking "any and all communications between any of the purported class members and

any employee, agent or representative of [the] Commonwealth of Massachusetts, including

anyone employed or affiliated with the Massachusetts Attorney General's Office, that concern,

refer, or relate to any of the events or allegations in the Complaint", the Plaintiffs failed to

provide any such written documentation to the Defendants at any time during discovery.

Although the Plaintiffs' summary judgment papers include an April 10, 2006 letter from

the Attorney General's Office authorizing the Plaintiffs' counsel to pursue a civil action against

Main Street, this letter is dated more than two years after the Plaintiffs filed their original

Complaint. It also fails to identify the specific individuals on whose behalf counsel for the Plaintiffs is authorized to bring suit, and it authorizes suit against Main Street alone and not against Joan Fabrics Services, LLC or Joan Fabrics Corporation. The April 10, 2006 letter fails to satisfy the requirements of Mass. Gen. Laws c. 149, § 150. Moreover, even if the Court concludes that it satisfies the statutory precondition as to Main Street, the Plaintiffs have produced no evidence that they ever obtained permission to sue Joan Fabrics Services, LLC and Joan Fabrics Corporation on their Wage Act claim. Accordingly, at a minimum, Counts II and VI should be dismissed as to Joan Fabrics Services, LLC and Joan Fabrics Corporation.

## **CONCLUSION**

This Court should deny the Plaintiffs' Motion for Summary Judgment and grant the Defendants' Motion for Summary Judgment. The Plaintiffs did not experience an employment loss entitling them to notice and a continuation of pay and benefits under the WARN Act because they were laid off prior to the mass layoff that took place during the 30-day period from November 6, 2003 through December 5, 2003. The Plaintiffs reliance on the Act's 90-day aggregation rule to expand the WARN Act coverage to them must fail because the aggregation rule does not apply to the facts of this case, and in any event, the Plaintiffs have not provided an accurate factual basis to justify their claim even if it did apply. In addition, the Plaintiffs are not eligible for any "vacation pay" under the unambiguous terms of the Main Street vacation pay policy because they were not employed by Main Street at the time of the December 2003 work stoppage. Likewise, because the Plaintiffs have failed to satisfy the statutory prerequisites of M.G.L. c. 149, § 150, they may not maintain their action for vacation pay under the Massachusetts Wage Act.

GSDOCS\00527:0069\1645612.2

MAIN STREET TEXTILES, L.P.
JOAN FABRICS SERVICES, LLC
JOAN FABRICS CORPORATION

By their attorneys,


/s/ Neil V. McKittrick
Neil V. McKittrick (BBO# 551386)
Elizabeth L. Schnairsohn (BBO# 658532)
GOULSTON & STORRS
A Professional Corporation
400 Atlantic Avenue
Boston, MA  02210
617-482-1776
nmkittrick@goulstonstorrs.com


## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and that all counsel of record are so registered.


/s/ Neil V. McKittrick
Neil V. McKittrick


Dated:  September 12, 2006

GSDOCS\00527:0069\1645612.2