UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-CV-10439-RGS

DONNA MANCHESTER AND NOEMIA CAMARA

v.

MAIN STREET TEXTILES, L.P., et al.

<u>MEMORANDUM AND ORDER ON
CROSS-MOTIONS FOR SUMMARY JUDGMENT</u>

March 20, 2007

STEARNS, D.J.

On March 3, 2004, plaintiffs Donna Manchester and Noemia Camara brought this lawsuit against their former employer, Main Street Textiles, L.P. (Main Street), and Main Street's corporate parents, Joan Fabrics Services, LLC, and Joan Fabrics Corporation. Plaintiffs allege that Main Street terminated them without the 60-day notice required by § 2102 of the Worker Adjustment and Retraining Notification (WARN) Act, 29 U.S.C. §§ 2101-2109. Plaintiffs seek back pay and benefits pursuant to § 2104 of the Act. On July 13, 2006, after discovery had closed and a trial date had been set, defendants filed a motion for summary judgment. Plaintiffs did not object, agreeing that no material facts (but one) are in dispute and that the case can be summarily decided.[1]  On August 29, 2006,

---

[1] The one material fact that is in dispute can be resolved as a matter of law, as will be seen.

plaintiffs filed a cross-motion for summary judgment. On September 22, 2006, the court heard oral argument.[2]

## FACTUAL BACKGROUND

The material facts are as follows. Main Street opened for business in 1996 as an affiliate of the Tyng Textiles Group, a subsidiary of Joan Fabrics Corporation. Main Street operated a weaving plant in Fall River, Massachusetts, producing decorative fabrics for the home furnishings industry. Main Street, which was already losing market share to foreign competition, suffered further in the economic downturn that followed the terrorist attacks of September 11, 2001. In April of 2003, Main Street curtailed production at the Fall River plant. In August of 2003, Main Street management met with outside counsel to discuss the possible ramifications of a permanent closing of the plant.

On August 25, 2003, Main Street had 358 full-time employees. On August 26, 2003, the first Main Street worker whom plaintiffs contend was entitled to WARN Act notice was laid off. By September 7, 2003, the date defendants identify as pivotal for WARN Act purposes, another nine workers had been terminated and the work force stood at 348 employees. As of September 23, 2003, another three employees had been let go, bringing the number of full-time employees to 345. Eighteen more workers were laid off between September 24 and October 23, 2003, including the plaintiffs. The number of employees now stood at 327.

---

[2]Plaintiffs had also alleged a violation of the Massachusetts Wage Act, G.L. c. 149, § 148. Judgment on this claim was entered for defendants at the conclusion of the hearing.

2

In early October of 2003, it became apparent to Main Street management that the business was no longer viable. On October 17, 2003, Main Street issued a WARN Act notice to its remaining employees and to state and city officials. The notice stated:

> [t]he Company regrets to inform you that Main Street Textiles has made the decision to permanently discontinue its manufacturing operations in Fall River. As a result, the Company expects the plant to close permanently by April 30, 2004. The first separations are expected to occur on or about October 17, 2003. Employees will be laid off at various times subject to the availability of work. Unfortunately, the Company does not know the exact dates that individual employees will be laid off and would like to delay lay offs as long as possible depending on the availability of work. If you are laid off prior to the expiration of the 60 day WARN Act notice period, the Company will continue your pay and benefits for the full 60 day notice period.

On November 6, 2003, Main Street laid off thirty-six employees. The next day, November 7, 2003, sixty-seven workers were terminated. Between November 6 and December 5, 2003, a total of 118 employees lost their jobs.

## STATUTORY BACKGROUND

Under the WARN Act, a covered employer must

> not order a plant closing or mass layoff until the end of a 60-day period after the employer serves written notice of such an order –
>
> > (1) to each representative of the affected employees as of the time of the notice or, if there is no such representative at that time, to each affected employee; and
> >
> > (2) to the State or entity designated by the State to carry out rapid response activities . . . and the chief elected official of the unit of local government . . .

29 U.S.C. § 2102(a).[3]  An employer who fails to provide timely notice is liable to terminated employees for back pay and benefits for each "day of violation," that is, each day during which the employee had not received the required notice, to a maximum of sixty days.  29 U.S.C. § 2104(a)(1)(A) & (B).  The purpose of the Act is "to ensure that 'workers receive advance notice of plant closures and mass layoffs that affect their jobs.'" Kildea v. Electro-Wire Products, Inc., 144 F.3d 400, 405 (6th Cir. 1998), quoting Marques v. Telles Ranch, Inc., 131 F.3d 1331, 1333 (9th Cir. 1997).

Defining when a plant has "closed," that is, has ceased all meaningful operations, did not appear to daunt the drafters of the Act.[4]  Giving meaning to the term "mass layoff," however, turned out to be a different kettle of fish.  In an apparent attempt to bridge policy differences, Congress inserted two definitions of "mass layoff" in the WARN Act that are in some respects inconsistent.  Section 2101(a)(3) of the Act defines a "mass layoff" as a reduction in force that

(A) is not the result of a plant closing; and

(B) results in an employment loss at the single site of employment during any 30-day period for –

    (i)(I) at least 33 percent of the employees (excluding any part-time employees); and (II) at least 50 employees (excluding any part-time employees); or

---

[3]Main Street does not dispute that it is a "covered employer" within the meaning of § 2101(a)(1) of the Act.

[4]A plant "closing" is defined by 29 U.S.C. § 2101(a)(2) as "the permanent or temporary shutdown of a single site of employment, or one or more facilities or operating units within a single site of employment, if the shutdown results in an employment loss at the single site of employment during any 30-day period for 50 or more employees . . . ."

4

      (ii) at least 500 employees (excluding any part-time employees); . . .

Thus, under § 2101(a)(3) a "mass layoff" occurs if during any 30-day period 500 employees are terminated or, if fewer than 500, at least 50 employees are laid off who collectively make up no less than 33 percent of the existing work force. When employees are not laid off simultaneously, the date of the first layoff within the 30-day period is the day on which counting begins for 60-day notice purposes. 20 C.F.R. § 639.5(a).

There is, however, another definition of "mass layoff," which is inserted not in § 2101, the definitions section of the Act, but rather as a coda to § 2102, the section of the Act that explains the mechanics of the notice requirement. Section 2102(d) provides that

> [f]or purposes of this section, in determining whether a plant closing or mass layoff has occurred or will occur, employment losses for 2 or more groups at a single site of employment, each of which is less than the minimum number of employees specified in section 2101(a)(2) or (3) of this title but which in the aggregate exceed that minimum number, and which occur within any 90-day period shall be considered to be a plant closing or mass layoff unless the employer demonstrates that the employment losses are the result of separate and distinct actions and causes and are not an attempt by the employer to evade the requirements of this chapter.

## DISCUSSION

The parties do not dispute that a "mass layoff" occurred and that at least some Main Street employees were entitled to notice under the WARN Act. The question is: Which employees? The answer depends on which definition of a "mass layoff" applies – the 30-day threshold rule or the 90-day aggregation rule. Main Street contends that only those employees who were laid off within sixty days of the issuance of the WARN Act notice on October 17, 2003, are entitled to pay and benefits under the Act.[5] Main Street notes that

---

[5]Main Street has paid WARN Act back wages and benefits to these employees.

in the 30-day period that elapsed between November 6, 2003, and December 5, 2003, 118 employees, or 33.9 percent of the 348 employees who made up the full-time work force on September 7, 2003, were laid off. Why September 7, 2003? Main Street points to 20 C.F.R. § 639.5(a)(2). According to the regulation, "[t]he point in time at which the number of employees is to be measured for the purpose of determining coverage is the date the first notice is required to be given," unless this "snapshot number" is "clearly unrepresentative of the ordinary or average employment level," in which case "a more representative number can be used to determine coverage." Main Street argues that the regulation fixes the "snapshot date" as September 7, 2003, the sixtieth day preceding the first of the layoffs that occurred during the 30-day period that commenced on November 6, 2003. On September 7, 2003, Main Street employed 348 workers.[6]

Plaintiffs, for their part, contend that Main Street's WARN Act obligations attached on August 26, 2003, as that was the date on which plaintiffs allege that Main Street began a program of "staggered" layoffs that triggered the 90-day aggregation rule. Plaintiffs rely in the first instance on 20 C.F.R. § 639.5(a)(1), which counsels employers to "look ahead and behind" in deciding whether they are required to give WARN Act notice.[7]

[T]he employer should –

---

[6]Plaintiffs do not argue that this number (348) is unrepresentative of Main Street's relevant "average employment level."

[7]Under 29 U.S.C. § 2107(a), the Secretary of Labor is required to "prescribe such regulations as may be necessary to carry out this chapter. Such regulations shall, at a minimum, include interpretative regulations describing the methods by which employers may provide for appropriate service of notice as required by this chapter."

>	(i) Look ahead 30 days and behind 30 days to determine whether employment actions both taken and planned will, in the aggregate for any 30-day period, reach the minimum numbers for a plant closing or a mass layoff and thus trigger the notice requirement; and
>
>	(ii) Look ahead 90 days and behind 90 days to determine whether employment actions both taken and planned each of which separately is not of sufficient size to trigger WARN coverage will, in the aggregate for any 90-day period, reach the minimum numbers for a plant closing or a mass layoff and thus trigger the notice requirement.  An employer is not, however, required under section 3(d) to give notice if the employer demonstrates that the separate employment losses are the result of separate and distinct actions and causes, and are not an attempt to evade the requirements of WARN.

Plaintiffs also rely on a Department of Labor (DOL) pamphlet that gives employers an example "of a situation in which [the] 90-day aggregation [rule] might apply."[8]  The example is as follows.

- DAY 1      Company has 180 employees
- DAY 2      Company terminates 30 employees (150 is now the number for WARN computations)
- DAY 31     Company terminates 29 employees (now 121 remaining employees)
- DAY 60     Company terminates 6 employees (115 remaining employees)
- DAY 90     Company terminates 5 employees (110 remain)

Assuming no notice was given, the company is liable to all 70 employees who were terminated because the mass layoff threshold has been reached through separate actions that did not occur for separate and distinct causes within this 90-day period. All employees terminated within the 90 days have suffered a mass layoff and are entitled to 60 days' notice before the date of termination.  For this purpose, the date on which the company size is measured is Day 1.

---

[8]Worker Adjustment and Retraining Notification (WARN) Act: an Employer's Guide to Advance Notice of Closings and Layoffs, at 7.  Plaintiffs have not provided the court with an authenticated copy of the pamphlet, its date of publication, or any indication whether the pamphlet was distributed by DOL prior to August of 2003.

Plaintiffs argue that if the example in the pamphlet is applied in Main Street's case, there is no 30-day period during which the 50 employee/33 percent threshold of § 2101(a)(3) was met.  On August 25, 2003, the date on which plaintiffs argue the 90-day period began to run, Main Street had 358 employees.  In none of the sequential 30-day periods did the number of employees meet the § 2101(a)(3) threshold.  Plaintiffs' calculations are as follows.

> August 25 to September 23, 2003, 13 employees were laid off out of a work force of 358 (3.6 percent);
>
> September 23 to October 23, 2003, 18 employees were laid off out of a work force of 345 (5.2 percent); and
>
> October 23 to November 22, 2003, 107 employees were laid off out of a work force of 327 (32.7 percent).

By contrast, during the 90-day period between August 25, 2003, and November 22, 2003, a total of 138 employees were laid off, or 38.5 percent of the 358 employees who had jobs at Main Street on August 25, 2003.[9]

The crux of the issue is which is correct: defendants' argument that the 50 employee/33 percent threshold, if crossed during any 30-day period while a reduction in force is taking place, takes primacy in determining when a "mass layoff" has occurred; or plaintiffs' argument that the 90-day aggregation rule, if met, gives laid-off workers an alternative entitlement to WARN Act wages and benefits.  Unfortunately, no case law gives

---

[9]The plaintiffs do not address the method of calculating the "snapshot date" specified in 20 C.F.R. § 635.5(a)(2).  The regulation would require using as the base denominator the number of employees who had jobs at Main Street on June 27, 2003 (a number which does not appear in the record), as opposed to the plaintiffs' choice of the number of persons employed on the day preceding the first of the aggregation rule layoffs.

guidance. Consequently, I will do my best to interpret definitions that appear to be incompatible, at least when applied in a case with facts like this one.[10]

Under established rules of statutory construction, a statute's more general provision yields to a more specific provision addressing the same subject matter. <u>National Cable & Telecomm. Ass'n, Inc. v. Gulf Power Co.</u>, 534 U.S. 327, 335 (2002); <u>Rent Control Bd. of Cambridge v. Praught</u>, 35 Mass. App. Ct. 290, 293-293 (1993), citing 2B <u>Singer, Sutherland Statutory Construction</u> § 51.05 (5th ed. 1992). Applying this rule, it is reasonably apparent that the 30-day threshold rule was intended by the drafters of the WARN Act to be the default provision for determining when a "mass layoff" occurs. This is so for two reasons: first; the 30-day threshold rule appears in the more specific definitions section of the Act rather than in the more general implementing provisions (where the aggregation rule is inserted); and second, § 2102(d) is subordinated by its own terms to § 2101(a)(3). Section 2102(d) states that the aggregation rule is to be applied only when the total number of employees laid off exceeds "the minimum number of employees specified in section 2101(a)(2) or (3) of this title," that is, only when the threshold rule is satisfied, albeit over a more extended period of time. The subordinate rank of § 2102(d) is further emphasized by the affirmative defense permitting an employer to avoid the aggregation rule altogether by showing that employment losses exceeding the § 2101(a)(3) threshold are the result of "separate and distinct actions and causes and are

---

[10]As one commentary has noted, "the WARN Act 'is filled with language which, perhaps because it is born out of compromise, is imprecise, vague, difficult to interpret, and which may be very difficult to apply sensibly to particular fact situations.'" Ethan Lipsig and Keith R. Fentonmiller, "A WARN Act Road Map," 11 <u>The Labor Lawyer</u> 273 (1995-1996), quoting 1989 Daily Lab. Rep. (BNA) No. 154 (Aug. 11, 1989).

not an attempt by the employer to evade the requirements" of the Act. This defense is not available to an employer under § 2101(a)(3). Again, it seems reasonably clear that the 90-day aggregation rule was inserted into the statute after the enactment of § 2101(a)(3) as a deterrent to employers who might be tempted to stagger layoffs in such a way as to avoid triggering the Act's primary 30-day (50 employee/33 percent) threshold.[11] Because I conclude that under the circumstances of this case, § 2101(a)(3) is paramount to § 2102(d), the 30-day threshold rule applies. Judgment will therefore enter for Main Street.[12]

### ORDER

For the foregoing reasons, Main Street's motion for summary judgment is ALLOWED. Plaintiffs' cross-motion for summary judgment is DENIED.

SO ORDERED.

/s/ Richard G. Stearns

_____

---

[11] Assume an employer has 100 employees. By laying off 32 employees on day 1, and 22 employees on day 31, the employer would now be free to close the plant without incurring WARN Act liability, as the termination of the remaining 48 employees would not trigger the threshold rule of § 2101(a)(3). Plaintiffs have offered no evidence that Main Street was engaged in any attempt to evade the 30-day threshold rule; quite the opposite, the layoffs of late November and early December of 2003 triggered it.

[12] While the policy choice is not an easy one, in an abstract sense the result in this case seems equitable enough. Assume that Main Street had issued the WARN Act notice sixty days prior to August 25, 2003, instead of on October 17, 2003 (as was the case). If the same sequence of layoffs had ensued, no employee would have been eligible for WARN Act benefits, as opposed to the 118 employees who were actually eligible because of the late issuance of the notice. In a sense, however, this is beside the point. The purpose of the WARN Act is to give workers the opportunity to adjust to an impending loss of their jobs. Liability for back wages is a cudgel intended to secure employer compliance and not a more general mechanism for mandating employee severance pay.

UNITED STATES DISTRICT JUDGE